Jill Bong
marszinmotion@yahoo.com
PO Box 321,
Days Creek, OR 97429
541-825-3541
Plaintiff, appearing Pro Se

FILED 22 MAR '23 10:26 USDC-ORE

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

JILL BONG,

Plaintiff,

v.

KATE BROWN in both her individual and official
capacity as Governor of the STATE OF OREGON,
RACHAEL BANKS in both her individual and official
capacity as Public Health Director of OREGON
HEALTH AUTHORITY, STEVE WOODS in both his
individual and official capacity as Superintendent of
DOUGLAS COUNTY SCHOOL DISTRICT 15 ("the
School"), REX FULLER in both his individual and
official capacity as District Board member of the
School, CLINT THOMPSON in both his individual
and official capacity as District Board member of the
School, JOHN BOLING in both his individual and
official capacity as District Board member of the
School, CHARLIE SAWYER in both his individual
and official capacity as District Board member of the
School, REBEKAH SAWYER in both her individual
and official capacity as District Board member of the
School, VALERIE ANDERSON in both her individual
and official capacity as District Board member of the
School, HOLLY HILL in both her individual and
official capacity as Human Resources Director of
DOUGLAS EDUCATION SERVICE DISTRICT, BOB
SCONCE in both his individual and official capacity
as Uniserv Consultant of OREGON EDUCATION
ASSOCIATION, Unknown legal counsel in both their
individual and official capacities as legal counsel for
OREGON SCHOOL BOARDS ASSOCIATION
("insurer"), OREGON EMPLOYMENT DEPARTMENT,

Defendants.

Case No.:

6:23-CV-00417-MK

VERIFIED COMPLAINT
AND DEMAND FOR
JURY TRIAL ON ALL
COUNTS APPLICABLE

VERIFIED COMPLAINT

1

# TABLE OF CONTENTS

**I. JURISDICTION**       **6**

**II. VENUE**       **6**

**III. PARTIES**       **7**

**IV. INTRODUCTION**       **10**

**V. FACTS RELEVANT TO CLAIMS**       **17**

Background       18

Health Emergency Declared       19

Governor Brown Shuts Schools Down Due to "Critical Shortages in Staff"       19

The School Reopens - 2020-2021 Academic Year       21

Plaintiff Notified Woods of her Disability       21

Superintendent Woods Induces the Performance of Public Health Mitigation Services       22

Plaintiff is Paid a Disparate Wage       25

The Cold "Vaccine" Rollouts       28

Most Oregon Schools Reopen       29

Second Academic Year under the "COVID-19" Public Health Emergency       30

Governor Brown Directs OAR 333-019-1015 ("Mask Rule") Promulgation       31

The Illogic of OAR 333-019-1015 ("Mask Rule")       33

**BACKGROUND OF THE "COVID-19 VACCINES" mRNA GENE THERAPY TREATMENT PRODUCTS**       **35**

Governor Brown's Demand for "Vaccination" Tweet       38

No Compelling Reason to Target Quasi-Suspect K-12 employees       39

The School, the Union, the School's insurer, Douglas ESD, Superintendent Woods and Public Health Director Banks announce their shared beliefs in concert with Governor Brown       40

The Illogic of OAR 333-019-1030 ("Vax Rule")       41

**THE RELIGIOUS EXCEPTION POLICY IS UNCONSTITUTIONAL**       **43**

Defendants Act in Concert       45

Superintendent Woods' Demand for Personally Identifiable Health Information Papers       46

Plaintiff Officially Becomes a Licensed Probationary Teacher       46

Plaintiff Reveals her Minority Religious Beliefs       47

No Official Written School "Vax Rule" Policy       47

VERIFIED COMPLAINT

Secret Meeting Between Governor Brown's Officer, Deputy Superintendent of Schools and Education Associations 48

Plaintiff Speaks Out Against OAR 333-019-1030 ("Vax Rule") 49

Plaintiff Suffers Physical Ill-effects from Emotional Distress 51

Plaintiff Requests Reasonable Accommodation for her Disability and for her Minority Beliefs 52

No Interactive Process or Accommodation Provided 53

Plaintiff "Complies" with the Terms of the Religious Accommodation Agreement 54

Woods Preemptively Hires Christian Math Tutor to Replace Plaintiff 55

The Union Interlopes 56

Religious Inquisition 58

Extreme Emotional Distress 61

Others Similarly-Situated Did Not "Comply" with Vax Rule 62

Superintendent Woods Terminates Plaintiff without Statutory Authority 62

Post Receipt of the Termination Letter 65

Defendant Employment Department Denies Government Benefits without a Pre-termination Hearing 65

The School BOARD Stigmatizes Plaintiff 66

Defendant Employment Department & Office of Administrative Hearings Deficiencies & Irregularities 67

Plaintiff Discovers What Post-Termination Procedure Should Have Been 69

The School BOARD'S Failure to Abide by its Own Personnel Policies 70

Testament to the Lack of, or Negative Effect of Mask Rule and Vax Rule on pediatric "COVID-19" hospitalization 72

Governor Brown Terminates "COVID-19" State of Emergency 74

Plaintiff is Subjected to Undue Delay in the Adjudication of Termination of her Government Benefits 74

Plaintiff Discovers the Hidden Hand of the School Insurer's Legal Counsel 76

Woods and Hill Subject Plaintiff to Arbitrary Vax Rule Enforcement 78

The School and Douglas ESD's Custom of Imposing Union Representation on Non-Union Members 80

Plaintiff Did Not Receive All the Benefits of the Collective Bargaining Agreement Received by Other the School Teachers 81

School BOARD, Superintendent Woods, HR Hill and Insurer's Legal Counsel were "on the same page" Regarding Enforcing Vax Rule on Plaintiff 82

Defendant Employment Department's Due Process Procedures and Undue Delay 83

Plaintiff Suffers from Financial Duress 85

Public Health Director Banks Reveals her Beliefs 85

F. EXHAUSTION OF ADMINISTRATIVE REMEDIES 89

G. SPECIFIC FACTUAL ALLEGATIONS 90

VERIFIED COMPLAINT

Plaintiff's Religious Beliefs                                                                          90

Failure to Adequately Train                                                                          95

The School's and Douglas ESD's Delegation of Authority to Woods and Hill
Respectively                                                                                                96

Vicarious Liability Claims against Douglas Education Service District ("Douglas ESD")
97

Respondeat Superior Claims Against Oregon Education Association ("Union")         100

Respondeat Superior Claims Against Oregon School Boards Association ("insurer")
102

§ 1983 Joint Action Claims against Oregon Education Association ("Union")          103

§ 1983 Pervasive Entwinement Claims against Oregon School Boards Association
("insurer")                                                                                             104


**VI. DEMAND FOR EMPANELMENT OF GRAND JURY PRIMA FACIE EVIDENCE OF
CRIMINAL ACTS BY DEFENDANTS                                                            106**


**VII. COMPLIANCE WITH NOTICE PROVISIONS                                      107**


**VIII. CLAIMS FOR RELIEF                                                                     108**
**42 U.S.C. § 1983 - SEPARATION OF POWERS                                       108**
**42 U.S.C. § 1983 - FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM      113**
Quasi-suspect Classification                                                                   114
No Compelling State Interest                                                                   116
Tailoring Both Too Broad and Too Narrow                                                 117
**42 U.S.C. § 1983 - FOURTEENTH AMENDMENT VAGUENESS CLAIM             120**
**42 U.S.C. § 1983 - CONTRACT AND BILL OF ATTAINDER CLAIM                 124**
**by way of the 14th AMENDMENT                                                          124**
Contract Clause Violation                                                                       125
Bills of Attainder Clause Violation                                                            127
**42 U.S.C. § 1983 - CONSPIRACY AGAINST RIGHTS CLAIM                       132**
**42 U.S. Code § 1983 - THIRTEENTH AMENDMENT CLAIM                          135**
**42 U.S.C. § 1981 - EQUAL RIGHTS UNDER THE LAW CLAIM                      137**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS CLAIM
138**
**ORS 659A.030(b) - RACIAL WAGE DISCRIMINATION                               139**
**42 U.S.C. § 2000e-2(a)(1), (b) - DISPARATE WAGE BASED ON RACE OR COLOR
CLAIM                                                                                                   141**
**ORS 659A.136 - MEDICAL EXAMINATIONS AND INQUIRIES OF EMPLOYEES CLAIM
142**
**42 U.S.C. § 1983 - FOURTH AMENDMENT CLAIM                                    144**
**42 USC §1983 - FIRST AMENDMENT FREE EXERCISE CLAIM                     147**
**42 USC §1983 - FIRST AMENDMENT FREEDOM TO REFRAIN FROM ASSOCIATION**

VERIFIED COMPLAINT

**CLAIM**       149

**ORS 659A.030 - DISCRIMINATION BECAUSE OF RACE, COLOR OR RELIGION CLAIM**       152

**42 U.S.C. § 1985(3) - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**       154

**42 U.S.C. § 1986 - NEGLECT TO PREVENT**       155

**DISCRIMINATION UNDER TITLE VII**       157

**AMERICANS WITH DISABILITIES ACT ("ADA")**       160

**DISCRIMINATION UNDER TITLE VII**       163

**ORS 165.007 - FORGERY IN THE SECOND DEGREE;**       165

**42 U.S. Code § 1983 - FRAUDULENT MISREPRESENTATION**       165

**42 U.S. Code § 1983 - FIRST AMENDMENT RETALIATION CLAIM**       167

**BREACH OF CONTRACT FOR A DEFINITE PERIOD OF TIME and CONSEQUENTIAL ECONOMIC LOSS**       168

**TORTIOUS INTERFERENCE WITH EXISTING CONTRACT**       170

**42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM**       173

**Deprivation of Property Interest without Due Process**       173

    Inadequate State Post-Deprivation Due Process Procedure       175

**42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM**       176

**ORS 164.075 - EXTORTION CLAIM**       177

**18 U.S.C. § 1962 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") CLAIM**       179

**42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM**       182

**Procedural Due Process**       182

**IX. DAMAGES**       185

**X. ATTORNEY FEES & COSTS**       186

**XI. PRAYER**       186

**XII. CERTIFICATION AND CLOSING**       192

## I. JURISDICTION

1.    Jurisdiction in this Court is based upon 28 U.S.C § 1331 as it involves

subject-matter jurisdiction pursuant to Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1964 *et seq.* ("RICO"); Constitutional and Civil

Rights claims, 28 U.S.C. §1343 *et seq.*, 42 U.S.C. § 1988; Title VII of the Civil

Rights Act of 1964, 42 U.S.C § 2000e *et seq.* ("Title VII"); Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); and 18 U.S.C. §§ 241 and

242.

2.    This Court has supplemental jurisdiction over Plaintiff's State law

claims against Defendants Steve Woods, Holly Hill, Bob Sconce and unknown

insurer's legal counsel in their official and individual capacities pursuant to

28 U.S.C. § 1367 because Plaintiff's claims are so related within the Court's

original jurisdiction that they form part of the same case of controversy under

Article 3 of the US Constitution.

## II. VENUE

3.    Venue is proper in this district because Defendants Steve Woods, Holly

Hill, Bob Sconce, Rex Fuller, Charlie Sawyer, Rebekah Sawyer, Clint

Thompson, John Boling and Valerie Anderson reside in this district; and

substantial part of the events or omissions giving rise to this complaint

occurred herein, pursuant to 28 U.S.C. §1391(b)(1) and (2).

4.    Venue is proper in this district under 42 U.S.C. §2000e-5(f)(3) because

the alleged unlawful employment practice was committed in this State.

## III. PARTIES

5.    Plaintiff JILL BONG ("Plaintiff") is an individual who is a citizen of the State of Oregon.

6.    DOUGLAS COUNTY SCHOOL DISTRICT 15 ("the School" or "public school"), is a local government unit pursuant to laws of the State of Oregon and has its principal place of business at 11381 Tiller Trail Hwy, Days Creek, Oregon 97429.

7.    Defendant, REX FULLER ("Fuller"), is an individual who is a citizen of the State of Oregon. Fuller is sued in both his individual and official capacity as the School district board member.

8.    Defendant, VALERIE ANDERSON ("Anderson"), is an individual who is a citizen of the State of Oregon. Anderson is sued in both her individual and official capacity as the School district board member.

9.    Defendant, CLINT THOMPSON ("Thompson"), is an individual who is a citizen of the State of Oregon. Thompson is sued in both his individual and official capacity as the School district board member.

10.    Defendant, CHARLIE SAWYER ("C. Sawyer"), is an individual who is a citizen of the State of Oregon. C. Sawyer is sued in both his individual and official capacity as the School district board member.

11.    Defendant, REBEKAH SAWYER ("R. Sawyer"), is an individual who is a citizen of the State of Oregon. R. Sawyer is sued in both her individual and official capacity as the School district board member.

VERIFIED COMPLAINT

12.     Defendant, JOHN BOLING ("Boling"), is an individual who is a citizen of the State of Oregon. Boling is sued in both his individual and official capacity as the School district board member.

13.     Defendant, STEVE WOODS ("Woods" or "Superintendent Woods"), is an individual who is a citizen of the State of Oregon. Woods is sued in both his individual and official capacity as the School Superintendent.

14.     DOUGLAS EDUCATION SERVICE DISTRICT ("Douglas ESD" or "Education Support") , is a local government unit pursuant to laws of the State of Oregon and has its principal place of business at 1409 NE Diamond Lake Blvd., Suite 110, Roseburg, OR 97470.

15.     Defendant HOLLY HILL ("Hill" or "HR Hill") , is an individual who is a citizen of the State of Oregon. Hill is sued in both her individual and official capacity as Human Resources Director of Douglas ESD and as Human Resource Director (subcontractor) of the School.

16.     OREGON HEALTH AUTHORITY ("Health Authority" or "OHA") is a state-executive branch agency organized under the laws of the state of Oregon. Its Public Health Division has its principal place of business at 800 NE Oregon Street, Portland, OR 97232.

17.     Defendant, RACHAEL BANKS ("Banks") is an individual who is a citizen of the State of Oregon. Banks is sued in both her individual and official capacity as Public Health Director of the OREGON HEALTH AUTHORITY.

18.    OREGON EDUCATION ASSOCIATION ("Union" or "OEA") is a labor organization organized under the laws of the state of Oregon. It has its principal place of business at 6900 SW Atlanta Street, Portland, OR 97223.

19.    Defendant, BOB SCONCE ("Sconce" or "Union Rep. Sconce") is an individual who is a citizen of the State of Oregon. Sconce is sued in both his individual and official capacity as Uniserv Consultant of the OREGON EDUCATION ASSOCIATION.

20.    OREGON SCHOOL BOARDS ASSOCIATION ("Insurer" or "OSBA") is a private non-profit entity incorporated under the laws of the State of Oregon. It has its principal place of business at 1201 Court Street NE, Suite 400, Salem, Oregon 97301.

21.    Defendant unknown OREGON SCHOOL BOARDS ASSOCIATION LEGAL COUNSEL ("insurer's legal counsel") are individuals and citizens of the State of Oregon. They are sued in both their individual and official capacities as legal counsel for the insurer. Pre-discovery is needed for proper service to these individuals.

22.    STATE OF OREGON is a State. It has its principal place of business at 900 Court Street, Suite 254 Salem, OR 97301-4047.

23.    Defendant KATE BROWN ("Brown" or "Governor Brown") is an individual who is a citizen of the State of Oregon. Brown is sued in both her individual and official capacity as Governor of the STATE OF OREGON.

24.    Defendant OREGON EMPLOYMENT DEPARTMENT ("Employment Department) is a state agency organized under the laws of the state of

Oregon. It has its principal place of business at 875 Union St. NE Salem, OR 97311.

## IV. INTRODUCTION

25.     Plaintiff fled the authoritarian state she grew up in and sought freedom, privacy and equality from her new home - "The Land of the Free Home of the Brave". Plaintiff cannot fathom the cowardice of so-called local officials who acted in concert with the State to stomp on the Bill of Rights and the limitations it sets forth for government in restricting those rights, as is enumerated in our United States Constitution - all under the pretext of "controlling" a severe cold virus.

26.     This action arises out of the Defendant, Governor Brown, acting within and outside the scope of her executive capacity as Governor as set forth by the Oregon Constitution and the limited emergency powers granted to her by legislature; enacting Orders that directed executive agencies under her purview to promulgate administrative rules without statutory approval, to exert undue influence in the form of punitive threats on local officials to unreasonably deprive the Plaintiff and others similarly-situated of their civil and constitutional rights.

27.     At all relevant times to this lawsuit, Governor Brown, while clothed as the Governor of Oregon, acting omnipotent and all-knowing defied logic and reason for twenty-four (24) months; and extends her personally held beliefs and bias to incorporate knowing every K-12 school employee needs her or the

Oregon Health Authority's medical diagnosis, prescription and treatment; and deeming this quasi-suspect class incapable of making informed decisions regarding their own health.

28.    Governor Brown defies logic and reason in imposing medical decisions upon this class of individuals by requiring the Plaintiff and others similarly situated, to either surrender private medical or religious papers; or to wear and enforce the wearing of breath-restricting ideological symbols in the form of masks on students as an occupational condition, absent of any legal or lawful authority. This demand is a violation of the Plaintiff's constitutionally secured rights.

29.    Governor Brown, a highly experienced, high-ranking state official and a student of the law, created a workforce directly under; as well as outside of her control, that has led from disparate impact to actual disparate treatment, segregating K-12 school employees into classes - those with "papers" unrelated to job function, and those without. Individuals who surrender the papers are "eligible for employment" in the K-12 industry have more liberty and freedoms than those who do not.

30.    This action arises out of the Defendant, Rachael Banks ("Banks" or "Public Health Director Banks"), acting within and outside the scope of her capacity as the Public Health Director of the Oregon Health Authority ("OHA") as set forth by the powers granted to her by legislature; through the use of undue influence in the form of punitive threats on employing schools under the color of law administrative rules, absent statutory approval, in order to

VERIFIED COMPLAINT

direct school employers outside her purview to unreasonably deprive the Plaintiff and others similarly situated of their statutory and constitutional rights without proper due process.

31. Banks, who is the final policy-maker with regards to the promulgation of OAR 333-019-1015 ("Mask Rule") and OAR 333-019-1030 ("Vax Rule"), acting as another omnipotent, all-knowing, who continues to defy logic and reason for nineteen (19) months and counting; twelve (12) months and counting after Governor Brown's declaration to the end of the "COVID-19 public health emergency"; extends her personally held beliefs and dogma to incorporate knowing every K-12 school employee needs her medical diagnosis, prescription and treatment; demands that this distinct class surrenders medical or religious "papers" as an occupational requirement by using color-of-law administrative rules absent legislative and judicial oversight; to not only impair lawful contracts, but to impose punitive punishment on those who do not associate with her personal beliefs, absent of any legal or lawful authority. This is a violation of the Plaintiff's constitutionally secured rights.

32. Banks abused her position as the Public Health Director of the Oregon Health Authority, negligently and maliciously acted in concert with Governor Brown, to impose totalitarian ideology regarding mask and "vaccine" "requirements", thus displaying extreme prejudice towards the Plaintiff and others similarly situated. Illogically forced medical decisions on a

female-dominated industry is an unreasonable abuse of power especially when considering the timeframe of over twenty-four (24) months.

33. This action arises out of the Superintendent Woods, acting within and outside the scope of his capacity as the Superintendent of the public School district, as set forth by the powers granted to him by legislature and the School board policy; by his demand that Plaintiff and others similarly-situated ("others") perform involuntary services under the color of law; by his efforts to chill Plaintiff's speech; by his unreasonable demand to search and seize Plaintiff's and others' highly valuable and transferable medical papers; through his demand for Plaintiff to associate with Governor Brown's totalitarian ideology; by his denial of Plaintiff's right to free exercise of her religious beliefs and her freedom to refrain from association as a condition of public employment; by his failure to reasonably accommodate Plaintiff's disability; by his breach of contract and his tortious interference with Plaintiff's contract with the School; and by his willful harassment and denial of Plaintiff's right to due process; thus unreasonably and unequally depriving Plaintiff of her statutory and constitutional rights. Superintendent Woods' actions are illogical and unreasonable abuses of power.

34. This action arises out of the Defendant, Holly Hill ("Hill" or "HR Hill"), acting within and outside the scope of her capacity as the Human Resource Director of Douglas Education Service District ("Douglas ESD"), acting as the Human Resource subcontractor for the School; as set forth by the limited powers granted to her by the School subcontract.

VERIFIED COMPLAINT

13

35.    HR Hill is the official responsible for establishing final policy with respect to the subject matter in question. Hill, who is charged with executing the School employment contracts, but because of her racial or religious animus, or both, willfully altered Plaintiff's contract terms which subjected Plaintiff to disparate employment terms and conditions. Hill unreasonably searched and seized Plaintiff's papers; forced association with totalitarian ideology as well as induced Plaintiff to associate with a Union. Hill, because of Plaintiff's minority beliefs, conspired with Superintendent Woods and Union Rep. Sconce to harass and unreasonably and unequally deprive Plaintiff of her statutory and constitutional rights. Such actions are illogical and unreasonable abuses of power.

36.    Upon information and belief, Union Rep. Sconce is the official responsible for establishing final policy with respect to representing member interests in employment-related and professional matters within his Uniserv jurisdiction.

37.    This action arises out of Union Rep. Sconce, acting within and outside the scope of his capacity as the Douglas County Uniserv Consultant of the Oregon Education Association ("Union"), a labor organization; by unreasonable seizure of Plaintiff's papers without warrant; by inducing Plaintiff to associate with both the union he was representing as well as Brown's and Banks' totalitarian ideology as an occupational requirement; by conspiring with Defendants Woods and Hill to conduct inquisition into Plaintiff's minority beliefs; by tortiously interfering with Plaintiff's contractual

relationship with the School; thus unreasonably and unequally depriving the Plaintiff of her statutory and constitutional rights.

38.     This action arises out of the unknown legal counsel, acting within and outside the scope of their capacity as legal counsel for the Oregon School Boards Association ("insurer"), public school support organization and is the School's insurer; by tortiously interfering with Plaintiff's business relationship with the School; by proximately forcing Plaintiff to associate with the insurer's shared totalitarian ideology with Defendants Brown and Banks; by conspiring with Defendants Woods and Hill to terminate Plaintiff from her public employment for refusing to associate with their totalitarianism; thus unreasonably and unequally depriving the Plaintiff of her statutory and constitutional rights.

39.     This action arises out of egregious, malicious, and heavy-handed religious persecution by the Defendants Woods, Hill, Sconce and insurer's legal counsel, who singled out a religious objector and persecuted Plaintiff with fear, intimidation and inquisition into her beliefs.

40.     This action arises out of Defendants, Rex Fuller, Clint Thompson, Rebekah Sawyer, Charlie Sawyer, John Boling and Valerie Anderson (collectively "BOARD members") each jointly acting within and outside the scope of their respective capacities as the School District board ("BOARD") members and policymakers of the School; by their unreasonable and unequal deprivation of Plaintiff's contractual, statutory and constitutional rights.

41.    This civil action arises out of a widespread criminal enterprise engaged in a pattern of predicate acts clustering around extortion and slavery, which affects interstate commerce during the past ten (10) calendar years. The primary objective of the racketeering enterprise has been to inflict severe and sustained economic hardship upon Plaintiff and other similarly-situated victims.

42.    This action arises from Defendant Employment Department's undue delay and procedural deficiencies in its adjudication of Plaintiff's unemployment government benefits claim.

43.    This action arises out of the Defendants' conspiracy to deprive Plaintiff of inherent, sacred, and inviolable rights under the First, Fourth, Thirteenth and Fourteenth Amendments of the U.S. Constitution.

44.    Plaintiff brings claims in this suit for declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C §§ 2201 and 2202.

45.    This action also arises out of the Defendants' conspiracy to deny equal employment opportunity under color of law, which is protected by Title VII of the Civil Rights Act of 1964. Further these state actor violators are subject to liability either directly or via joint action or pervasive entwinement under Title 42 §§ 1981, 1983, 1985 and 2000(e) among others. The causes of action brought are:

(a) Violation of Constitutionally Protected Rights - Separation of Powers, First Amendment (freedom to refrain from association, freedom of speech, freedom of religion), Fourth Amendment (right to be secure in one's person and

VERIFIED COMPLAINT

papers), Thirteenth Amendment (freedom from involuntary servitude),

Fourteenth Amendment (due process, equal protection), Contract Clause/Bill

of Attainder;

(b) Violation of 42 U.S.C. § 1981 Equal Rights Under the Law;

(c) Violation of 42 U.S.C. § 1985 Conspiracy to interfere with Civil Rights;

(d) Violation of 42 U.S.C. § 2000(e) Discrimination;

(e) Violation of 42 U.S.C. §§ 12112(4) and 12112(5) Americans with

Disabilities Act;

(f) Violation of 42 U.S.C. § 1981(a) Harassment ;

(g) Violation of ORS 165.007 Forgery;

(h) Violation of ORS 659A.030 Discrimination;

(i) Violation of ORS 659A.136 Medical Inquiries;

(j) Breach of Contract;

(k) Tortious interference with economic relations;

(l) Tortious interference with prospective economic relations;

(m) Violation of ORS 164.705 Extortion; and

(n) Violation of 18 U.S.C. § 1962 Racketeer Influenced and Corrupt

Organizations Act

## V. FACTS RELEVANT TO CLAIMS

46.    Plaintiff incorporates within this Complaint, the attached exhibits fully

by reference.

*Background*

47.     DOUGLAS COUNTY SCHOOL DISTRICT ("the School") is a tiny public school district with a total student enrollment of about 200; and is located in a rural town of about 300 people.

48.     The School includes Days Creek Charter School.

49.     Plaintiff commenced public employment as the School's first and only Math tutor in January 2016.

50.     Upon acceptance of her employment, Plaintiff refused the School's offer to vaccinate Plaintiff against Hepatitis B.

51.     Around 2018, Woods was hired from Texas, to serve as Superintendent for the School.

52.     Superintendent Woods is a graduate of a Christian College and has worked for Christian schools for about 16 years.

53.     Around 2018 or 2019, in Superintendent Woods' effort to hire more teachers, Woods asked Plaintiff if Plaintiff knew of anyone, perhaps from church, who may be interested in and qualified to teach.

54.     Declining to reveal that Plaintiff is not Christian, Plaintiff responded that she did not know of anyone.

55.     During Plaintiff's tenure, Plaintiff has been instrumental in both helping many at-risk students from disadvantaged socio-economic backgrounds to graduate as well as helping many students achieve a higher level of academic proficiency.

VERIFIED COMPLAINT

56.     Plaintiff earned a good reputation in Plaintiff's community for doing a good job.

57.     From 2016-2020, the School employed Plaintiff as a tutor/teacher using a series of one-year implied contracts.

58.     The School has no prior claims of misconduct or poor job performance against Plaintiff.

### *Health Emergency Declared*

59.     On December 12, 2019 a "cluster of patients" in Wuhan, China, began to experience the symptoms of an atypical pneumonia-like illness that did not respond well to standard treatments.[1]

60.     On January 10, 2020, the World Health Organization ("WHO") announced an outbreak of the 2019 Novel Coronavirus (2019-nCoV) in Wuhan, China[2], which was later renamed, "COVID-19"[3] ("cold" or "the cold").

61.     It is a fact that a coronavirus is a cold virus.

### *Governor Brown Shuts Schools Down Due to "Critical Shortages in Staff"*

62.     On March 12, 2020, Governor Brown issued a directive[4] to close schools from March 16, 2020 through March 31, 2020 which included the statement,

---

[1] https://www.cdc.gov/museum/timeline/covid19.html

[2] https://www.cdc.gov/museum/timeline/covid19.html

[3] https://www.cdc.gov/museum/timeline/covid19.html

[4]

https://www.myoregon.gov/2020/03/12/governor-kate-brown-announces-statewide-school-closure-for-students-in-oregon-from-monday-march-16-through-tuesday-march-31/

"Schools are experiencing critical shortages in staff, and superintendents are concerned for school personnel who are at elevated risk such as those over age 60 and those with underlying medical issues. "I want to be very clear: sending Oregon children home will not stop the spread of the coronavirus. While children are home, when at all possible, they should not be in the care of older adults or those with underlying health issues that are most at-risk from COVID-19.""

63.   Per Brown's directive, the School closed around March 13, 2020.

64.   On March 19, 2020, Brown issued Executive Order EO 20-10[5] ordering "all elective and non-urgent procedures across all care settings...including but not limited to hospitals, ambulatory surgery centers, outpatient clinics, dental clinics, and veterinary clinics," to be canceled by March 23, 2020.

65.   Plaintiff's job, together with the rest of the teaching staff, was moved online.

66.   On April 23, 2020, Brown issued Executive Order EO 20-20[6] prohibiting in-person classroom instruction through June 30, 2020.

67.   On April 27, 2020, Brown issued Executive Order EO 20-22[7] allowing "elective or non-urgent" medical procedures to resume in a limited fashion, to be arbitrarily determined by the Health Authority, beginning May 1, 2020.

68.   Plaintiff remained healthy and faithfully carried out Plaintiff's duties online for the remainder of the 2019-2020 academic year.

---

[5] https://www.oregon.gov/gov/eo/eo_20-10.pdf
[6] https://www.oregon.gov/gov/eo/eo_20-20.pdf
[7] https://www.oregon.gov/gov/eo/eo_20-22.pdf

VERIFIED COMPLAINT

69. On July 28, 2020, Oregon Health Authority and Oregon Department of

Education jointly published "Ready Schools, Safe Learners: Community

COVID-19 Metrics"[8] ("Metrics Document").

70. Page 2 of the Metrics Document states in the relevant part,

" unless community spread is reduced, reopening schools to in-person
instruction, even with protective measures like physical distancing and
face coverings, will cause significant growth of the epidemic...for any
in-person instruction plans, we *must consider the safety of staff because
they are at a much higher risk of both infection and potentially severe
disease due to age* and other risk factors, according to the CDC."
(emphasis added)

71. The arbitrariness of the use of reopening metrics was evidenced when

wildfires disrupted COVID-testing in September 2020.

### The School Reopens - 2020-2021 Academic Year

72. In August 2020, the School reopened.

73. Plaintiff began the 2020-2021 academic year providing the School with

onsite, in-person tutoring services without any personal protective

equipment.

### Plaintiff Notified Woods of her Disability

74. At the start of the 2020-2021 academic year, Superintendent Woods

declared that all employees were required to wear medical devices in the form

of a face mask.

---

8

https://www.oregon.gov/oha/PH/DISEASESCONDITIONS/DISEASESAZ/Emerging%20Respit
ory%20Infections/Ready-Schools-Safe-Learners-Community-COVID-19-Metrics.pdf

VERIFIED COMPLAINT

75.   Plaintiff informed Woods that due to a disability, Plaintiff is unable to wear a mask.

76.   Superintendent Woods asked Plaintiff what the disability was.

77.   Plaintiff felt uncomfortable with the questions, but revealed that Plaintiff suffers from Autism Spectrum Disorder (Asperger's Syndrome).

78.   At that time, Plaintiff was not aware that under the Americans with Disabilities Act 42 U.S.C. § 12111(4)(A) employers are prohibited from making "inquiries of an employee as to ... the nature ... of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

79.   Whether Plaintiff is able to wear a mask or not was never a job-related requirement or a business necessity related to being an educator.

80.   Woods granted Plaintiff reasonable accommodation for Plaintiff's disability.

## Superintendent Woods Induces the Performance of Public Health Mitigation Services

81.   From the beginning of the 2020-2021 academic year until the date of the termination of Plaintiff's employment, under the pretext of a public health emergency, Superintendent Woods induced Plaintiff and all the School teaching staff to enforce the use of "masks" on students.

82.   Plaintiff was unaware that State law and the School Policy JGAB[9] prohibit the use of restraints "that places, or creates a risk of placing,

---

[9] https://policy.osba.org/douglcty/J/JGAB%20D1.PDF

pressure on a student's mouth", or "[a]ny restraint that impedes, or creates a risk of impeding, breathing." ORS 339.288(1)(g), (h)

83.    Plaintiff - who is not trained in the use of restraints on students - was unaware that state law requires that only trained personnel may apply the use of non-prohibited restraints on students in public education programs. ORS 339.291

84.    The School instructional staff were induced to enforce the use of face masks/coverings to purportedly help prevent the spread of the cold, which is considered a communicable disease.

85.    According to the United States Food and Drug Administration ("FDA"), face masks which are used to prevent the transmission of a communicable disease are medical devices[10].

86.    Plaintiff and other instructional staff were induced into enforcing students' use of masks under the threat that the School may get shut down by the Health Authority or by the Oregon Department of Education.

87.    Plaintiff and other instructional staff are not Public Health officials or medical professionals and were hired, paid and authorized to only provide educational services to the School.

88.    Plaintiff and other instructional staff were not hired, paid, authorized, trained or licensed to prescribe or enforce the use of any medical devices or to perform public health enforcement services.

---

10

https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/face-ma sks-barrier-face-coverings-surgical-masks-and-respirators-covid-19#basics

89.  Plaintiff acted out of fear that if Plaintiff did not carry out these services outside the scope of her employment contract, that Plaintiff would lose Plaintiff's job.

90.  Plaintiff witnessed and cautioned students against wearing unsanitary masks e.g. masks which looked very dirty, masks which were left exposed in sport bags, on desks, on or in restroom sinks or on the floor; or masks which were previously worn by another student.

91.  Plaintiff witnessed students sharing bites from the same sandwich and swapping masks which they were wearing, often swapping masks after food consumption.

92.  Students complained to Plaintiff of headaches, difficulty comprehending mask-wearing teachers, acne developing in the mask-wearing area, as well as of pain around the ears where the mask elastic is tied to the ears.

93.  These and other similar mask issues were raised to Superintendent Woods during staff meetings by Plaintiff as well as by other teachers.

94.  Plaintiff felt emotionally distressed about having to enforce "public health" measures on her students.

95.  Plaintiff voiced her reservations and misgivings about having to enforce mask-wearing on students on various occasions to Superintendent Woods.

96.  Woods continued the official school stance of students being required to wear masks up to, and possibly after the date of Plaintiff's alleged termination on October 18, 2021.

VERIFIED COMPLAINT

### *Plaintiff is Paid a Disparate Wage*

97.    Around December 2020, the Science teacher unexpectedly resigned.

98.    Superintendent Woods offered Plaintiff a temporary Science teacher job to replace the resignee.

99.    Woods told Plaintiff that Plaintiff would be paid at or above her current wage of $24 per hour.

100.   The written job posting for the position offered the pay rate of $29.83 per hour for a Year 0 teacher holding a Bachelors degree.

101.   Plaintiff accepted the offer with the understanding that Plaintiff would be paid at $29.83 per hour.

102.   On or around January 4, 2021, Plaintiff commenced employment as the Science teacher.

103.   Plaintiff signed the contract drafted by HR Hill's Human Resource department, not realizing that the contract term was changed to the rate of $29.83 per *period.* (Exhibit A)

104.   One class period averages about 1.5 hours.

105.   Plaintiff's effective pay rate would therefore be about $19.89 per hour.

106.   Plaintiff immediately asked Superintendent Woods and HR Hill to correct the situation.

107.   Plaintiff continued to be paid at her tutor rate of $24 per hour; and despite numerous attempts on Plaintiff's part to resolve the matter with Woods and Hill, neither rectified the matter.

108. In response to Plaintiff's objections to being paid $24 per hour, Superintendent Woods simply declared that he had fulfilled his part of the deal - which was that Plaintiff would be paid at least $24 per hour.

109. Plaintiff did not know at that time that neither Woods or Hill had the discretion to set the pay rate of any of the School's licensed employees.

110. As the Superintendent and Director of Human Resources for the School respectively, Woods and Hill knew or should have known that the pay rate for licensed employees are fixed and pro-rated at a per-hour rate according to the Collective Bargaining Agreement.

111. Around March 2021, Plaintiff became very frustrated with Plaintiff's pay discrepancy and threatened to quit - an action which would have caused a severe teaching staff shortage.

112. Superintendent Woods immediately arranged for HR Hill to issue Plaintiff a corrected contract which included the proper step-scale pay rate.

113. Plaintiff discovered in February 2022 that the 2020-21 the School Employee Handbook[11] (p 33) states in the relevant part,

"Salaries, ... will be determined in accordance with salary schedules and salary placement guidelines *established by the Board* and/or policies adopted by the Board which are consistent with salary schedules and salary placement provisions of collective bargaining agreements." (emphasis added)

---

11

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/2020-21_dc_employee_ha ndbook_-_google_docs.pdf

VERIFIED COMPLAINT

26

114. Plaintiff discovered in February 2022 that Article 1(E) of the Collective

Bargaining Agreement[12] between the School and Days Creek Licensed

Education Association 2021-24 (page 4) states,

"Any individual contract between the Board and an individual licensed teacher heretofore or hereafter executed shall be subject to and consistent with the terms and conditions of this Agreement. If an individual contract contains any language inconsistent with this Agreement, during the duration of this Agreement, this Agreement shall be controlling."

115. Plaintiff discovered in February 2022 that Article 15(C) of this Collective

Bargaining Agreement (page 26) states,

"Part-time licensed personnel shall receive professional compensation at a pro-rated basis computed by **dividing the hours taught** by the part-time employee by the hours taught by the full-time employee." (emphasis added)

116. Jared Iles, a similarly-situated Math teacher working at the same time

and location as Plaintiff, was paid according to Collective Bargaining

step-scale pay rate while Plaintiff was paid less.

117. Jared Iles is male, is or appears to be White, is a graduate of a

Christian college who was hired by the School straight out of college.

118. Plaintiff is a Chinese female, holds a BSc in Engineering from an Ivy

League University, who had over 10 years of tutoring experience, and had a

strong track record of helping students to graduate.

---

12

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/2021-2024_days_creek_lic
ensed_cba_-_final.pdf

119. For the entire third quarter of the 2020-21 academic year, Plaintiff was performing the functions of a teacher, but was paid Plaintiff's tutor rate of $24 per hour as compared to Jared Iles' $29.83 per hour.

120. The pay discrepancy that Plaintiff suffered for the third quarter of the 2020-2021 academic year was never rectified.

### *The Cold "Vaccine" Rollouts*

121. Around January 25, 2021, Oregon's teachers and school staff received Group 1 priority eligibility from Oregon to voluntarily get "vaccinated" against the cold.

122. Governor Brown told the media on March 5, 2021 that, "there is a low risk of COVID-19 transmission in school."[13]

123. Around April 5, 2021, anyone aged 16 and older with underlying health risks were eligible for voluntary "vaccination".

124. Around April 13, 2021, in response to the FDA's advisory to states to halt administration of the Johnson & Johnson cold "vaccine" due to serious adverse effects including but not limited to death, the Health Authority persisted that it "*continue[s] to believe* the existing *COVID-19 vaccines are safe and effective* and urge everyone who is eligible to get vaccinated."[14] (emphasis added)

---

13

https://ktvz.com/news/education/2021/03/05/gov-kate-brown-to-issue-order-reopening-all-schools-by-next-month/
14

https://covidblog.oregon.gov/oha-asks-the-states-vaccine-providers-to-immediately-stop-administering-the-johnson-and-johnson-vaccine/

### *Most Oregon Schools Reopen*

125. By the period of May 3-8, 2021, the Oregon Department of Education

"COVID-19 School Status Report" showed that 92.3% of schools were now

conducting hybrid or in-person classes.

126. By May 10, 2021, at least one cold "vaccine" was authorized (not

approved) for use on children 12 years old or older.

127. On May 28, 2021, The Oregon Health Authority and Oregon

Department of Education jointly issued "READY SCHOOLS, SAFE LEARNERS

GUIDANCE FOR SCHOOL YEAR 2020-21"[15].

128. Page 18-19 of "READY SCHOOLS, SAFE LEARNERS GUIDANCE FOR

SCHOOL YEAR 2020-21" states that,

"High-risk populations include people who have one or more of the
following characteristics or conditions. This list was recently revised by
CDC (January 4, 2021), to reflect updated data. The CDC now names
people with disabilities and people with developmental disorders as a part
of "Other People Who Need Extra Precautions."[16]

People at increased risk include: • Older adults • Pregnant people

People of any age with certain underlying medical conditions are at
increased risk for severe illness from COVID-19:

Age 65 years or older • Cancer • Chronic kidney disease • COPD (chronic
obstructive pulmonary disease) • Down Syndrome • Heart conditions,

---

15

https://www.oregon.gov/ode/students-and-family/healthsafety/Documents/Ready%20Sc
hools%20Safe%20Learners%202020-21%20Guidance.pdf
16

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html?CDC_AA
_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-prec
autions%2Fpeople-at-increased-risk.html

VERIFIED COMPLAINT

such as heart failure, coronary artery disease, or cardiomyopathies •
Immunocompromised state (weakened immune system) from solid organ
transplant • Obesity (body mass index [BMI] of 30 kg/m2 or higher) but <
40 kg/m2 • Severe obesity (BMI > 40 kg/m2) • Sickle cell disease •
Smoking • Type 2 diabetes mellitus"

129.  Around June 4, 2021, Plaintiff completed the entire 2020-21 school

year performing in-person class instruction for the School while remaining

healthy and without having been provided with any personal protective

equipment.

### *Second Academic Year under the "COVID-19" Public Health Emergency*

130.  On June 25, 2021, Governor Brown issued Executive Order EO 21-15[17]

rescinding all remaining "COVID-19" restrictions by June 30, 2021 stating,

"I am returning decision-making regarding the health and safety of
students in K-12 schools to local school districts with clear direction to the
Oregon Department of Education and Oregon Health Authority to provide
guidance for transparent and accountable local planning process..."

131.  Brown omitted the fact that the powers of local school boards are

limited under State law and do not include enforcing healthcare decisions on

students or employees.  ORS 332.075

132.  The restrictions on elective and non-urgent medical procedures were

finally rescinded in EO 21-15, more than a year since Defendant Brown

prevented or restricted access to "elective or non-urgent" medical procedures

through her use of Executive Orders.

---

[17] https://www.oregon.gov/gov/eo/eo-21-15.pdf

VERIFIED COMPLAINT

133. The minutes of the July 12, 2021 the School BOARD meeting[18] in the

relevant part states,

"The Boards and Superintendent/Executive Director Operating Agreement was read out loud and all members were asked to sign. [Defendant] S. Woods emphasized the following points from the document:
Collaborative Governance: #4 - *The Board shall make decisions only at properly called meetings.* Board members recognize that individual members have no authority to take individual action in policy or district or school administrative matters, unless so authorized by board vote." (emphasis added)

### *Governor Brown Directs OAR 333-019-1015 ("Mask Rule") Promulgation*

134. About a month after Governor Brown rescinded all her "mask

mandates" in EO 21-15 because of the "success" of the "widespread" "uptake

of safe and effective vaccines"; on July 29, 2021, Brown directed[19] the Health

Authority and the Oregon Department of Education ("ODE") to create a rule to

require masks indoors for K-12 schools statewide for the 2021-22 academic

year.

135. In response to Brown's directive, the Health Authority ("OHA") and the

Oregon Department of Education ("ODE") jointly issued a letter titled, "K-12

Face Covering Rule"[20] letter stating in the relevant part that,

---

[18]https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021.07.12.pdf
[19]

https://mailchi.mp/oregon/news-releasegovernor-kate-brown-directs-state-agencies-to-ali
gn-k-12-mask-guidance-with-cdc-recommendations?e=ec13697a5f
[20]

https://www.oregon.gov/ode/students-and-family/healthsafety/Documents/K-12%20Face
%20Covering%20Rule%20One%20Pager.pdf

*"ODE and OHA agree with Governor Brown on the need for an immediate shift to universal face coverings in K-12 settings...requiring universal use of face coverings inside schools is the best choice for Oregon"* (emphasis added)

136. The letter omitted the legislative authority of the Health Authority or the Oregon Department of Education which allows them to determine what "the best choice for Oregon" is.

137. On August 2, 2021, the Health Authority issued PH 33-2021 Masking Requirements in Schools[21].

138. PH-33-2021 became OAR 333-019-1015 Masking Requirements in Schools ("Mask Rule").

139. Mask Rule states in relevant part that:

"(1) The Oregon Health Authority...requiring universal use of masks or face coverings inside schools is necessary.(b) "Face covering" means a ... polypropylene... that covers the nose and the mouth and that rests snugly above the nose, below the mouth, and on the sides of the face."

140. It is a fact that polypropylene is a plastic.

141. It is self-evident that the use of *plastic* face coverings that rest snugly above the nose, below the mouth, and on the sides of the face is a suffocation hazard.

142. The black letter of Mask Rule solidified Plaintiff's beliefs that forcing the use of masks all day long, especially on children is abusive.

143. Plaintiff again raised her concerns to Superintendent Woods regarding mask enforcement but the School's official stance on requiring masking continued.

[21] http://records.sos.state.or.us/ORSOSWebDrawer/Recordhtml/8581010

### *The Illogic of OAR 333-019-1015 ("Mask Rule")*

144. Mask Rule also stated,

"A face shield may be worn if an individual cannot mask for medical reasons...A mask will not have to be worn when an individual is:.. Engaged in a sport...where wearing a mask could be a strangulation hazard such as...wrestling."

145. Mask Rule did not explain why, if face shields are effective in

preventing the transmission of the cold, why masks have to be worn; or why,

if face shields are not effective, why face shields must be worn.

146. Mask Rule also did not explain why the risk of contracting or

transmitting the cold diminishes or disappears during close-contact sport like

wrestling; or when one is sleeping or "actively eating or drinking".

147. Shortly after the adoption of Mask Rule, the Health Authority and the

Oregon Department of Education issued another joint letter[22] titled,

"Enforcement of OAR 333-019-1015 Masking Requirements in Schools",

threatened licensed educators with sanctions for "failing to obey" Mask Rule,

• Licensed educators who fail to obey this rule may face additional penalties. OAR 584-020-0035(3) The ethical educator, in fulfilling obligations to the profession, will: (a) Maintain the dignity of the profession by respecting and obeying the law, exemplifying personal integrity and honesty. There would also be a possible violation of OAR 584-020-0025(3)(a), related to leadership skills and legal requirements. Substantial deviation from these standards may subject the educator to discipline for gross neglect of duty, per OAR 584-020-0040 (4)(n) & (o).

---

22

https://www.oregon.gov/ode/students-and-family/healthsafety/Documents/Enforcement%20of%20OAR%20333-079-1015%20Masking%20Requirements%20in%20Schools.pdf

• Sanctions could range from a letter of reprimand to suspension or revocation depending on severity, willfulness, or frequency of the violation or degree of harm.

148. The Health Authority and the Oregon Department of Education were themselves refusing to obey the statutory prohibition on use of restraints which risk impeding the breathing of students.

149. The minutes of the August 9, 2021 the School BOARD meeting[23] shows that the BOARD approved of mask-wearing enforcement.

150. On August 11, 2021, Governor Brown stated in a press statement[24], "[t]he *latest science is clear that both vaccinated and unvaccinated individuals are able to spread the delta variant* ... Masks are simple and they are effective. Wearing a mask should give you confidence that you are not infecting others." (emphasis added)

151. In contrast, about two weeks prior, Brown claimed in her press release[25] that "[v]accines remain the most effective and best way to protect ourselves and our families."

152. Defendant Brown did not explain how a healthy individual without the cold, could infect others with or without a mask.

153. In an open letter[26] to educators dated August 16, 2021, Defendant Brown stated,

---

[23] https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021-08-09.pdf
[24] https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=75088
[25] https://drive.google.com/file/d/1e6KulrdjdvefntLYk6rJpcU3IAMsQ8Ez/view?usp=sharing
[26]
https://drive.google.com/file/d/1GAI2Ne7Ao8USl6gdMvtVblz6i_o2F2fp/view?usp=sharing

VERIFIED COMPLAINT

"Cases and hospitalizations are at all-time highs in Oregon. Children are now becoming severely ill and requiring hospitalization in higher numbers...It is up to us to make clear-eyed decisions *based on science and fact...*

Because that's the thing about masks: they don't just protect you, they protect everyone around you. Wearing a mask is an act of kindness. By wearing masks, we are teaching our children that they can protect each other in the classroom." (emphasis added)

154. Brown omitted the fact that the "higher numbers" of children requiring "COVID-19 hospitalization" was statistically insignificant.

155. Brown omitted what "science and fact" shows that masks protect everyone around the mask-wearer, or why a healthy individual, who would be unable to infect anyone, would be able to "protect everyone" around them by wearing a mask.

156. Brown omitted the fact that she (Brown), does not have the authority to impose "acts of kindness".

157. The notion that "wearing a mask is an act of kindness" is nothing more than Brown's personal belief.

## BACKGROUND OF THE "COVID-19 VACCINES" mRNA GENE THERAPY TREATMENT PRODUCTS

158. On December 11, 2020, the US Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech BNT162b2 cold "vaccine"[27].

159. By 2021, three (3) cold "vaccines" were available in the United States.

---

[27] https://www.cdc.gov/museum/timeline/covid19.html

160. The three (3) cold "vaccines" available in the United States were manufactured by Pfizer-BionTech, ModeRNA and Johnson & Johnson/Janssen respectively.

161. At all times relevant to this lawsuit, all three (3) cold "vaccines" were in the Phase 2/3 stage of clinical trials.

162. According to the FDA, clinical drug trials involve four (4) Phases[28] before approval.

163. The FDA normally takes about 10 years for a new drug to be developed and approved[29].

164. At all times relevant to this lawsuit, there were no long-term (two or more years) studies on the effects of any of the relevant cold "vaccines".

165. All three (3) cold "vaccines" available in the United States were released to the public less than two (2) years after the cold virus was first identified in China.

166. At all times relevant to this lawsuit, the Johnson & Johnson and Moderna cold "vaccines" were *not* approved by the FDA.

167. The cold "vaccines" by Pfizer-BioNTech and Moderna contain mRNA.

168. mRNA is gene therapy, which modifies DNA.

169. On June 25, 2021, the FDA announced "revisions to the patient and provider fact sheets for the Moderna and Pfizer-BioNTech COVID-19 vaccines

---

28

https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process
[29] https://www.hiv.va.gov/patient/clinical-trials/drug-approval-process.asp

VERIFIED COMPLAINT

regarding the suggested increased risks of myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the tissue surrounding the heart) following vaccination."[30]

170.   Effects of myocarditis include but are not limited to heart failure, heart attacks or strokes and sudden cardiac death[31].

171.   On October 29, 2021, the FDA authorized (not approved) the Pfizer-BioNTech gene therapy product for Emergency Use in children aged 5-11 years[32].

172.   As of February 8, 2022, the FDA admits that, "[i]nformation is not yet available about potential long-term health outcomes" regarding the safety of "Cominaty", nor "the duration of protection that the [Cominaty] vaccine will provide."[33]

173.   In the same Q&A, the FDA further states,

"Most vaccines that protect from viral illnesses also reduce transmission of the virus that causes the disease by those who are vaccinated. While it is **hoped** this will be the case, *the scientific community does not yet know if Comirnaty will reduce such transmission.*" (emphasis added)

---

30

https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-june-25-2021
31

https://www.mayoclinic.org/diseases-conditions/myocarditis/symptoms-causes/syc-20352539
32

https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age
[33] https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna

174.    Therefore, there was no logical reason for any of the Defendants to claim that the gene therapy products were ultimately safe or effective in any purported purpose of "controlling" the cold.

### Governor Brown's Demand for "Vaccination" Tweet

175.    On August 16, 2021, Plaintiff commenced employment with the School as the Math tutor for the 2021-2022 academic year.

176.    Plaintiff's employment with the School involved in-person teaching/tutoring as it had been in the 2020-2021 academic year.

177.    On August 19, 2021, Governor Brown stated on Twitter[34],

"I've directed the Oregon Health Authority to issue a rule requiring all teachers, educators, support staff, and volunteers in K-12 schools to be fully vaccinated against COVID-19—again by October 18, or six weeks from FDA approval, whichever is later"

---

[34]

https://twitter.com/OregonGovBrown/status/1428418770779787266?ref_src=twsrc%5Etf w%7Ctwcamp%5Etweetembed%7Ctwterm%5E1428418770779787266%7Ctwgr%5Ee7e1e 9d699103cfc9a0263b89d1e140946cea652%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fw ww.newsweek.com%2Foregon-gov-brown-announces-covid-vaccine-mandate-all-teachers -school-staff-1621223

 **Governor Kate Brown** ✓ · Aug 19, 2021 
@OregonGovBrown · **Follow**
Replying to @OregonGovBrown
That's why I've directed the Oregon Health Authority to issue a rule
requiring all teachers, educators, support staff, and volunteers in K-12
schools to be fully vaccinated against COVID-19—again by October
18, or six weeks from FDA approval, whichever is later.

 **Governor Kate Brown** ✓
@OregonGovBrown · **Follow**

There are those who will disagree with the actions I am
taking today. But school is starting across the state.
COVID-19 poses a threat to our kids, and our kids need to
be protected. And I'm willing to take the heat for it.

11:09 AM · Aug 19, 2021 

178. In a subsequent tweet, Brown wrote,

"There are those who will disagree with the actions I am taking today.
But school is starting across the state. COVID-19 poses a threat to our
kids, and our kids need to be protected. And I'm willing to take the heat
for it."

179. Brown knew or should have known that it is beyond the scope and

authority of the Governor to impair lawfully executed contracts; or to

diagnose or prescribe medical treatment on any one for any reason.

### *No Compelling Reason to Target Quasi-Suspect K-12 employees*

180. These cold "vaccinations" are administered through intramuscular

injection of a substance purportedly to "control" a disease, is a procedure

which can reasonably be considered a form of medical treatment or a medical

procedure.

181. Compelled physical intrusion into the human body is an invasion of bodily integrity that implicates significant, constitutionally protected privacy interests. *Missouri v. McNeely*, 569 U.S. 141, 143 (2013).

182. The cold poses no statistical[35] threat to children.

183. The cold does not become more virulent in K-12 school settings.

184. The cold does not become less virulent in stand-alone preschool programs that go up through kindergarten.

185. The unapproved or gene therapy products do not prevent contraction or transmission of the cold.[36]

186. There was no compelling or logical reason for Brown to order the segregation of the discrete quasi-suspect class of K-12 school employees for forced medical intervention.

### *The School, the Union, the School's insurer, Douglas ESD, Superintendent Woods and Public Health Director Banks announce their shared beliefs in concert with Governor Brown*

187. Following the Governor's announcement, the Union ("OEA") released a press statement[37] that same day which in relevant part stated,

---

35

https://www.oregon.gov/oha/covid19/Documents/DataReports/2021-Annual-Data-Report.pdf
36

https://www.oregon.gov/oha/PH/DISEASESCONDITIONS/COMMUNICABLEDISEASE/REPORTINGCOMMUNICABLEDISEASE/Documents/rules/2021/Vaccination-Schools/PH_39-2021.pdf
37

https://www.opb.org/article/2021/08/19/gov-kate-brown-holds-briefing-on-covid-19-surge-in-oregon/

"OEA *believes* that today's vaccine requirement...will help improve safety in our schools and in our communities. *The science* on this issue *is clear*. Vaccines, coupled with other proven public health mitigation strategies, are the best way to ensure our schools...are a safe place for students to learn and for educators to teach." (emphasis added)

188. The minutes of the Douglas ESD Board of Directors meeting[38] held on that same day states in part,

"New mandates requiring anyone in K12 education staff or teachers in the presence of students – volunteers, coaches, etc. Holly [HR Hill] will share with the board the plan for staff. The ESD is working with districts to develop a process to gather information and share information in hopes to relieve some pressure from the school districts. October 18th is deadline."

189. On August 23, 2021, in a letter[39] to BioNTech Manufacturing GmbH, the FDA *approved the labeling* of the Pfizer/BioNTech cold gene therapy product with the "proprietary name, *COMIRNATY*, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials". (emphasis added)

190. That same day, Plaintiff reported for work with the School to conduct in-person educational services for the 2021-2022 academic year.

191. Two (2) days later, the Oregon Health Authority filed a Temporary Administrative Order PH 39-2021[40] with the Oregon Secretary of State.

### *The Illogic of OAR 333-019-1030 ("Vax Rule")*

---

38

https://drive.google.com/file/d/1Ix3zJ47mIGcUV8qh1wTOrjOvPjMI5rBy/view?usp=sharing
[39] https://www.fda.gov/media/151710/download
40

https://www.oregon.gov/oha/PH/DISEASESCONDITIONS/COMMUNICABLEDISEASE/REPOR
TINGCOMMUNICABLEDISEASE/Documents/rules/2021/Vaccination-Schools/PH_39-2021.p
df

VERIFIED COMPLAINT

192. The reason cited for Vax Rule was so that,

"the state can continue to prevent and slow the spread of COVID-19" as "COVID-19 case numbers are higher than they have ever been, hospitalization of COVID-19 patients is on a steep rise, and Oregon's health care system is overwhelmed and at or over capacity."

193. It is self-evident that transmission of *any* communicable disease cannot happen between two healthy people.

194. It is a fact that only a person infected with a cold can transmit the virus to a healthy person.

195. Vax Rule demanded that all K-12 school employees surrender papers documenting having been injected with either non-FDA-approved substances; or gene therapy substances - all substances which Vax Rule admits does not prevent transmission or contraction of the cold; or that K-12 employees have "approved" exception papers as an occupational requirement.

196. Clearly, surrendering any of the "required" or "approved" papers does not prevent or slow the spread of any cold.

197. Defendant Banks should instead have promulgated a rule prohibiting *everyone* (employees and students alike) either suspected or known to have the cold from being on school premises - but she did not.

198. ORS 433.128 *Conditions of and principles for isolation or quarantine*, ORS 433.121 *Emergency administrative order for isolation or quarantine*; and ORS 433.452 *Detaining persons exposed to reportable condition or condition that is basis for state of public health emergency* already lay out the due process procedures for isolation or quarantining of anyone suspected of

VERIFIED COMPLAINT

having a communicable disease - and compelled procedures involve judicial adjudication.

199. Public Health Director Banks knew or should have known that it is beyond the scope and authority of the Health Authority to diagnose or prescribe forced medical treatment on any one for any reason.

200. It is clear from Banks' promulgation of Vax Rule, that Banks *intended* to circumvent communicable disease mitigation due process procedures which the State legislature had already wisely laid out years prior, in order to impose her own totalitarian ideology upon a quasi-suspect class of K-12 school employees; and to impose punitive punishment on those who did not have the "required papers", by denying occupation to those without "papers" which Banks demanded via Vax Rule.

201. Temporary Administrative Order PH 39-2021 became OAR 333-019-1030 ("Vax Rule"), which would undergo numerous revisions and iterations over the next fifteen (15) months.

### *THE RELIGIOUS EXCEPTION POLICY IS UNCONSTITUTIONAL*

202. Vax Rule stipulates that by October 18, 2021, employees or volunteers of school or school-based programs must surrender papers containing private medical information or to have "approved" religious papers as an occupational requirement.

""Documentation of a religious exception" means a form prescribed by the Oregon Health Authority, signed by the individual, stating that the individual is requesting an exception from the COVID-19 vaccination

VERIFIED COMPLAINT

43

requirement on the basis of a sincerely held religious belief and includes a statement describing the way in which the vaccination requirement conflicts with the religious observance, practice, or belief of the individual." - OAR 333-019-1030 (Vax Rule)

203. Banks, Woods, Hill, Sconce, insurer's legal counsel and the School BOARD members, who arbitrarily enforced the Religious Exception Policy knew or should have known that these standards are blatantly unconstitutional and thus impermissible for adoption by a government employer.

204. The required use of any "prescribed" exception form discriminates against Plaintiff who has a personal religious belief against associating with the terms set forth by the Religious Exception Policy.

205. The need for use of a "prescribed" exception form and statement describing "vaccination" conflicts with religious observance "requirements" would later devolve into heresy inquisitions against Plaintiff by Woods, HR Hill, Union Rep. Sconce, insurer's legal counsel; as well as the School BOARD members, who openly discriminated against Plaintiff because of her minority religious views.

206. On information and belief, the Health Authority has no published rules or regulations to govern the process on how each individual K-12 school district may "approve" or deny exception requests; nor are K-12 schools required to give any reasoned explanation of their decisions.

207. Public Health Director Banks violated Plaintiff's rights by promulgating a facially unconstitutional requirement within Vax Rule in a manner which is

far more restrictive than the requirements set forth by the First Amendment

and Title VII for administering accommodations.

### *Defendants Act in Concert*

208.  On August 25, 2021, the School's insurer's board of directors issued a

public letter[41] stating,

"to ensure we provide consistent in-person instruction ... safety precautions must be implemented ... use of face masks and most recently mandatory vaccinations for school staff, volunteers and others who come into contact with students."

209.  The insurer does not provide "in-person instruction", nor is it a

policy-making body of any school district.

210.  The insurer's letter further "strongly urge[d] all school board members

to get vaccinated for the COVID-19 virus" in order to show "solidarity with our

students and staff."

211.  Superintendent Woods and Education Support Superintendent,

Michael Lasher, together with nine (9) other Douglas County school district

Superintendents out of 12 total school districts in the County publicly

released a letter[42] dated August 27, 2021 stating in relevant part,

"We realize that many in our community are frustrated by recent mandated health and safety measures around vaccines and face coverings... *Regardless of personal beliefs*, these requirements are our pathways forward for maximizing in-person learning and minimizing disruption to students and families." (emphasis added)

---

[41] https://www.osba.org/News-Center/EdNotes/2021_08_25_Vaccine.aspx
[42]

https://bloximages.newyork1.vip.townnews.com/nrtoday.com/content/tncms/assets/v3/e
ditorial/e/6e/e6e502f8-dba1-581f-ba5f-08d2f6d17c65/612a729fbbf9c.pdf.pdf

VERIFIED COMPLAINT

### Superintendent Woods' Demand for Personally Identifiable Health Information Papers

212. Around this time, on more than one occasion, Plaintiff questioned Superintendent Woods as to the legality of Mask Rule and Vax Rule.

213. Around September 1, 2021, Woods announced that all employees and volunteers of the School were required to complete a survey titled "Days Creek District school COVID-19 Vaccination/Exception Verification" ("the survey").

214. The survey directed School employees/volunteers to answer the questions regarding their cold "vaccination" status, as well as to submit paper "proof".

215. The papers demanded were intrusive and required submission of personally identifiable health information such as name, birthdate, date, location and type of gene therapy treatment or substances unapproved by the FDA received.

216. Around this time, Woods presented Plaintiff with a written employment contract, retroactive to August 16, 2021.

### Plaintiff Officially Becomes a Licensed Probationary Teacher

217. On September 11, 2021, Plaintiff accepted the employment contract. (Exhibit B)

218. Plaintiff was contracted to be a "probationary teacher", to provide the School with "education services lawfully and properly performed" for the 2021-2022 academic year.

219. By statute, the "probationary teacher" position is a "for cause" position. ORS 342.835

220. On September 11, 2021, Plaintiff completed the survey, declining the cold "vaccine" offer, presuming that the process for declining the vaccination offer would be similar to the Hepatitis B vaccine offer, which was a non-issue.

221. Plaintiff included a statement stating that Plaintiff declined to give up Plaintiff's right to medical privacy.

### *Plaintiff Reveals her Minority Religious Beliefs*

222. Plaintiff included a Declination Letter declining to sign any "prescribed" Health Authority religious exception forms, with which Plaintiff had a religious opposition to.

223. The Declination letter alluded to Plaintiff's non-Christian beliefs.

224. The minutes of September 13, 2021 show that the School BOARD had adopted the custom, practice and de facto policy of requiring all the School employees or volunteers to surrender private medical or religious papers as a condition of employment.[43]

### *No Official Written School "Vax Rule" Policy*

225. At all times relevant to this lawsuit, there was no State Law or rule duly passed by the State Board of Education or written policy duly passed by the School BOARD requiring the School employees to have any private medical

---

[43]

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021-09-13.pdf

VERIFIED COMPLAINT

papers or "approved" exception papers on file as a condition of employment with the School.

### Secret Meeting Between Governor Brown's Officer, Deputy Superintendent of Schools and Education Associations

226. On September 29, 2021, the Governor Brown's Senior Education Policy Advisor, Lindsey Capps; and Deputy Superintendent of Schools, Colt Gill arranged to meet School insurer, Oregon School Boards Association Executive Director Jim Green; insurer's Director of Legislative Services, Lori Sattenspiel; Oregon Education Association ("Union") Executive Director Jim Fotter; Union President Reed Scott-Schwalbach; as well as officials of other education associations.

227. The planned issues of discussion included but were not limited to; clarification about expectations/requirements of districts around "May Not Employ" language in the rule; clarification about assigning staff to other duties who are not "vaccinated"; and mitigation measures for employees with exemptions (testing, etc.)

228. It is clear from the intended topics of discussion that the terms of Vax Rule were unclear enough to warrant clarification.

229. Interestingly, discussions involving clarification of Vax Rule did not involve any employee or official from the promulgator - the Oregon Health Authority but rather, involved Governor Brown's officer, which shows that Brown was and continued to be the chief architect behind the promulgation and enforcement of Vax Rule.

230. Minutes of the meeting were not recorded.

### *Plaintiff Speaks Out Against OAR 333-019-1030 ("Vax Rule")*

231. While off-duty, Plaintiff regularly spoke to co-workers outside of the classroom regarding the edicts of Vax Rule, as well as the already-known and publicized side effects of the cold "vaccines" including but not limited to myocarditis (inflammation of the heart muscle which may result in death).

232. Plaintiff criticized Governor Brown's, the Health Authority's and the School's demand for forced medical intervention of a rushed-to-market, experimental gene therapy as well as the demand for private employee papers as an occupational requirement.

233. Word of Plaintiff's speech reached Superintendent Woods.

234. Woods, acting within the course and scope of his employment as Superintendent of the School, told Plaintiff to refrain from talking to coworkers about the cold "vaccines" and the edicts of Vax Rule; thus depriving Plaintiff of her right to free speech.

235. Plaintiff refused to chill her speech and continued to speak against both the Vax Rule and the cold treatment products.

236. In mid-September 2021, Plaintiff mailed Superintendent Woods and HR Hill copies of a "Notice of Liability for Sanctioning Biomedical, Biotechnology & Biosynthetic Instruments" ("Notice of Liability").

237. One of the points in the Notice of Liability documents informed Woods and Hill that requiring an employee to be a human subject in a medical

VERIFIED COMPLAINT

experiment without informed consent violates the Belmont Report; and the demand for papers unrelated to job function is a violation of Amendment IV and Amendment XIV § 1 of the United States Constitution.

238. Plaintiff majored in engineering and not law.

239. Plaintiff admits that some of the legal processes which Plaintiff adopted may have been incorrect or inefficient.

240. However, Plaintiff presented the contents and affidavits within the Notice of Liability in good faith.

241. While off-duty, with permission from the recipients, Plaintiff circulated digital or physical copies of the Notice of Liability documents to co-workers and to other community members, asking recipients if they would be interested in signing the documents before Plaintiff sent the Notice of Liability to state officials.

242. Around this time, while on a break, Plaintiff was in the teacher's lounge quietly and privately conversing with another co-worker, speaking against Vax Rule.

243. Cathy Knapp, acting in the course and scope of her employment as School administrator, happened to be in the teacher's lounge at that time.

244. Cathay Knapp interrupted Plaintiff's conversation and reminded Plaintiff that Woods had already instructed Plaintiff to not discuss Vax Rule or the cold "vaccine" anymore.

245. Cathy Knapp told Plaintiff that she (Knapp) did not want Plaintiff to get into trouble for continuing to speak out.

246. Fearing reprisal, Plaintiff ended her conversation with her co-worker, thus depriving Plaintiff of her free speech.

### *Plaintiff Suffers Physical Ill-effects from Emotional Distress*

247. Superintendent Woods continued to directly use emotional pressure, economic threats and threats of criminal reports of trespass against Plaintiff, in order to compel Plaintiff to comply with Vax Rule by October 18, 2021.

248. Direct emotional threats included but were not limited to threats that Plaintiff's students were relying on Plaintiff to stay on staff (through Plaintiff's compliance with Vax Rule); that Plaintiff should not think that Plaintiff is irreplaceable because Defendant Woods has teachers from the recently defunct nearby Canyonville Christian Academy looking for work; that if Plaintiff did not comply with Vax Rule, Plaintiff would "no longer be employable" by the School; and Plaintiff's students would forget eventually Plaintiff.

249. Woods' economic threats included threats that Plaintiff would not be eligible for unemployment insurance payments, and should Plaintiff be fired for not "complying" with Vax Rule, Plaintiff would lose all seniority with regards to the teacher salary raises if Plaintiff left and returned to work with the School if and when Vax Rule was repealed.

250. Under ORS 657.262, the School, a public employer, may not inform an employee that said employee is ineligible for benefits, unless the Director of

the Employment Department has reviewed the employee's claim for benefits and determined that the employee is ineligible for benefits.

251. Woods threatened Plaintiff with criminal trespass should Plaintiff continue reporting for work after October 18, 2021 without surrendering Plaintiff's medical or religious papers.

252. Plaintiff became emotionally distressed.

253. Plaintiff suffered from severe sleep disruption which developed from the emotional distress, resulting in significant sleep deprivation.

254. Plaintiff suffered from abnormal hair loss, cried often and her heart palpitated significantly more than normal due to the emotional distress.

### *Plaintiff Requests Reasonable Accommodation for her Disability and for her Minority Beliefs*

255. On or around October 4, 2021, Superintendent Woods emailed Plaintiff a "task" for Plaintiff to perform - which was to be injected with the first dose of products unapproved by the FDA, or a gene therapy product, to be completed by October 4, 2021, as a condition of employment.

256. Plaintiff sent a response email to Woods in good faith, requesting religious reasonable accommodation to Vax Rule.

257. Plaintiff sent a copy of her reasonable accommodation request to HR Hill, who is entrusted with State and Federal law compliance.

258. On October 4, 2021, HR Hill responded in an email stating in relevant part that,

"We [the School and Douglas ESD] are governed by the State mandate which provides us with option for our employees. Please know that this is not mine [Hill] nor Steve's [Woods] decision but the mandate from the Governor.

These are your options for continued employment under the mandate:

1. Religious Exception

2. Medical Exception

3. Have a position that is exempt from working with Kids (this would not pertain to you)

For #1 and #2 above you have forms to complete, which you have seen. I understand you are not interested in option #2 above but it seems that it is your religious belief that you should not get vaccinate. If that is the case, can you submit a signed request using the proper forms for option #1?"

259. In that same email, HR Hill arranged for Plaintiff to meet with Hill and Woods to discuss how Woods could honor Plaintiff's request for reasonable accommodation.

260. Due to Plaintiff's Autism Spectrum Disorder, Plaintiff has trouble processing large amounts of verbal information, especially when Plaintiff is under stress.

261. In another email response (Exhibit C), Plaintiff requested a reasonable accommodation under the Americans with Disabilities Act ("ADA")which stated in the relevant part that,

"Because I [Plaintiff] have trouble processing larger amounts of verbal information, I'm respectfully requesting reasonable accommodation under the ADA to have all important points/requests etc be presented in written form in addition to, or in place of verbal form. I may also need to respond in writing."

***No Interactive Process or Accommodation Provided***

262. On October 5, 2021, Plaintiff had an in-person meeting on the School campus, in Woods' office, with HR Hill and Superintendent Woods, where the entire meeting was conducted verbally.

263. During the meeting, Woods asked Plaintiff if there was any way where Plaintiff would agree to sign the "prescribed" exception form (OHA Form 3871).

264. Plaintiff responded that Plaintiff would sign an Health Authority exception form on condition that Plaintiff is allowed to cross out any and all terms within the form that Plaintiff did not in good conscience agree with.

265. As a reasonable religious accommodation, Woods and Hill then agreed to accept Plaintiff's own religious exemption statement, to be written outside of any form, in lieu of having to surrender private medical papers.

266. HR Hill told Plaintiff that Plaintiff had until October 14, 2021 to submit Plaintiff's religious statement, failing to do so would result in Plaintiff no longer being "employable" by the School after October 18, 2021.

267. Neither Woods nor Hill engaged in any interactive process, or accommodated Plaintiff's reasonable accommodation request under the Americans with Disabilities Act.

### Plaintiff "Complies" with the Terms of the Religious Accommodation Agreement

268. On October 11, 2021, Plaintiff emailed both Woods and Hill a tentative draft of Plaintiff's religious exemption statement documents.

VERIFIED COMPLAINT

269. The minutes of the School BOARD meeting[44] held later that same day in the relevant part reflects,

"Woods reported that the only update is that on Monday, October 18 all employees and volunteers of schools and school-based programs are required to provide documentation that they are fully vaccinated or have an approved religious or medical exemption.

There was some discussion regarding exemptions, the district's plans for compliance with the mandate, possible loss of staff members, fines for non-compliance, liability for the district, free testing offered, unions support of the mandate, the state assuring districts there are no grounds for lawsuits for employees who are non-compliant with the mandate..."

270. On October 14, 2021, around 7:50 am, Plaintiff submitted a signed hard copy of the final, unchanged draft of the previously agreed upon religious statement documents.

### *Woods Preemptively Hires Christian Math Tutor to Replace Plaintiff*

271. At around 8 am the same day, Defendant Woods introduced and assigned a new High School Math tutor, Brian Jenks, to shadow Plaintiff.

272. It was now evident to Plaintiff and to Plaintiff's students that Superintendent Woods had taken preemptive steps to hire someone else to replace Plaintiff.

273. Plaintiff was caught off-guard by Brian Jenks' arrival but dutifully carried out Plaintiff's duties as assigned.

---

44

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021-10-11.pdf

VERIFIED COMPLAINT

274. Plaintiff was emotionally distressed by this apparent move to replace Plaintiff.

275. Brian Jenks, who is or appears to be Caucasian and of American national origin, mentioned to Plaintiff that he (Jenks) is a member of the local Canyonville/Days Creek church.

276. One of Plaintiff's students asked Plaintiff if Plaintiff was going to be fired.

277. Plaintiff was mortified by her student's questions regarding Brian Jenks' presence, which resulted in headaches and stomachaches throughout the ordeal.

### *The Union Interlopes*

278. Later that day on October 14, 2021, Superintendent Woods intercepted Plaintiff, with Brian Jenks shadowing, on Plaintiff's way to her next class.

279. Woods instructed Brian Jenks to act as a substitute for Plaintiff's next class.

280. Superintendent Woods had not given Plaintiff any notice of this unexpected, unannounced meeting, which would include Woods, HR Hill and Union Rep. Sconce.

281. Plaintiff asked Superintendent Woods who Sconce was.

282. Superintendent Woods explained to Plaintiff that HR Hill wanted Union Rep. Sconce to be present at this meeting, so that Sconce could ensure that the rights of union employees would not be infringed upon.

VERIFIED COMPLAINT

283. Not knowing what the issue was about, Plaintiff informed Superintendent Woods that Plaintiff is not a member of the Union, a labor organization.

284. Superintendent Woods responded that he (Woods) was aware that Plaintiff was not a UNion member but implied that Sconce's presence at the meeting was necessary.

285. In an assertion of authority, Superintendent Woods directed Plaintiff to go to the Superintendent's office and to sit in a chair by the wall, on the left side of the room.

286. Superintendent Woods shut the door.

287. Union Rep. Sconce was seated on Plaintiff's left, in a manner that flanked the back of the room.

288. HR Hill was seated in front of Plaintiff, flanking the right side of the room.

289. Superintendent Woods seated himself on Plaintiff's right, in a manner that flanked the remaining wall.

290. Plaintiff felt very confused, confined and overwhelmed.

291. Plaintiff did not have any impression that Plaintiff was free to leave at any time.

292. Plaintiff knew that Superintendent Woods had approved all exception requests filed, and assumed that Plaintiff's agree-upon exemption would be approved as well.

293. The introduction of Brian Jenks had already disrupted Plaintiff's expected routine.

294. Routine or expected schedules help the Plaintiff to cope with sensory overload.

295. This unexpected meeting added a deviation from Plaintiff's expected teaching schedule.

296. Due to the extreme anxiety and emotional distress which Plaintiff had already been subjected to, Plaintiff started to enter partial autism shutdown mode.

297. In this case, Plaintiff partially lost the ability to articulate verbally (this is sometimes called intermittent or selective mutism).

298. Plaintiff informed Sconce that Plaintiff is not a member of the Union.

299. Sconce responded that he (Sconce) was aware that Plaintiff is not an Union member but did not recuse himself from the meeting.

300. Instead, Sconce told Plaintiff that he (Sconce) was attending the meeting because Plaintiff's name was on Sconce's "list", which Plaintiff had not consented to be a part of.

***Religious Inquisition***

301. Plaintiff noticed that Union Rep. Sconce had seized, and was reading the Declination Letter that Plaintiff had submitted in confidence to Superintendent Woods on September 11, 2021.

302.  Plaintiff was mute to demanding that Sconce surrender Plaintiff's
papers at once.

303.  Plaintiff found Sconce's intrusion into Plaintiff's private Property to be
emotionally distressing and highly offensive, but was unable to articulate
Plaintiff's anger.

304.  Plaintiff did not enlist representation from Sconce.

305.  Union Rep. Sconce is not legal counsel for the School or Douglas ESD.

306.  There was no conceivable reason for Sconce's presence, other than to
harass, outnumber and intimidate Plaintiff.

307.  Despite agreeing to accept Plaintiff's religious exemption documents on
October 5, 2021, Woods and Hill did not acknowledge the religious statement
which Plaintiff had submitted earlier that morning.

308.  Instead, Woods and Hill now insisted that Plaintiff was required to write
her religious exemption request on form OHA 3871 - the alleged "prescribed"
Health Authority form, which all three Defendants already knew from
Plaintiff's religious statement that Plaintiff had a conscientious opposition to
the use of any Health Authority forms.

309.  Yet, HR Hill persisted in interrogating Plaintiff as to why Plaintiff was
refusing to sign OHA Form 3871.

310.  Plaintiff re-iterated her conscientious stance.

311.  Woods asked Plaintiff if there was any way that Plaintiff would sign
OHA Form 3871.

312. Plaintiff re-iterated that Plaintiff would cross out any part of OHA Form 3871 which Plaintiff had a conscientious objection to, to which Woods declared that Plaintiff could not cross out any part of OHA Form 3871 before signing it but did not explain why.

313. Woods again asked Plaintiff if there was any other way where Plaintiff would submit a signed OHA Form 3871.

314. Feeling harassed, Plaintiff reiterated that signing the exception form goes against Plaintiff's sincerely held religious beliefs.

315. Plaintiff declared that Plaintiff would sign an un-crossed out OHA Form 3871 but only with an "under duress" notation.

316. Woods and Hill looked to Union Rep. Sconce for a response to Plaintiff's statement.

317. Union Rep. Sconce declared that OHA Form 3871, with an "under duress" notation, would not be acceptable as it would not be "binding".

318. In unison, HR Hill declared that Plaintiff's only two options were to either sign OHA Form 3871, or to quit.

319. Feeling harassed and overwhelmed from feeling like she (Plaintiff) was surrounded, by Sconce's intrusion and by Hill's interrogation, Plaintiff burst into tears.

320. Plaintiff refused to resign.

321. HR Hill told Plaintiff that should Plaintiff refuse to comply with the new condition of having to sign OHA Form 3871 by October 18, 2021, Plaintiff would no longer be "eligible" for School employment.

VERIFIED COMPLAINT

322. Neither Woods nor Hill conducted any interactive process or accommodated Plaintiff under the Americans with Disabilities Act ("ADA") during this October 14, 2021 "meeting".

### *Extreme Emotional Distress*

323. October 15-17, 2021 are non-work days for Plaintiff.

324. Plaintiff suffered from stress and extreme sleep deprivation during this period.

325. On October 18, 2021, around 8 am, Plaintiff walked into Plaintiff's classroom and was distressed to find, for the first time ever, that Plaintiff's work area had been rearranged without Plaintiff's consent.

326. The new tutor, Brian Jenks, was seated at Plaintiff's desk.

327. On seeing Plaintiff, Brian Jenks quickly vacated Plaintiff's seat.

328. Plaintiff noticed that the large prize, which had been displayed in the classroom since the beginning of the school year, and which Plaintiff had

had been removed from the classroom.

329. A number of students asked Plaintiff why the prize had been removed.

330. Plaintiff felt mortified ....

331. Brian Jenks' presence, the rearrangement of Plaintiff's classroom and the removal of the prize were extremely distressing to Plaintiff.

332. On October 18, 2021, at around 10am, suffering from extreme emotional and mental strain, Plaintiff signed her name on top of the

"prescribed" OHA form 3871, signed with the words "under duress" in the signature line and submitted the form to Woods.

333. Defendant Woods declared that he (Woods) could not accept the form on the grounds that the words "under duress" invalidated OHA form 3871.

### *Others Similarly-Situated Did Not "Comply" with Vax Rule*

334. Around this time, Reuben Stratford, a similarly-situated member of the teaching staff at the same location, told Plaintiff that he had submitted an unsigned OHA religious exception form (OHA Form 3871).

335. Ruth-Ann Crabtree, another similarly-situated member of the teaching staff at the same location, told Plaintiff that she (Crabtree) had submitted her own religious statement documentation together with a signed OHA religious exception form (OHA Form 3871), but with sections of the form crossed out.

336. Ruth-Ann Crabtree and Reuben Stratford told Plaintiff that neither had submitted "proof of vaccination" papers.

337. Ruth-Ann Crabtree and Reuben Stratford are Christians and are, or appear to be White and of American national origin.

### *Superintendent Woods Terminates Plaintiff without Statutory Authority*

338. At the end of Plaintiff's shift on October 18, 2021, around 12:15pm, Woods told Plaintiff to join him (Woods) and Hill in Woods' office.

339. There was a blank OHA Form 3871 set on the table, which Woods and Hill demanded that Plaintiff sign.

340. Plaintiff, who was under the impression that Plaintiff could not include the words "under duress", or cross out any terms within the form, refused to sign the form.

341. Neither Woods, Hill nor the School BOARD provided written notice to Plaintiff that Plaintiff had to completely fill out OHA form 3871, or that Plaintiff had to sign her name in the signature line, in order for Plaintiff to retain her job.

342. As a result, Plaintiff returned the blank OHA form 3871 to Defendant Woods, who immediately presented Plaintiff with a Notice of Termination effective October 19, 2021. (Exhibit D)

343. Until Woods termed the unannounced meeting with Union Rep. Sconce as a "pre-termination hearing" in the Termination Notice, Plaintiff was not privy to having participated in any "pre-termination hearing".

344. The Notice of Termination declared that Plaintiff had allegedly not complied with "the Governor's new rule and state mandate identified in OAR 333-019-1030."

345. The Notice of Termination further declared that because Plaintiff

"was not able to sign the forms" and was "not able to comply with any of the other options presented", Plaintiff would "no longer be eligible for employment in the education field working with K-12 students."

346. Plaintiff did not know at that time that as the Superintendent of the School, Woods had no statutory authority to terminate Plaintiff, a probationary teacher. ORS 342.835

VERIFIED COMPLAINT

347. Neither Woods nor Hill demonstrated or provided an individualized assessment as to why or how Plaintiff would pose a direct health threat to the workplace after October 18, 2021.

348. Plaintiff proposed another reasonable accommodation request to Woods.

349. Plaintiff asked Woods to allow Plaintiff to serve as an online tutor, as Plaintiff had been in the latter part of the 2019-2020 academic year.

350. Woods told Plaintiff that the School would not be able to accommodate Plaintiff's new reasonable accommodation proposal.

351. At all times relevant to this lawsuit, the School subcontracted online Math tutoring services from Yup.com.

352. Upon information and belief, the School did not require any medical or religious papers for any of the Yup.com tutors who came in "contact" with the School students while offering their tutoring services.

353. Plaintiff declined Woods' offer of a night-time custodial position at the custodial pay rate which was about a 40-50% reduction in pay.

354. Feeling emotionally drained, Plaintiff signed the "Notice of Termination" letter acknowledging receipt of the letter.

355. On Woods' direction, Plaintiff surrendered the School-issued laptop and keys to the school buildings during that final meeting.

356. Plaintiff was soon also locked out of access to the School's computer network system.

357. Believing that Plaintiff had been terminated, Plaintiff stopped reporting for work after October 18, 2021.

358. Woods approved the exception requests from all other similarly-situated employees of the School working at the same location as Plaintiff.

### *Post Receipt of the Termination Letter*

359. On or around October 19, 2021, Plaintiff mailed copies of the Notice of Liability documents to state-level officials.

360. On or around October 20, 2021, Plaintiff initiated a dismissal appeal to the Oregon teacher Fair Dismissal Appeals Board.

### *Defendant Employment Department Denies Government Benefits without a Pre-termination Hearing*

361. Around October 24, 2021, Plaintiff applied for unemployment benefits.

362. On or around November 5, 2021, Plaintiff received notice from the Defendant Employment Department informing Plaintiff that Plaintiff's application for unemployment benefits was denied for the following reason:

"You were employed by DOUGLAS COUNTY SD 15 until October 18, 2021 when you were fired because you failed to follow the employer's COVID-19 vaccination policy. This was a willful or wantonly negligent violation of the standards of behavior an employer has the right to expect because you had been given prior warning about the deadline for receiving the vaccine or to file for an exception."

363. Plaintiff appealed the Defendant Employment Department's denial.

### The School BOARD Stigmatizes Plaintiff

364. On November 10, 2021, Plaintiff saw a the School BOARD Meeting Notice[45] posted at the Days Creek Post Office.

365. The November 8, 2021 School BOARD meeting agenda included a Consent Agenda stating in the relevant part, "Termination of employment of licensed, classified, or coaching personnel i) Jill Bong- Math Tutor".

366. Plaintiff was mortified to see her name publicly posted for employment termination.

367. It was then that Plaintiff realized that neither Superintendent Woods nor HR Hill had the final policy-making authority to terminate licensed teaching staff.

368. The minutes of the November 8, 2021 the School BOARD meeting[46] reflect that,

"The following individuals were present:

District Board Members: Rex Fuller, Clint Thompson, Rebekah Sawyer, Valerie Anderson and Charlie Sawyer
Staff/Patrons: *Holly Hill*, Joanne Gordon, Terri Woods, Diane Swingley and James Ellis
Superintendent: *Steve Woods*
Business Manager.: Claire Cotton
Board Secretary: Lisa Hemphill" (emphasis added)

369. HR Hill does not normally attend the School BOARD meetings.

370. The minutes of the November 8, 2021 BOARD meeting states in the relevant part that,

---

[45] https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/agenda_2021-11-08.pdf
[46] https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021-11-08.pdf

"Discussion: There was some discussion regarding exceptions for the COVID vaccine, ineligibility for employment, correspondence regarding a course of action regarding Jill Bong, Oregon Department of Education Fair Dismissal Appeals Board, mandate regarding COVID 19, fines for not following the mandates, multiple meetings and attempts to try to retain employment...

VOTING IN FAVOR: R. Fuller, C. Thompson, R. Sawyer, V. Anderson, C. Sawyer and J. Boling"

371. The School BOARD further approved employment of Brian Jenks,

"Math tutor and long-term substitute".

372. Upon information and belief, Brian Jenks attends the same church as

Defendants Thompson, C. Sawyer and R. Sawyer.

373. Plaintiff was not given Notice of the meeting by hand or by mail, and

therefore did not attend the meeting.

374. The School BOARD did not provide Plaintiff with any notice or reason

for dismissing Plaintiff pre or post-termination.

## *Defendant Employment Department & Office of Administrative Hearings Deficiencies & Irregularities*

375. Plaintiff's employment benefit appeals hearing was scheduled for

December 15, 2021, to be heard by Administrative Law Judge ("ALJ") D.

McGorrin.

376. On the day of the hearing, without notifying Plaintiff, a different ALJ

appeared to hear the case.

377. On receiving the unemployment benefit appeal denial dated December 16, 2021, Plaintiff was able to discern the ALJ's Japanese last name - Kaneshiro.

378. Plaintiff's Chinese ethnic background is discernible from Plaintiff's last name, as well as from the exhibits which Plaintiff submitted.

379. Because of the lack of notice of the change of ALJ, Plaintiff was unable to request a change of judge based on the fact that the Japanese have a historical racial animus towards the Chinese.

380. Plaintiff appealed the benefit denial to the Employment Appeals Board, who reversed and remanded for further development, ALJ Kaneshiro's erroneous decision that,

"Claimant's refusal to sign the OHA form was tantamount to illegal conduct because as she was a public employee, OHA had the legal authority to require her to sign a specific form, and she refused."

381. The Employment Appeals Board stated in the relevant part that,

"Despite claimant's prior objections, the record nevertheless shows that claimant actually was willing to sign the OHA exception form—if she was also permitted to note on the form that she was doing so "under duress." While the employer's witness testified at hearing that they "could not accept" the form with such a notation, they did not offer an explanation as to why it was unacceptable...

However, the record does not show that the OHA exception form, despite the fact that it required a signature, contained the elements necessary to constitute a contract. Unless the form was a contract, contracts-law doctrine would not apply to it...

OAR 333-019-1030. The rule contained no provision which stated or suggested that noting that the signature was obtained under duress

would invalidate the form or otherwise fail to comply with the requirements of the rule, and the employer offered no other evidence to support their position.

If the "under duress" notation would not have actually invalidated claimant's signature, and therefore had no practical effect on the employer's compliance with the rule, the employer's expectation that claimant submit the signed form without the notation may not have been a standard of behavior that the employer had the right to expect of an employee. Likewise, under such circumstances, claimant's submission of the form with the "under duress" notation may not have constituted a disregard for the employer's interests.

However, further inquiry is needed to determine the employer's basis for believing that the form signed "under duress" would not comply with the requirements of the rule. On remand, the ALJ should ask the employer's witness to explain the employer's basis for this belief."

### *Plaintiff Discovers What Post-Termination Procedure Should Have Been*

382. On January 6, 2022, the Oregon teacher Fair Dismissal Appeals Board

("FDAB") dismissed Plaintiff's dismissal appeal for lack of jurisdiction stating

in the relevant part,

"The [School] District's December 7 motion to dismiss challenges FDAB jurisdiction. The District asserts that the Appellant was employed by the District as a "probationary teacher" and for this reason, the FDAB has no jurisdiction...

[P]robationary teachers that are discharged, removed from employment ... must first seek a hearing with their respective district board—not the FDAB. After that, the teacher must appeal any further disposition by the district board directly to the Circuit Court for the county in which the school district is headquartered—not the FDAB."

383. Plaintiff had not been notified of any appeals procedure prior to

receiving the Fair Dismissal Appeals Board ruling.

VERIFIED COMPLAINT

384.   Upon research, Plaintiff discovered the School's personnel policies and State laws regarding probationary teacher dismissals.

### The School BOARD'S Failure to Abide by its Own Personnel Policies

385.   According to the School Policy GCPD-AR[47] Dismissal 1(b),

"Probationary teachers may be dismissed at any time for any reason or reasons deemed in good faith sufficient by the Board. *Written notice of* *intended dismissal* *and reason(s) for dismissal must be given to the teacher* *prior* *to Board action on the dismissal.*" (emphasis added)

386.   Plaintiff was not provided with written notice and reason of *intended* dismissal prior to Board action on the dismissal.

387.   The School Policy GCPD[48] *Discipline and Dismissal of Licensed Staff* states,

"It is the policy of the Board to use due process and to comply with relevant portions of the collective bargaining agreement when disciplining and/or dismissing employees."

388.   The 2021-24 Licensed Employee Collective Bargaining agreement[49] (page 7) in the relevant part states,

"Due process is recognized as an essential part of just cause. The following procedures of due process will be followed:....

1.   Forewarning or foreknowledge is given of the possible or probable disciplinary consequences of the employee's conduct, except for conduct that the employee should have reasonably known could result in discipline.

---

[47] https://policy.osba.org/douglcty/G/GCPD%20R%20D1.PDF
[48] https://policy.osba.org/douglcty/G/GCPD%20D1.PDF
[49]
https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/2021-2024_days_creek_lic ensed_cba_-_final.pdf

2. Before any discipline is administered, a fair and objective investigation of the charges will be conducted in which the *District will seek out relevant witnesses and evidence.*

3. A meeting will occur with the supervisor prior to action being taken on the proposed sanction at which notice of the charge or reasons for contemplated action is given and notice of the nature of the contemplated disciplinary action (notice of sanction) is given.

4. A meeting will occur with the supervisor prior to action being taken on the proposed sanction in which the employee presents a response to the charge(s).

5. *The employee will be given an opportunity to present his or her version of events before the employer takes final action on a disciplinary sanction.*

6. *The right of representation for the employee during part or all of this process will be honored"* (emphasis added)

389. Plaintiff was not afforded due process as laid out by Policy GCPD and its referenced Collective Bargaining agreement due process procedures:

(a) Plaintiff was subjected to unwritten, fluid requirements for Vax Rule "compliance";

(b) The terms of "compliance" were not applied even handedly amongst similarly-situated the School employees;

(c) The School BOARD did not seek relevant witnesses (Plaintiff) or evidence was made before the decision to dismiss Plaintiff was made;

(d) The School BOARD conducted no investigation of the charges before discipline, ie Plaintiff's termination, was administered;

(e) The School BOARD did not seek out relevant witnesses and evidence in order to conduct a fair investigation before dismissal was administered;

(f)     Plaintiff was not given any opportunity before the School BOARD to respond to any charges;

(g)     Plaintiff was not given any opportunity to present her version of events before the School BOARD took final action to officially dismiss Plaintiff.

(h)     Woods, Hill and Sconce induced labor organization representation on Plaintiff;

(i)     Plaintiff was denied right of representation during the entire termination process.

### Testament to the Lack of, or Negative Effect of Mask Rule and Vax Rule on pediatric "COVID-19" hospitalization

390.   Throughout the entire "COVID-19" health emergency, pediatric (children under 18 years old) hospitalizations averaged at 12% of the cold hospitalizations.

391.   About four (4) months after the implementation of Mask Rule and Vax Rule, the percentage of pediatric "COVID-19" hospitalizations jumped almost four-fold - to 43% on February 3, 2022.

392.   Such numbers point at best to the ineffectiveness, or the fast-waning effectiveness of the "COVID-19 vaccines" and at worst, to the *negative* effects of the Vax Rule measures.

393.   Yet, Public Health Director Banks refused to repeal Vax Rule.

The pediatric census level is at 5 as of 5/16.





6
Source: https://healthdata.gov/Hospital/COVID-19-Reported-Patient-Impact-and-Hospital-Capa/g62h-syeh/data

394.  On March 11, 2022, Banks issued OHA 4140[50] "Public health order rescinding school indoor masking requirements"

395.  In OHA 4140, Defendant Banks claimed,

"The Oregon Health Authority (OHA) adopted a permanent school masking rule on January 28, 2022. OAR 333-019-1015. Under that rule that State Public Health Director or State Public Health Officer may issue an order rescinding the school masking requirements if those requirements are no longer necessary to control COVID-19...

The school masking requirements are no longer necessary because impact of COVID-19 has decreased in Oregon in several ways, including but not limited to:

• Hospitalizations due to COVID-19 have dropped below 300.
• As of March 8, 2022, the 7-day average of 520 cases/day was 94% lower than the peak of 8,209 cases/day on January 20; it is also the lowest 7-day average case number we have seen since July 2021.
• As of March 9, 2022, 75.5% of people ages 18 and over living in Oregon have completed their primary COVID-19, vaccination series in addition to immunity in those who have recently recovered from COVID-19 during the recent surges due to Delta and Omicron variants."

---

[50] https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/le4140.pdf

396. The Oregon Health Authority did not "rescind" or repeal OAR 333-019-1030 (Vax Rule).

### *Governor Brown Terminates "COVID-19" State of Emergency*

397. On March 17, 2022, Defendant Brown issued Executive Order EO 22-03[51] terminating the COVID-19 State of Emergency.

398. Without offering any evidence to support her claim, Brown claimed that, "Oregon's cautious, science-driven approach to the pandemic undoubtedly saved lives."

399. Despite the absence of any new public health emergency, Public Health Director Banks refused to repeal Mask Rule or Vax Rule, thus continuing to act using the overreach of Banks' now-deactivated emergency powers.

### *Plaintiff is Subjected to Undue Delay in the Adjudication of Termination of her Government Benefits*

400. On January 28, 2022, Plaintiff faxed a Notice of Irregularities and Deficiencies to Chief Administrative Law Judge ("ALJ") John Mann, which detailed the deficiencies of Plaintiff's Hearing on December 15, 2021.

401. The Notice also requested a change of ALJ for the remanded Hearing.

402. Plaintiff never received a response from Chief ALJ John Mann.

---

[51] https://www.oregon.gov/gov/eo/eo_22-03.pdf

VERIFIED COMPLAINT

403. In mid-April 2022, Plaintiff read in the Oregon Public Broadcasting News[52] that Chief ALJ John Mann had been placed on unpaid administrative leave because ALJ John Mann had been indicted and was being held in jail for ten counts of encouraging child sexual abuse.

404. On April 27, 2022, Presiding Chief ALJ John R. Lohuis responded to the Notice of Irregularities and Deficiencies.

405. On April 28, 2022, about three (3) months after the Employment Appeals Board remanded the case, Plaintiff attended the second employment benefits appeals hearing.

406. ALJ Jason Janzen presided over the second hearing.

407. The April 28, 2022 hearing transcript provided by Defendant Employment Department in the relevant part states:

"Q [ALJ Janzen]...First, did the Claimant act- - ever actually sign the Oregon Health Authority form with the under duress, uh, notation?
A [Hill] Uh, *she signed it, not – but* (sic) *with her name*, but she signed the words under duress. [emphasis added]

Q [ALJ Janzen] And when did she sign it?
A [Hill] She signed that, um, in October prior to that 18th, the deadline...

Q [ALJ Janzen] All right. And why could the Employer not accept, um,this OHA religious, uh, exception form, uh, being signed with, uh, notation stating under duress?

A [Hill] The form required the employee's signature. And so, uh, using those words under duress is not her signature. So it – it isn't – it is not

---

52

https://www.opb.org/article/2022/04/12/oregons-top-administrative-law-judge-charged-for-child-pornography/

VERIFIED COMPLAINT

indicating that the employee –nobody would know who that employee is if it was not with her signature" (Tr. 6:1-19, April 28, 2022)

408.  Upon information and belief, Plaintiff's signature was the only

signature which Woods and Hill singled out for "authentication".

### *Plaintiff Discovers the Hidden Hand of the School Insurer's Legal Counsel*

409.  The Oregon School Boards Association ("OSBA" or "insurer") insures

the School through PACE.

410.  Hill further testified,

"Q [ALJ Janzen] ... was there a discussion with Ms. Bong [Plaintiff] about why the Employer could not accept the form, you know, with any, um, statement that it was being signed under duress or anything like that?

A [Hill] Yes.  We, um, let her know that, uh, we even checked, you know, with – with, um, uh, attorney to find out do we have to have the form?  Do they need to sign it?  And we informed her that there's no way around it.  We have been instructed and informed by attorneys that – that she has to sign either the religious exception, the – the medical exception, um, and provide us documentation, you know, in the medical exception, um, by a physician. Or get vaccinated and provide proof of that vaccination.  Those are the three ways that we can keep people employed and that's for all employees." (Tr. 9:5-20, April 28, 2022)

"Q [ALJ Janzen] All right.  So you – you – the Employer actually asked counsel if – if she could submit her own exception.  Is that correct?

A [Hill] We did.  So, um, I talked to, um, OS-, uh, -BA, Oregon School Board Association and they said no.  Unfortunately, it has to be on that form" (Tr. 10:4-9, April 28, 2022)

"Q [ALJ Janzen] Okay.  Um, and so what is the – the Employer's relationship to the Oregon School Board Association?  Can you explain that?

VERIFIED COMPLAINT

76

A [Hill] Yeah. Oregon School Board Association is there to serve all the districts in Oregon. They... provide policy changes and updates due to the changes that the laws, uh, uh, demand.... They provide training for school boards. They provide, um, support... for superintendents. They have... free legal advisements, (Mr. Woods was whispering "legislative updates" to her in the background), legislative updates, etc." (Tr. 12:7-20, April 28, 2022)

"Q [ALJ Janzen] So what did the – did – did – did the Oregon School Board Association provide a reason as to why sh- - why the Employer could not accept, uh, an exempt- - an exception form, um, prepared by Ms. Bong?

A [Hill] Um, they – they just stated ...the mandate included that it had to be on the forms provided. They had to be on that OHA form... I just took the answer as okay. That's the law. That's the mandate. Uh, thank you, and I was gone. So I didn't ask. I didn't inquire as to what were all the reasons.

Q [ALJ Janzen] Okay. Um, and do you know what would have happened to the Employer if, uh, if it had accepted a form prepared by Ms. Bong instead of the OHA form?

A [Hill] We would have been out of compliance with the mandate. And, um, that means we'd be going against the law set by the governor." (Tr. 13:10-25; Tr. 14:1-2, April 28, 2022)

"Q [Plaintiff] Um, does the OSBA speak for the OHA [Oregon Health Authority]?

A [Hill] They do not. They're a separate en- - separate entity. But they, um, they [employ] attorneys that assist with... laws that affect schools. And so they are a resource for, um, school districts to go to. We are not attorneys, obviously, and so *sometimes the interpretation of laws...can have several different,* um, *perspectives...*

And in this situation it was *important for us and responsible for us to seek counsel so that we could make sure that we,* uh, had been – (unintelligible) *carried out the law and then the way that it was written.* So, uh, that's what – that – that's what I did and which I – I do on several – several different occasions. They are there to – every school board policy, um, most

VERIFIED COMPLAINT

districts in the State of Oregon use them to help interpret. They write the policies..." (Tr. 22:4-22, April 28, 2022) (emphasis added)

"Q [Plaintiff] did Douglas County – County School District 15 school board talk to the OSBA and adopt what the OSBA suggested?

A [Hill] no. There was no formal adoption of, um, they adopt school, uh, they do adopt policy, but they [the School BOARD] didn't adopt the – they provide the superintendent and employees of the district, um, uh, the ability to govern the school or to – to, um, manage the operation. The school board role is to not get into the day-to-day operations. They get into the school policy and school law. That's their job to adopt policy and – and to make those kinds of decisions, but not to get into the operations." (Tr. 23:18-25; Tr. 24:1-5, April 28, 2022)

411. Insurer's legal counsel is not the counsel of record for either the School or Douglas ESD.

412. The communication between the insurer's legal counsel and Woods or Hill was made for the purpose of committing crimes or tort or the commission of a fraud.

### *Woods and Hill Subject Plaintiff to Arbitrary Vax Rule Enforcement*

413. HR Hill testified,

"A [Hill] ... If she would have signed her name anywhere on there, you know, um, in the, uh, her – her signature, you know, indicating and checking the box. We would have been happy to just move on and keep her employed. That was our goal." (Tr. 18:10-14, April 28, 2022)

414. Yet, earlier in the hearing, HR Hill admitted,

"A [Hill] So, um, uh, looking for the form that she did submit, um, *she did sign her name*, um, *on the Oregon Health Authority page or form*. And it said individual's name. It had – has her name Jill Bong. It does have the date of birth and then she didn't fill out the rest of it, which [is her]

phone number, Employer, organization. And then she did fill, uh, sign the form under duress. And then – and she signed it – it was, um, on the date of 10/18/21. So that –that's my correction. She did fill out her name for the top part [emphasis added]...

Q [ALJ Janzen] And that's – that's it. There was no – she didn't have her actual signature on it?
A [Hill] No." (Tr. 10:12-21; Tr. 11:1-10, April 28, 2022)

415. HR Hill went on to testify,

"Q [ALJ Janzen] All right. *Did you tell her she couldn't sign it with the under duress notation?* Or did anyone in the meeting [the alleged "pre-termination hearing"] from the Employer tell her that she could not sign it with the under dur- - duress notation?

A [Hill] *Yes. Absolutely. We let her know that we couldn't accept that. So sorry.* Could she please just sign her name? She said that that's the best that she could do. She could only sign those words under duress. [emphasis added]" (Tr. 17:21-25; Tr. 18:1-7, April 28, 2022)

416. Apparently dissatisfied with this answer, ALJ Janzen posed the

question again, to which Hill contradicted herself,

"Q [ALJ Janzen] Did you or did anyone with the Employer ever tell Ms. Bong that she could not sign her signature on the form, on the religious exemption form, uh, with the words under duress next to it?

A [Hill] *No.* That was not a question that was asked. That was not anything that was talked about... So it never even came up, well, could you sign the form with those ["under duress"] words? You know, that wasn't a question we asked. [emphasis added]

We – we basically said if there any way you can sign the form? So that would have been her opportunity to just say yes. I could sign it if – with these words under duress. We were trying to keep her employed. And so we just asked how can we help you sign this form? Is there any way? Is there anything? And she could have had that opportunity at that

moment to give us that option, but she informed us that she could not sign it anyway." (Tr.58:3-21, April 28, 2022)

417. In fact, as HR Hill had testified earlier in the hearing, Plaintiff had submitted OHA Form 3871, as determined by insurer's legal counsel to be the form as "prescribed by the Oregon Health Authority", "signed by the individual"; Plaintiff also stated that Plaintiff had a sincerely held belief against the "vaccine mandate".

### *The School and Douglas ESD's Custom of Imposing Union Representation on Non-Union Members*

418. HR Hill testified that it is the custom and de facto policy of the School, Douglas ESD and the Union to impose union-representation on non-union members during any pre-termination process,

"But even if you're not part – if you don't pay dues into the union, um, ever[y] teacher still abides by that union contract. So they still have the rights and the benefits of that union contract. And part of that benefit is to have a representative, a union representative. And so, um, so *he [Union Rep. Sconce] was there on behalf of, uh, the union.* [emphasis added]" (Tr.59:2-28, April 28, 2022)

419. When questioned why HR Hill invited Union Rep. Sconce to the alleged "pre-termination hearing" held on October 4, 2021, Hill testified,

"...when there's any conversation with an employee and it's going to be a situation where they [the employee] may not be, um, employed any longer then *we* [Woods, Hill and Sconce] *always want to have union representation because we want the employee to be represented.* And because the nature of this conversation was about your employment and continuing it, because you had indicated you could not sign the form, *we* [Defendants Woods, Hill and Sconce] *wanted to make sure he [Sconce] would be there to help you [Plaintiff] talk through that.* [emphasis added]

VERIFIED COMPLAINT

Q [Plaintiff] And what if the employee doesn't want to be represented by the union?

A [Hill] You [Plaintiff] could have asked – if – you [Plaintiff] could have asked him [Sconce] to leave if you [Plaintiff] had wanted him [Sconce] to.

Q [Plaintiff] I was not – did you [Hill] tell me [Plaintiff] that I [Plaintiff] had the option to do that?

A [Defendant Hill] Uh, *we [Woods and Hill] told you [Plaintiff] that he [Sconce] was your [Plaintiff's] union representative* [emphasis added]...

Q [Plaintiff] Well, I – I specified that I'm not union represented." (Tr.64:23-25; Tr.65:1-15, April 28, 2022)

A [Hill] "He's – he's [Sconce] the uniserve for the region which means he-he [Sconce] is employed by OEA [Union] and he [Sconce] – every school district that has OEA as their, um, union he [Sconce] represents. And so, if you're an employee, you're a teacher, you're a staff, you know, you're a – you're a – you're a teacher then you are – you are represented by him [Sconce] essentially" (Tr. 66:2-7, April 28, 2022)

420. State law prohibits a public employer from influencing the decision of

any or all of its employees regarding whether to support or oppose a labor

organization that represents or seeks to represent those employees. ORS

243.670 (1)(a)(A)

### *Plaintiff Did Not Receive All the Benefits of the Collective Bargaining Agreement Received by Other the School Teachers*

421. HR Hill testified,

"any teacher that is employed with the school district [the School], um, they have the ... rights and the benefits of the Collective Bargaining Agreement and the Collective – Collective Bargaining Agreement is a union agreement.

VERIFIED COMPLAINT

81

And so even if they don't pay dues, union dues, um, they still are benefiting from that union contract. And so they – one of those benefits is also union representation even if they don't pay into it. So they still get the service to be represented…" (Tr. 68:22-25; Tr. 69:1-7, April 28, 2022)

422.  At the time Plaintiff was a teacher and a licensed employee of the School during the third quarter of the 2020-21 school year, Plaintiff did not receive all the benefits of the Collective Bargaining Agreement in that Plaintiff was paid at a lower rate that the prorated per-hour wage as promised in Article 15C (page 26) of the School's collective bargaining agreement.

423.  Plaintiff was also singled out to be denied pre-termination due process procedures as defined in the 2021-24 Licensed Employee Collective Bargaining agreement[53] (page 7).

### School BOARD, Superintendent Woods, HR Hill and Insurer's Legal Counsel were "on the same page" Regarding Enforcing Vax Rule on Plaintiff

424.  The School BOARD, Woods, Hill and the insurer were "all on the same page" with regards to enforcing Vax Rule on Plaintiff.

"MS. HILL:  … I would say the school board follows the recommendation of the superintendent. Um, and when it was – the – *the school board received information that the school superintendent and myself had no jurisdiction* [to terminate Plaintiff]. We had no choice in the matter as we told you several times. There was no, uh, with – with that we explained to them as we explained to you how we tried on numerous occasions to get a signature.

---

53

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/2021-2024_days_creek_lic ensed_cba_-_final.pdf

But we had been, um, *informed and advised by [insurer's] legal counsel that* this was our only, uh, *we only had three*, uh, *reasons to keep people employed.* And that a vaccination, *proof of vaccination, religious exception signed, um, by the employee, or a medical exception signed by the employee and by a physician.* So they [the School BOARD], um, they [the School BOARD] understood that and they [the School BOARD] agreed to that as well. Nobody ever agreed to violate any law. That did not happen. So that is – that is where everybody – that *we [the School BOARD, Woods, Hill and insurer] were all on that same page* when it comes to law [ie OAR 333-019-1030 (VAX Rule)]. [emphasis added]...

Q [Plaintiff] And when did, um, the superintendent [Woods] make these recommendations to the school board?

A [Hill] Um, at the date of termination he [Woods] informed the board, you know, on [October 19, 2021]. It was then made, um, uh, it was adopted at the next board meeting or approved at the next board meeting. Uh, they [the School BOARD] were informed that due to the mandate [Vax Rule] that it stated – the mandate [Vax Rule] says you cannot be employed past October 18th as we [Woods and Hill] informed you [Plaintiff]. And so that you [Plaintiff] were terminated, you [Plaintiff] know, as of [October 19, 2021] and the board was made aware of that and it was on the next board agenda [on November 8, 2021]." (Tr. 26:12-25; Tr. 27:1-17, April 28, 2022)

### *Defendant Employment Department's Due Process Procedures and Undue Delay*

425. On May 3, 2022, Administrative Law Judge ("ALJ") Jason Janzen issued Final Order 22-UI-192727 cherry-picked testimony in order to rule against Plaintiff stating, "the employer [the School] never imposed any conditions that claimant [Plaintiff] could not sign her name with the "under duress" notation."

426. ALJ Janzen in his Final Order added his conclusionary facts, absent fact-finding; in order to assume subject-matter jurisdiction which Janzen did not have, in order to adjudicate Civil Rights Title VII complaints.

427. During the hearing, ALJ Jazen stated,

"ALJ JANZEN: Here's what I'll say about this. The burden's on the Employer to – to show misconduct. They haven't gone, uh, they haven't alleged that as a reason for your discharge. I mean, it's – it's – it's their burden to establish whether or not they discharged you for misconduct. They haven't offered that as a reason." (Tr.62:10-15, April 28, 2022)

428. Yet, in ALJ Janzen's Final Order, Janzen added his own conclusionary testimony without proper fact-finding in order to form his legal conclusions based on suppositions that,

"[Plaintiff's] refusal to sign the form *would have been* an ongoing violations of the employer's policy every day she [Plaintiff] reported for work after October 18, 2021... [Plaintiff's] conduct cannot be excused as an isolated instance of poor judgment... [Plaintiff] is disqualified from receiving unemployment insurance benefits." (emphasis added)

429. Plaintiff appealed the ruling and on May 16, 2022, Plaintiff received "Notice of Receipt of Application for Review" from the Employment Appeals Board.

430. About nine (9) months after the Defendant Employment Department denied Plaintiff her benefits without a pre-termination hearing, the Employment Appeals Board adopted and affirmed Janzen's Final Order on August 2, 2022.

431. Plaintiff is currently appealing the decision in the Oregon Court of Appeals.

VERIFIED COMPLAINT

### *Plaintiff Suffers from Financial Duress*

432. Around July 13, 2022, under economic duress, Plaintiff was forced to prematurely withdraw all funds from her Oregon Public Employees Retirement System (PERS).

433. Plaintiff was further forced to apply for Temporary Assistance to Needy Families (public assistance).

### *Public Health Director Banks Reveals her Beliefs*

434. On July 26, 2022, Defendant Banks issued a letter[54] in response to a Petition to Repeal Administrative Rule OAR 333-019-1030 (Vax Rule) stating in the relevant part that,

"Being fully vaccinated against COVID-19 is one of the most effective ways to reduce the potential for severe illness, hospitalization and death from COVID- 19...

Vaccine efficacy against COVID-19 infection has fallen significantly, but there is still protection from severe illness, hospitalization and death...

Even when cases rise sharply, hospitalizations and deaths among fully vaccinated individuals have remained low. Vaccine efficacy against infection has fallen significantly, but there is still protection...

OHA understands that people who have been fully vaccinated can still transmit COVID-19."

---

[54]

https://drive.google.com/file/d/1568fKNWNgRD5zgjkElpKsZC8iWEvGAMQ/view?usp=sharing

435.  Within this same letter, Defendant Banks cited, "COVID-19

Breakthrough Report Oregon's Monthly Surveillance Summary; Monthly

Breakthrough Case Report July 2022 OHA 2395B (8/4/22)"[55].

436.  Page 10 of the Breakthrough Case Report shows that for the months of

May-July 2022, the percentage of "vaccinated" individuals who had a

"COVID-19 death" ranged between 51.2-61.3% i.e. a majority of "COVID-19

deaths" were those individuals who were "vaccinated".

Table 7. COVID-19 deaths by month, by breakthrough case status

| Month | Total COVID-19 deaths | Breakthrough deaths | Percent breakthrough deaths |
|---|---|---|---|
| April 2021 | 123 | 6 | 4.9 |
| May 2021 | 228 | 20 | 8.8 |
| June 2021 | 120 | 16 | 13.3 |
| July 2021 | 99 | 16 | 16.2 |
| August 2021 | 610 | 134 | 22.0 |
| September 2021 | 941 | 199 | 21.1 |
| October 2021 | 661 | 175 | 26.5 |
| November 2021 | 417 | 95 | 22.8 |
| December 2021 | 351 | 87 | 24.8 |
| January 2022 | 619 | 222 | 35.9 |
| February 2022 | 651 | 254 | 39.0 |
| March 2022 | 248 | 116 | 46.8 |
| April 2022 | 89 | 32 | 36.0 |
| May 2022 | 142 | 87 | 61.3 |
| June 2022 | 162 | 83 | 51.2 |
| July 2022 | 127 | 69 | 54.3 |

437.  Despite Banks's claim that "vaccines "still [provide] protection from

severe illness, hospitalization and death", the Health Authority's own data

shows that most of the "COVID-19 deaths" were those of the "vaccinated".

---

55

https://drive.google.com/file/d/1xUDmoMW2PPSYxRAKMedrz_qGvrqBesrM/view?usp=sh
aring

438. Banks also stated in her letter (page 3) that, "cases of COVID-19 and hospitalizations due to COVID-19 have risen recently. Some of this increase is exacerbated by the lifting of mask requirements in schools and in public places in early March."

439. Yet, in another letter[56], Defendant Banks' response to amend OAR 333-019-1015 (Mask Rule) also dated July 26, 2022, Banks stated, "OHA does not have any plans to reinstitute masking in schools," despite claiming that "[m]asks, when worn correctly and consistently, reduce the transmission of COVID-19. Masks protect not only children and staff in school, but also, they help protect others in the community".

440. Banks did not explain why, if some of the increase in "COVID-19 cases" and "COVID-19 hospitalizations" were "exacerbated by the lifting of mask requirements in schools and in public places in early March [2022]", why Banks did not reinstate the COVID Mask Rule or why Banks did not repeal COVID Vax Rule, if Defendant Banks believed that the lack of mask use was the cause of COVID-19 cases and hospitalizations.

441. In Banks' response[57], she states, "OHA continually monitors COVID-19 variants, disease trends and vaccine effectiveness and *believes* the rule is still necessary to control COVID-19." (emphasis added)

---

56
https://drive.google.com/file/d/1sYPIUC-3WuV3rqhG86sO_FOYVy8vMfDF/view?usp=sharing
57
https://drive.google.com/file/d/1568fKNWNgRD5zgjkElpKsZC8iWEvGAMQ/view?usp=sharing

442. Defendant Banks' statement reveals that methods to "control COVID-19" is not based on data which clearly contravenes Banks' claim that "vaccination" "is one of the most effective ways to reduce the potential for...death from COVID-19" but rather based on her "beliefs" that the "vaccines" are effective against "COVID-19 deaths".

443. Over the course of sixteen (16) months and counting, the purported reason for Vax Rule went from "controlling COVID-19" to "better protecting" K-12 employees against "severe disease" (a falsehood) and thus having "less time out of school"[58].

444. The idea that the "vaccine" reduces symptoms, thus allowing K-12 employees to continue reporting for work, *while sick* and therefore can transmit "COVID-19", instead of having employees call-in sick and thus self-isolating, is the antithesis of "controlling COVID-19" or "protecting students".

445. In both responses to petitions for repeal of Vax Rule, Banks states that, "COVID-19 vaccines are safe. They have undergone multiple clinical trials..."

446. Banks knew or should have known that at all times relevant to this lawsuit, all "COVID-19 vaccines" available in the US were investigational drugs *still* undergoing clinical trials.

447. Banks knew or should have known that the package insert for the only FDA- "approved COVID-19 vaccine", COMIRNATY states that, "COMIRNATY

---

[58]

https://www.oregon.gov/oha/PH/RULESREGULATIONS/Documents/333-019-1030_Petitio n_Letter_Response%20_120922.pdf

has not been evaluated for the potential to cause carcinogenicity, genotoxicity, or impairment of male fertility."[59]

448. Banks knew or should have known that the "COVID-19 vaccines" are not "safe" and are known to increase the risk of serious conditions such as myocarditis and pericarditis[60].

### F. EXHAUSTION OF ADMINISTRATIVE REMEDIES

449. Plaintiff timely filed a charge of discrimination against the School with the Equal Employment Opportunity Commission ("EEOC").

450. EEOC merged Plaintiff's charges of discrimination[61] with Plaintiff's Oregon Bureau of Labor & Industries ("BOLI") complaint and closed the EEOC charge due to duplication with the BOLI complaint.

451. Plaintiff files this complaint within 90 days after receiving a notice of the right to sue from the EEOC/BOLI. A copy of the notice of the right to sue is attached as Exhibit E.

---

[59] https://www.fda.gov/media/154834/download

[60] A study from Goddard et al. showing a 14-fold increased risk of myocarditis/pericarditis after the second Pfizer and an 18-fold increased risk after the second Moderna dose. This paper is co-authored by CDC scientists like Tom Shimabukuro and Eric Weintraub and is based on the CDC's Vaccine Safety Datalink.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9273527/
[61]

https://drive.google.com/file/d/1SiCmj63UDZ7zDtbLXTPMGklWiojJrfm5/view?usp=sharing

VERIFIED COMPLAINT

## G. SPECIFIC FACTUAL ALLEGATIONS

### Plaintiff's Religious Beliefs

452.   Plaintiff's spiritual beliefs are strongly influenced by Plaintiff's South-east Asian upbringing, and are not part of any organized religion.

453.   Plaintiff's conscientious beliefs are deeply rooted in Chinese mysticism, Taoism and Confucianism; and are also influenced by the tenants of Christianity, Hinduism and Islam.

454.   However, Plaintiff's beliefs are not distinctly part of any of these belief systems.

455.   The Chinese believe that *mó guǐ* (魔鬼) are demonic entities - malevolent spirits which seek to inflict vengeance and pain on mankind.

456.   Plaintiff believes that the world-wide implementation of locking down the world's borders, worldwide use of social isolation, contact-tracing, masking, rollout of implementing the use of PCR testing and the concerted development, approval, production and distribution of multiple very similar "COVID-19 vaccinations" around the world - where efforts to eradicate the cold virus have failed for decades - involve organizational skills which are not of this world.

457.   Plaintiff, who is formally trained in Chemical Engineering, cannot comprehend how any product, let alone a highly unstable biological product which has to be kept at extremely low temperatures, can be scaled up from

VERIFIED COMPLAINT

laboratory-level production to world-wide industrial level production *and* distribution at such dizzying "warp speed" - a mere matter of months.

458.  Plaintiff believes that such incomprehensible production speed *or* pre-production of the "vaccines" is the work of the malevolent spiritual realm.

459.  Plaintiff believes that the *mó guǐ* (魔鬼) can more easily inhabit, or manipulate people who are in fear, who are desperate, who are "under the influence" of drugs, alcohol - aka "the spirits", who are sensitive to certain frequencies or who have experienced trauma.

460.  Plaintiff believes that these or other factors open a person to being more easily inhabited by other entities, benign or otherwise.

461.  For example, Plaintiff believes that the Christian idea of "sins" are actually different *mó guǐ* (魔鬼) driving the hand of the person it inhabits.

462.  Plaintiff believes that each *mó guǐ* (魔鬼) is distinctive and speaks to the person in the form of that person's thoughts - but those are not the true thoughts of the person the *mó guǐ* (魔鬼) speaks to.

463.  Plaintiff believes that this is why each demon responsible but its respective "sin" or *mó guǐ* (魔鬼) exhibits the same or similar characteristics in very different people in which they inhabit.

464.  Some Native American tribes call these *mó guǐ* (魔鬼) "weitko".

465.  Plaintiff believes that Christianity shares similar ideas to the Plaintiff - Lucifer is Pride, Satan is Wrath, Asmodeus is Lust etc.

466.  Plaintiff believes that fighting the voices or directives of the *mó guǐ* (魔鬼) can be likened to what Muslims call "Jihad" - an internal spiritual struggle.

467. In extreme cases, Plaintiff believes that the most hallowed out people can be fully controlled by the *mó guǐ* (魔鬼).

468. Plaintiff believes that when people become victim to the directives of the *mó guǐ* (魔鬼), they fall into the trap of potentially engaging in heinous offenses and crimes.

469. Plaintiff believes that those who escape punishment in the earthly world, will not escape punishment in the afterlife, where they are banished to one of the 18 levels of Chinese hell - Diyu, 地狱, or purgatory.

470. Behaviors which can earn a person a place in Chinese purgatory include but are not limited to hypocrisy, intentional self-harm, knowing child abandonment, voluntary food wasting, deceiving, knowingly sowing discord within the family and knowingly breaking the marriage bonds of others.

471. The punishments of Chinese purgatory are far more explicit and horrific than the flames of Christian hell.

472. Plaintiff does not want to end up in Chinese purgatory.

473. Plaintiff believes that the "COVID-19" mitigation measures adopted worldwide, are being driven by demonic or *mó guǐ* (魔鬼) forces moving the hands of many - from heads of states, to government agencies, down to the customer at the local store demanding the compulsory use of masks.

474. Plaintiff believes that it is vampiric and inherently evil for the infirmed and the old, or anyone else, to demand that the young and healthy sacrifice their childhood or youth; their mental, physical and economic health so that

those who have already lived their lifetime can potentially extend their selfish lives for a few more months.

475. Plaintiff believes that for the Oregon Health Authority - a *Public Health Authority* - to demand, using threats of imposing heavy fines or threats of loss of teaching licensure; that K-12 schools and teachers enforce the use of a *plastic device which covers the nose and mouth* snugly for any length of time, let alone for an entire school day, is *demonic.*

476. Plaintiff believes that purgatory punishment will be inflicted on Plaintiff for willingly participating in what Plaintiff believes to be great harm being inflicted on mankind.

477. For anyone who believes in masking or vaccines, Plaintiff supports their right to make *informed* healthcare decisions *for themselves.*

478. Plaintiff believes that OHA form 3871 is a spiritual contract which agrees by signature, that Plaintiff consents to what Plaintiff believes to be a malevolent "COVID-19" agenda.

479. Plaintiff has a conscientious objection to the Oregon Health Authority's deceptive use of the term "exception" versus "exemption".

480. An exemption pertains to the scope of the rule, not its enforcement, and is the condition whereby a rule does not apply to whomever is declaring the exemption.

481. An exception is not about the scope of the rule, but a deviation from the administration of the rule which allegedly applies to whomever is declaring the exception.

482. The OHA form 3871 states, "you may be required by your employer or other responsible party to take additional steps to protect you and others from contracting and spreading COVID-19."

483. Plaintiff has a conscientious objection to signing OHA form 3871, which Plaintiff believes implicitly agrees that Plaintiff is subject to the jurisdiction of the *mó guǐ* (魔鬼) forces Plaintiff believes is driving the hand of the Health Authority.

484. Plaintiff believes that by signing OHA form 3871, without crossing out certain terms and conditions or without some notation indicating that Plaintiff is signing under duress, that Plaintiff willing consents to harmful *mó guǐ* (魔鬼) agendas masquerading as "COVID-19 mitigation measures", to be inflicted on Plaintiff (ie intentional self-harm) as well as others (ie international harm on others).

485. As such, signing OHA form 3871 without crossing terms out or without the words "under duress", is conscientiously reprehensible to Plaintiff.

486. To accommodate the interests of the School wishing to comply with Vax Rule, Plaintiff was willing to sign OHA form 3871, as long as Plaintiff could do so on Plaintiff's terms - i.e. either crossing out sections of the form, or signing "under duress".

487. This reasonable accommodation request would have had no bearing on the School's need to "comply" with the black letter of Vax Rule.

488. Plaintiff objects to Defendants Banks', Woods', Hill's, Sconce's, insurer

legal counsel's and the School BOARD members' regulation, suppression and

censorship of her sincerely held religious beliefs.

## Failure to Adequately Train

489. OAR 584-420-0070 Professional Administrator License requires school

administrators to be trained the following:

Standard 1: Mission, Vision, and Core Values.
Standard 2: Ethics and Professionalism
Standard 3: Equity and Cultural Leadership
Standard 4: Instructional Leadership
Standard 5: Community and External Leadership
Standard 6: Management of People, Data, and Processes
Standard 7: Policy, Governance, Advocacy, and Sociopolitical Leadership
Standard 8: Clinical Practice Program

490. Douglas ESD's website[62] states,

"Our HR [human resource] focus is based on knowledge and respect. A
high value is placed on open and fair communication and a continuous
commitment for consistency in employment practices, best practices,
compliance with state and federal laws and guidelines, OSHA, FMLA,
OFLA, ADA [Americans with Disabilities Act] and worker's
compensation."

491. The School's and Douglas ESD's training programs are inadequate as

they do not train the Superintendent and Director of Human Resources

respectively, in Constitutional protection procedures.

492. Constitutional-protection training was obviously necessary to avoid

violations including but not limited to the unreasonable search and seizure of

---

[62] https://douglasesd.k12.or.us/human-resources/

VERIFIED COMPLAINT

employees' private papers, employees' right to refrain from association, first amendment retaliation, employee free exercise and due process procedures.

493. Because the Superintendent Woods and HR Hill were inadequately trained, Woods and Hill relied upon administrative rules approved by Public Health Director Banks acting under the direction of Governor Brown, to justify the chilling and deterring of the Plaintiff's rights.

494. Superintendent Woods' and HR Hill's inadequate training amounts to deliberate indifference to the rights of K-12 school employees.

495. This deliberate indifference was the moving force of the violation of Plaintiff's federally protected rights under the First, Fourth, Thirteenth and Fourteenth amendments of the US Constitution.

## The School's and Douglas ESD's Delegation of Authority to Woods and Hill Respectively

496. All the minutes of the the School BOARD meetings dating as far back as January 11, 2021[63] show that the School BOARD was aware of all the actions Woods was taking or intending to take with regards to the enforcement of Mask Rule and Vax Rule.

497. The August 19, 2021 Douglas ESD Board of Directors meeting shows that HR Hill shared her (Hill's) "process" on how to help school districts "gather information" by October 18, 2021, regarding Vax Rule.

---

[63]

https://www.dayscreek.k12.or.us/uploads/1/2/3/1/123181851/minutes_2021-01-11.pdf

VERIFIED COMPLAINT

498.  The Douglas ESD Board of Directors October 21, 2021 meeting minutes[64] further reflect that HR Hill reported to the Douglas ESD Board of Directors in relevant part that, "[t]here has been a lot of hiring and leaving. Really trying to get through the vaccine mandate. The ESD currently has 99.9% of staff vaccinated and/or exempt".

499.  Thus, Douglas ESD's Board of Directors had knowledge of the widespread pattern of similar incidents and circumstances under which Hill's actions of facilitating or being instrumental in school districts' demanding compliance of OAR 333-019-1030 ("VAX Rule") from said district's employees.

500.  The School's and Douglas ESD's Boards' knowledge or actions as described herein, show that both the School and Douglas ESD had adopted a custom or policy of delegating of final policy making authority with regards to Mask Rule and Vax Rule; through the respective Board's "affirmative link" of an implied "continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987).

### Vicarious Liability Claims against Douglas Education Service District ("Douglas ESD")

501.  The business of Douglas Education Service District in relevant part, is to support and guide managers, employees and member school districts through the entire cycle of employment, with a "continuous commitment for

---

[64]

https://drive.google.com/file/d/1v0QTi42Z9tEIMKrq-a3uBY_os_XLF-nN/view?usp=sharing

consistency in employment practices, best practices, compliance with state and federal laws and guidelines, OSHA [Occupational Safety and Health Administration], ... ADA [Americans with Disabilities Act] and worker's compensation."[65]

502. HR Hill is employed by Douglas ESD to oversee the purposes as described in the preceding paragraph.

503. At all times relevant to this lawsuit, HR Hill purported to be an agent acting as the School Director of Human Resources, which is within the scope of Hill's employment.

504. At all times relevant to this lawsuit, HR Hill was within the Douglas ESD authorized space limits as the Douglas ESD Director of Human Resources.

505. At all times relevant to this lawsuit, HR Hill, acting as an agent for the School, was at the School premises to conduct official business.

506. The days and times at which the relevant events happened were: The morning of Tuesday, October 5, 2021; Thursday, October 14, 2021, around 11am-noon; and Monday, October 18, 2021, around noon; which are all within the authorized times with which Douglas ESD conducts business.

507. As an agent for Douglas ESD, HR Hill was subcontracted by the School to act on the School's behalf.

508. HR Hill committed acts of -

---

[65]https://douglasesd.k12.or.us/human-resources/

VERIFIED COMPLAINT

(a)    willfully failing to correct Plaintiff's pay rate during the third quarter of the 2020-21 school year;

(b)    willfully imposing disparate employment conditions on Plaintiff under the color of law;

(c)    willfully failing to reasonably accommodate Plaintiff under the Americans with Disabilities Act and Title VII of the Civil Rights Act;

(d)    willfully enlisting Union Rep. Sconce to help conduct inquisition into Plaintiff's minority religious beliefs; and

(e)    willfully facilitating or instrumenting Superintendent Woods terminating Plaintiff without prior School BOARD approval.

509.   HR Hill's actions as described, were at least in part, undertaken by a purpose to serve Hill's employer, Douglas ESD who was acting as an agent for the School.

510.   HR Hill purported to act or speak on behalf of Douglas ESD, acting as an agent for the School.

511.   Plaintiff relied on HR Hill's misuse of delegated authority, while Hill was acting as the Director of Human Resources.

512.   The minutes of the Douglas ESD meetings as described herein, shows that Douglas ESD knowingly permitted and affirmatively held HR Hill out as having authority to act on Douglas ESD's behalf.

513.   Hill was aided in interfering with Plaintiff's business relations with the School, as well as causing Plaintiff's emotional distress because of the

existence of the agency relation which Hill had with the School as an employee of Douglas ESD.

### *Respondeat Superior* Claims Against Oregon Education Association ("Union")

514. The business of Oregon Education Association ("Union") is to serve as an advocate for school students, as well as to advocate for the rights and for better working conditions for public employees in the education field.

515. Upon information and belief, Union Rep. Sconce was employed for the latter purpose.

516. At all times relevant to this lawsuit, Union Rep. Sconce purported to be representing the rights of Union members, which is within the scope of Sconce's employment.

517. At all times relevant to this lawsuit, Union Rep. Sconce was in the School Superintendent's office, on the premise of the School, which is within the Union-authorized space limits; acting as the Union Representative who was at the School premises to conduct official business.

518. The day and time at which the relevant events happened was Thursday, October 14, 2021, around 11am-noon, which is within the authorized time with which the Union conducts business.

519. During the April 28, 2022 employment appeals hearing, HR Hill testified that Union Rep. Sconce was representing both the Union and Plaintiff, in furtherance of the Union's business of representing educators.

VERIFIED COMPLAINT

520. It should have been obvious to any reasonably competent labor organization representative, who is in charge of representing member interests in employment-related matters, that meddling with anyone's, especially a non-member's personal papers, is a gross invasion of privacy.

521. Union Rep. Sconce's intrusion, assumption of authority and active participation in Plaintiff's employment-related matters shows that the Union was grossly negligent or reckless in not properly training Union Rep. Sconce in the boundaries of a Uniserv Consultant's authority.

522. Sconce purported to act or to speak on behalf of the Union and there was reliance by Woods and Hill upon Union Rep. Sconce's apparent authority.

523. Sconce was able to act in such an authoritative manner, because of Sconce's position as the Douglas County Uniserv Consultant for the Union.

524. Sconce's acts, which in essence, were to induce Plaintiff to comply with the edicts of OAR 333-019-1030 ("Vax Rule"), is in furtherance of the Union's publicly stated support of Vax Rule.

525. Through the Notice of Claims which Plaintiff sent to Union President Reed Scott-Schwalbach, the Union was made aware of the details of Sconce's actions taken against Plaintiff.

526. The Union ratified Defendant Sconce's actions by continuing to employ Sconce as a Uniserv Consultant.

### *Respondeat Superior* Claims Against Oregon School Boards Association ("insurer")

527.   The Oregon School Boards Association ("insurer") website states that its purpose is to provide "legislative advocacy at state and federal levels, board leadership training, employee management assistance and policy, communications, legal and financial services" to public school boards.

528.   Upon information and belief, the insurer's legal counsel was employed to provide legal services to public schools and education service districts.

529.   Upon information and belief, at all times relevant to this lawsuit, the insurer's legal counsel purported to offer "free legal advisement" to Woods or Hill, which is within the scope of the insurer's legal counsel's employment.

530.   Upon information and belief, at all times relevant to this lawsuit, the insurer's legal counsel was within the insurer-authorized space limits; acting as the insurer's legal counsel to conduct official business during authorized business hours.

531.   HR Hill testified on April 28, 2022 that the insurer's legal counsel made legal determinations regarding Plaintiff's terms of employment, which had nothing to do with Plaintiff's job performance or to Plaintiff's adherence to the Laws of the State of Oregon, duly adopted rules by the Oregon Department of Education or duly adopted policies by the the School BOARD.

532.   It should have been obvious to any reasonably competent attorney, providing state-level public education legal support or advice, that any K-12 school district's demand for private medical or "approved" religious papers as

VERIFIED COMPLAINT

a condition of employment, violates Plaintiff's (and others similarly-situated) Constitutional and Statutory rights.

533. The insurer's legal counsel's intrusion, aiding and encouraging in Plaintiff's employment-related matters shows that the insurer was grossly negligent or reckless in not properly training the insurer's legal counsel in the Federal and State Constitutions and laws.

534. The insurer's legal counsel purported to act or to speak on behalf of the insurer and there was reliance by Woods and Hill upon Defendant the insurer's legal counsel's apparent authority.

535. The insurer's legal counsel was able to act in such an authoritative manner, because of the insurer's legal counsel's position.

536. The insurer's legal counsel's acts, which in essence, were to induce Plaintiff to comply with the edicts of OAR 333-019-1030 ("VAX Rule"), is in furtherance of the insurer's publicly stated support of Vax Rule.

## § 1983 Joint Action Claims against Oregon Education Association ("Union")

537. Defendants Woods and Hill are local or municipal officials.

538. To act "under color of" State law for § 1983 purposes , it is enough that he is a willful participant in joint action with the State or its agents. *Dennis v. Sparks*, 449 U.S. 24 (1980)

539. Private persons, jointly engaged with state officials in the challenged action, are acting under "color of law" for purposes of § 1983 actions. *Adickes v. S. H. Kress & Co.* (1970); *United States v. Price* (1966).

VERIFIED COMPLAINT

540. The Union worked jointly and closely in concerted action with Governor Brown, whose policy was to advance the uptake of the "COVID-19 vaccines" in the K-12 education sector differently than could be done in Brown's executive branch.

541. More broadly, Brown was an integral part of policy-making pertaining to all K-12 school employees to be "vaccinated" as an occupational requirement.

542. The very same day that Governor Brown issued her public directive to the Oregon Health Authority to promulgate the Vax Rule for K-12 employees, the Union and its President, Reed Scott-Schwalbach, publicly responded to Brown's call.

543. The facts show that there was a backdrop of entwinement with a private labor association - the more than 40,000 member strong state-wide Union was entrusted to help pressure members *and* non-members into associating with Brown's beliefs.

544. Woods, Hill, Sconce and insurer's legal counsel erred in their zeal to be the shining star of the Brown's arsenal to implement "vaccine mandates" by acting too far under the color of law - by their pervasive insensitivity of the rights of individuals to refrain from association, to be free from unreasonable search and seizures; and the right to seek exemptions.

### § 1983 Pervasive Entwinement Claims against Oregon School Boards Association ("insurer")

545. The Oregon School Boards Association ("insurer") is a non-profit public benefit corporation.

546. All insurer members are either local public school districts; Education Service Districts; Community College Districts; the State Board of Education; or any governmental educational organization qualifying as a political subdivision.

547. Insurer officers and board members consist entirely of either Education Service District employees, or public School Board members.

548. Thus, the insurer is an organization of public schools, represented by their officials acting in their official capacity; to provide communications, legal and financial services support to public education agencies.

549. To complement the insurer's entwinement with the State, Section 1 of the insurer's bylaws states in the relevant part that the OSBA

"exists solely to perform essential governmental functions and all of its income accrues to the State of Oregon or its political subdivisions as required under IRC Section 115."

550. According to the insurer's 2021-22 Budget Report[66], most of the insurer's non-investment income is derived from government funds.

551. The insurer's "nominally private character is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying

---

[66]

https://www.osba.org/-/media/Files/About-OSBA/Reports/Budget/OSBA-Budget-2021-22.pdf

constitutional standards to it." *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001)

552. There can be no doubt that the government benefits from its pervasive entwinement relationship.

553. Entwinement to the degree shown here requires that the insurer be charged with a public character and judged by constitutional standards.

## VI. DEMAND FOR EMPANELMENT OF GRAND JURY PRIMA FACIE EVIDENCE OF CRIMINAL ACTS BY DEFENDANTS

554. Plaintiff incorporates by reference the facts set forth above as if set forth herein full.

555. Plaintiff is seeking compliance with title 42 U.S.C. § 1987 (Prosecution of violation of certain laws) that authorizes and requires, at the expense of the United States, to institute prosecutions against all persons violating any of the provisions of Title 18 U.S.C. § 241 and 242, Title 18 U.S.C. § 1964 (a) (b) (c) and § 1968 (Civil investigative demand) and to cause such persons to be arrested, and imprisoned or bailed, for trial before the court of the United States or the territorial court having cognizance of the offense. See *Pub. Law 106-274, Sec. 4 (d), Sept. 22, 2000, 114 Stat. 804.*

556. As a proximate result by state action; depriving Plaintiff of constitutionally protected rights and the concerted effort on the part of Defendants to violate Plaintiff's constitutionally secured rights; absent of due process, as well as, repeated and multiple violations of Oregon Law and the rights protected by the Oregon Constitution, specifically:

VERIFIED COMPLAINT

A.    Oregon Constitution Article I §§ 2, 9, 17, 20, 21, 22, 34;

B.    Oregon Constitution Article III § 1;

C.    Tampering with physical evidence ORS 162.295 ;

D.    Tampering with public records ORS 162.305;

E.    Simulating legal process ORS 162.355 ;

F.    Official misconduct in the second degree ORS 162.405;

G.    Official misconduct in the first degree ORS 162.415 ;

H.    Recklessly endangering another person ORS 163.195;

I.    Subjecting another person to involuntary servitude in the second degree ORS 163.263;

J.    Coercion ORS 163.275;

K.    Criminal impersonation of a public servant ORS 162.365;

L.    Extortion ORS 164.075;

M.    Theft by deception ORS 164.085;

N.    Forgery in the second degree ORS 165.007;

O.    Criminal possession of a forged instrument in the second degree ORS 165.017;

P.    Practice of medicine without license ORS 677.990; ORS 677.085(4).

**VII. COMPLIANCE WITH NOTICE PROVISIONS**

557.  Plaintiff timely presented her claims to Defendants as required by the Oregon Tort Claims Act. ORS 30.275

VERIFIED COMPLAINT

## VIII. CLAIMS FOR RELIEF

### COUNT 1
### 42 U.S.C. § 1983 - SEPARATION OF POWERS

**For Declaratory and Injunctive Relief against Brown and Banks in their Official Capacities**

**For Damages against Brown and Banks in their Individual and Official Capacities**

---

558.   Plaintiff realleges and incorporates by reference all paragraphs above.

**Governor Brown**

559.   As the Governor of the State of Oregon, Brown is engaged in policy making.

560.   Before her Governorship, Brown, a professionally-trained lawyer, served in various high-ranking State-official positions since 1991.

561.   In the discharge of Brown's duty as the Governor of Oregon, Brown publicly directed the promulgation of Mask Rule and Vax Rule.

562.   Brown usurped the police power of the State legislature by using directives to the Oregon Health Authority to promulgate Mask Rule and Vax Rule, which illogically targeted a discrete quasi-suspect class of K-12 school employees.

563.   Governor Brown knew or should have known that Brown is neither medically licensed or legally authorized by Constitution or law, to prescribe or to legislate any form of medical intervention on anyone.

**VERIFIED COMPLAINT**

564. Governor Brown knew or should have known that she only has *limited* additional emergency powers - not carte blanche powers to act according to Brown's own beliefs. Oregon Constitution X-A, ORS 401.168 and ORS 401.175

565. In Executive Order EO 22-03[67], Defendant Brown stated, "A sudden crisis can require the Governor to invoke extraordinary emergency authorities...only when absolutely necessary, as they temporarily alter the normal balance of power..."

566. Therefore, Brown knew that her actions *had* altered the normal balance of power.

567. Yet, Brown acted under the color of the Emergency Powers granted to her as the Governor; and purported to act in the performance of her official duties in issuing directives to the Oregon Health Authority to promulgate OAR 333-019-1015 ("Mask Rule") and OAR 333-019-1030 ("Vax Rule").

568. The use of such directives to promulgate administrative rules is an unconstitutional exercise of legislative or judicial power.

569. Vax Rule seized functions properly committed to the Legislature and Judiciary, deprives Plaintiff and others similarly-situated ("others"), of the structural protections available when such functions are exercised by their constitutionally-assigned branches, such as opportunities for legislative and subsequent judicial review and the possibility of reconsideration.

---

[67] https://www.oregon.gov/gov/eo/eo_22-03.pdf

570. Under the integral-participant doctrine, Governor Brown set in motion a series of acts by others which Brown knew or reasonably should have known would cause these others to inflict the constitutional injury which Plaintiff and others similarly situated suffered. *Dahlia v Rodriguez*, 735 F.3d at 1078 n.22 (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999)).

571. Governor Brown's directives were based on improper motives - to wrest the police power of the state legislature - and cannot be reasonably characterized as acting in good faith.

572. Brown acted with such disregard for Plaintiff's - as well as others'- clearly established constitutional and statutory rights as described herein.

573. Brown is responsible and therefore liable as the person responsible for the series of events that occurred subsequent to the direction and approval of Mask Rule and Vax Rule, which resulted in the Constitutional injury which Plaintiff and others suffered.

**Public Health Director Banks**

574. It is well-established law that agencies of state government are controlled and derive their powers, except as provided in the constitution, through acts of the legislature. *Powell Grove Cem. v. Multnomah Co.*, 228 Or. 597, 600 (Or. 1961)

575. Banks' power to approve and implement Oregon Health Authority Administrative Rules is derived from Banks' position as the Director of Public Health of the Oregon Health Authority.

576. State laws governing the Oregon Health Authority's statutory authority, as well as the authority of the Public Health Director, are clearly laid out under Oregon's Public Health Laws.

577. The Mask Rule and Vax Rule were *not* sanctioned by the State legislature.

578. Vax Rule's demand for "papers" exercised coercive power upon employing K-12 schools, in order to further Brown's and Banks' agenda of forced association with their totalitarian ideology upon a discrete class of K-12 school employees.

579. Banks knew or should have known that all citizens of Oregon have the clearly established right to protection under the Oregon Constitution Art. III §1 Separation of Powers doctrine; to protection under the 1st, 4th, 13th and 14th Amendments; to protection under the Contract Clause; as well as to protection from employer medical inquiries under ORS 659A.136.

580. The only cold "vaccine" allegedly approved by the FDA is an mRNA gene-therapy product, which the FDA defines as "treatment".

581. Prescribing mandatory injection of cold "vaccination" using the obfuscated way of requiring the surrender of "proof of vaccination" papers, in order to "control" the cold can only be taken to mean having to undergo medical treatment to prevent the "COVID-19" disease.

582. State law expressly forbids the Health Authority or any of its employees, agents or representatives from interfering with an individual's selection of treatment or religious practice. ORS 431.180

VERIFIED COMPLAINT

583. Within Vax Rule, Banks approved utterance of falsehood that, "[b]eing vaccinated, is therefore critical to prevent spread of Delta."

584. As the Oregon Health Authority Director of Public Health, Banks knew or should have known that the blanket mask and vaccine edicts, issued by the Health Authority to circumvent its limited statutory authority and procedural due process as laid out under ORS Chapter 433, in particular, ORS 433.121; unbalances the clearly established Separation of Powers Constitutional framework in that Banks abused her Executive branch agency official role to promulgate rules which had the effective force of law without proper delegation from the legislature.

585. Procedural due process is clearly established under State law, where the Public Health Director or the local public health administrator must issue a written order to the person suspected of having a communicable disease; the written order must follow specific procedure; a medical examination must be carried out by a local health officer or an Oregon-licensed physician; a written report must be issued; the public health administrator may issue an order requiring prescribed treatment; the person may refuse the medication or other treatment; the public health administrator may order isolation or quarantine; and if the person refuses to comply, a court order for isolation or quarantine is required. ORS 433.035

586. Since only those infected or suspected to be infected with the cold can transmit the disease, procedures laid out under state law is appropriate to "control" the cold, regardless of an individual's occupational status or

regardless of providing "proof" of having been "treated" with substances which are ineffective to Vax Rule's purported purpose. ORS 433.035

587. Instead of applying State law, Banks acted under the color of law in approving Vax Rule, which blankets a class of individuals, suspecting them all of carrying a communicable disease, then imposing medical treatment, based illogically and solely on occupational status. ORS 433.035

588. By circumventing due process procedures as set forth in State law, Banks exhibited the malicious intent to deprive K-12 school employees of their constitutional rights - simply because they do not conform to Brown's and Banks' totalitarian ideologies. ORS 433.035

589. No reasonably competent official or Director of the Oregon Health Authority, with or without legal counsel, could have believed that a directive, tweet or press statement from the Governor constitutes as a law which grants the Oregon Health Authority the authority to promulgate Administrative Rules.

590. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 2
### 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM

For Declaratory and Injunctive Relief against Brown and Banks in their Official Capacities

For Damages against Brown, Banks, and Woods in their Official and Individual Capacities

VERIFIED COMPLAINT

591. Plaintiff realleges and incorporates by reference all paragraphs above:

592. In the discharge of official government duties, Governor Brown, Public Health Director Banks, Superintendent Woods and HR Hill knew or should have known that their individual direct and indirect actions violated the Equal Protection Clause as clearly established by the 14th Amendment of the United States Constitution, and corresponding provision of the Oregon Constitution Article I § 20. *Jacobson v. Massachusetts* (1905).

593. Governor Brown's directives and Banks' promulgation of Vax Rule set in motion a series of acts by others which Brown and Banks knew or reasonably should have known would cause others to inflict the constitutional injury which Plaintiff and others suffered.

### *Quasi-suspect Classification*

594. OAR 333-019-1030 ("Vax Rule") involves de facto government classification in that Governor Brown specifically targeted "all teachers, educators, support staff, and volunteers in K-12 schools to be fully vaccinated."

595. Vax Rule targets only a discrete group of persons or individuals - K-12 school employees and volunteers, by its demand for private medical or religious "papers" not related to any essential job function, as an occupational condition.

596.  Such unreasonable searches and seizures on this class as an occupational requirement, infringes on the fundamental rights of K-12 employees to be secure in their papers.

597.  The K-12 employee classification is quasi-suspect in that it is a well-known fact that a majority of teachers, about 76.5%[68], are female.

598.  Additionally, OAR 333-019-1010 *COVID-19 Vaccination Requirement for Healthcare Providers and Healthcare Staff in Healthcare Settings*, which Banks adopted on the same date as Vax Rule, based on the same August 16, 2021 press statement issued by Governor Brown, effectively bars women from another predominantly (about 73%[69]) female industry.

599.  Females are a discrete and insular minority.

600.  Being female is an inherent trait that is highly visible and is a class which has historically been disadvantaged and has historically lacked effective representation in the political process.

601.  Governor Brown's directives, which resulted in the adoption of Vax Rule and OAR 333-019-1010 ("Healthcare Staff Vax Rule"), posed an extreme and foreseeable impact on women's employment opportunities in Oregon.

602.  The foreseeability of Brown's directives and the resulting promulgation of Vax Rule and Healthcare Staff Vax Rule's discriminatory impact is sufficient to prove discriminatory purpose, especially since Brown already

---

[68] https://nces.ed.gov/surveys/ntps/tables/ntps1516_19031801_t1n_rev.asp
[69] https://data.census.gov/cedsci/table?g=0400000US41&tid=ACSST5Y2020.S2404

admitted in her March 5, 2021 Open Letter months prior, that schools are at "very low risk of COVID-19 transmission".

603. The effect of Brown's directives and their resulting promulgation of the administrative rules absolutely and permanently prevents a large percent of the state's women from obtaining employment in the education or healthcare fields that they trained for, due to circumstances beyond their control, which is being unable or unwilling to surrender "papers" unrelated to the objective assessment of job qualification.

### *No Compelling State Interest*

604. Vax Rule was purportedly promulgated in order to "control COVID-19" and to "protect" students too young to get "vaccinated".

605. The state legislature has already passed laws involving isolation and quarantine of individuals or groups with or exposed to communicable diseases - none involve forced medical intervention; and certainly not intervention of any kind on healthy individuals or groups. ORS Chapter 433

606. Since the cold "vaccines" neither prevent contraction or transmission of the cold virus, there is no legitimate governmental objective to demand papers not related to the essential function of any job.

607. Furthermore, there are no "reasonably conceivable state[s] of facts that could provide a rational basis" for the differential treatment of students in the same K-12 school settings or personnel in stand-alone pre-K to K schools or the general public; and personnel in K-12 school settings. *Immaculate Heart,* 797 F.Supp.2d at 211

### *Tailoring Both Too Broad and Too Narrow*

608. Vax Rule was not narrowly tailored with the least restrictive means to achieve the purported purpose of "protecting" students, especially those who are too young to be "vaccinated" in that they do not address the specific experience of the virus across Oregon.

609. The justification for Vax Rule was to "control COVID-19", and to ensure that students can stay in school and receive in-person instruction.

610. Even if the "vaccines" are "effective", which Vax Rule admits it is not; Vax Rule does not require all students eligible to be "vaccinated" to be "vaccinated" as a condition of onsite school attendance.

611. Vax Rule creates a favored class, explicitly excluding staff of stand-alone pre-Kindergarten through Kindergarten schools, whose students consist entirely of those who were too young to be "vaccinated". OAR 333-019-1030(2)(h)(B)

612. This exclusion serves as an inconvenient example of how the Vax Rule fails at appropriate tailoring.

613. There are more than 1,200 public K-12 schools organized into 197 school districts in the State of Oregon, serving over half a million students, spread over a vast 98,000 square miles, which range from dense urban areas to small towns and vast expanses of rural communities.

614. Of these schools, some function exclusively online.

615. The virus's prevalence varies greatly over the vast diversity of the State of Oregon —as do the resources of the various regions to combat a population-proportionate outbreak.

616. Despite this diversity, Vax Rule takes a one-size fits all approach.

617. The same vaccination requirements apply to K-12 employees and volunteers regardless of age, health, local-level risk factors, historical rate of cold complications resulting in hospitalizations occurring in each school, extent of physical proximity and in-person contact with students, classroom size, school size, class size, risk profile such as obesity rates (which is known to cause higher risk of cold complications); and classroom, school ventilation systems, or whether the class or activity is held indoors, outdoors or online.

618. Oregon Health Authority's own reported statistics show that over 80% of the cold hospitalizations and over 90% of cold deaths involved individuals who had underlying conditions.

619. Children under 19 years of age have an extremely disproportionately low chance of developing cold-related complications or death as compared to high-risk adults with underlying conditions over 60 years old.

620. Yet, Vax Rule targeted healthy K-12 school employees and not people with underlying conditions or people over 60 years old for "vaccination" - which the Rule itself admits are ineffective.

621. Therefore, Plaintiff poses no more danger to others than a person who is consenting or coerced to an ineffective medical treatment.

622. As such, there is no rational basis for such a tailoring as outlined herein.

623. Forcibly injecting individuals with experimental substances is not grounded in science but rather in the effort to coerce men and women into waiving their right to freely opt out of harmful, reckless and unjustified medical treatment imposed by bureaucrats, whose understanding of "science" appears to be limited to that of political science.

624. The policy of discrimination which restricts an individual's right to bodily autonomy and the right to be secure in his papers, based on one's willingness or ability to subject himself to ineffective medical treatment; prescribed by school administrators who are generally not licensed medical professionals, cannot be justified as relating to any rational permissible goal.

625. Superintendent Woods' decision to demand Plaintiff's and other's private papers under the color of "Vax Rule" law, violated Plaintiff's clearly established rights to Equal Protection under Fourteenth Amendment.

*Jacobson v. Massachusetts* (1905)

626. The School BOARD's custom or policy of demanding all employees' private papers as a condition of employment under the color of "Vax Rule" law

enabled its agents or employees to act with deliberate indifference to Plaintiff's right to equal protection.

627. The individual Defendants clearly acted out-of-scope of each of their respective authorities, as none of their official capacities give any of the Defendants the power or authority to directly or indirectly diagnose, prescribe and treat Plaintiff for any medical condition, or to demand for Plaintiff's papers, based on Plaintiff's employment with a K-12 school.

628. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 3
## 42 U.S.C. § 1983 - FOURTEENTH AMENDMENT VAGUENESS CLAIM

For Declaratory Relief against Banks in her Official Capacity

For Damages against Banks, Hill, Sconce, Insurer's legal counsel and Woods in their Official and Individual Capacities

629. Plaintiff realleges and incorporates by reference all paragraphs above:

630. OAR 333-019-1030(2)(B)(j) states,

" "School-based program staff and volunteers": (A) Means anyone age 16 and older: (i) Who is employed by a school-based program or who is not employed but is otherwise engaged to provide goods or services to a school-based program through any formal or informal agreement, whether compensated or uncompensated, and *includes but is not limited* to teachers, administrative staff, child care staff, cleaning staff, coaches, school-based program drivers, family volunteers". (emphasis added)

631. At the time of her termination, Plaintiff functioned as a tutor.

VERIFIED COMPLAINT

632. OAR 333-019-1030(9) states,

"Nothing in this rule is intended to prohibit schools or school-based programs from: (b) Having *more restrictive or additional requirements, including but not limited* to requiring teachers, school staff and volunteers, and school-based program staff and volunteers to have documentation of an additional or booster dose of a COVID-19 vaccine if that is recommended by the U.S. Centers for Disease Control and Prevention." (emphasis added)

633. OAR 333-019-1030(2)(c) states,

" "Documentation of a religious exception" means *a form prescribed by the Oregon Health Authority, signed by the individual,* stating that the *individual* is requesting an exception from the COVID-19 vaccination requirement on the basis of a sincerely held religious belief and includes a statement describing the way in which the vaccination requirement conflicts with the religious observance, practice, or belief of the individual." (emphasis added)

634. OAR 333-019-1030(2)(B)(j)(ii) states, "School-based program staff and volunteers": (A) Means anyone age 16 and older: (ii) Providing goods or services at or for a school-based program that includes *direct or indirect contact* with children or students." (emphasis added)

635. The terms "signed by the individual", "individual", "a form prescribed by the Oregon Health Authority", "including but is not limited to", "direct or indirect contact" and "more restrictive or additional requirements" are not sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. *Connally v. General Construction Co.*, (1926)

636. The terms within OAR 333-019-1030 ("Vax Rule") are vague enough to encourage arbitrary and discriminatory enforcement by school administrators.

637. "[M]ore restrictive or additional requirements including but not limited…" gives excessive discretion to each individual employing school (in the absence of any cause) to search and seize an employee's papers. *Kolender v. Lawson* (1983)

638. OAR 333-019-1030(9)(b) does not provide any procedures by which schools may impose "more restrictive or additional requirements" but rather, leaves individual schools, whose essential function is to provide educational services, and are not in the business of enforcing public health measures, or prescribing medical treatments; to make healthcare decisions for its staff and volunteers without any regulatory, legislative or judicial oversight.

639. Since "a form prescribed by the Oregon Health Authority" is not defined, Superintendent Woods and HR Hill relied on the School's insurer's legal counsel to arbitrarily interpret the "prescribed" form to be Form OHA 3871.

640. Woods and Hill arbitrarily determined that the School could not employ Plaintiff as an online tutor because that would be considered "direct contact with students".

641. Yet, upon information and belief, the School subcontracted online Math tutor services without demand for "papers" but who were, by Woods' and

Hill's definition, were in "direct contact with students" for the entire 2021-22 school year.

642.  Vax Rule also allows for "exceptions" on religious or medical grounds, subject to approval from individual employing schools without proper procedures or oversight as to how approvals or denials should be determined.

643.  OAR 333-019-1030(2)(c) was vague, and was written in such a way that implied that schools were allowed to impose their own rules and stipulations outside the scope of authority and function of a school.

644.  Plaintiff complied with the black letter of Vax Rule - and more.

645.  Yet, Plaintiff was subjected to unwritten, fluid and arbitrary interpretations by Superintendent Woods, HR Hill, Union Rep. Sconce and insurer's legal counsel as to the terms of Plaintiff's compliance with Vax Rule, in an unequal application of the rule as compared to others similarly-situated.

646.  The School, its insurer, Douglas ESD and the Union failed to adequately train their respective employees on constitutional rights.

647.  This lack of proper training enabled each of their respective agents and employees to act with deliberate indifference to the constitutional rights of Plaintiff under the color of "Vax Rule" law.

648.  Banks, Hill, Sconce, insurer's legal counsel and Woods knew or should have known that Plaintiff has the right to equal protection under the 14th Amendment.

649. The unequal application of Vax Rule, which had nothing to do with its purported purpose, resulted in the loss of Plaintiff's occupation and livelihood.

650. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 4
### 42 U.S.C. § 1983 - CONTRACT AND BILL OF ATTAINDER CLAIM
### by way of the 14th AMENDMENT

For Declaratory and Injunctive Relief against Brown and Banks in their Official Capacities

For Damages against Brown and Banks in their Individual Capacities

651. Plaintiff realleges and incorporates by reference all paragraphs above and below:

652. In the discharge of Brown's duty as the Governor of Oregon, Brown directed the enactment, adoption and implementation of OAR 333-019-1030 ("Vax Rule").

653. Brown is responsible and therefore liable as the person responsible for the series of events that occurred subsequent to the direction and approval of Vax Rule, which resulted in Plaintiff's contract impairment.

654. Governor Brown knew or should have known that using a directive or administrative rule under the color of emergency powers law, to impair an existing contact is in direct contravention of the clearly established United

States Constitution Article I, §10, Clause 1 and the corresponding Oregon Constitution Art I §21.

### Contract Clause Violation

655. As a lawful contract, Plaintiff's employment contract with the School was protected by the United States and Oregon Constitutions.

656. The Supreme Court has ruled that a "law" for the purposes of the Contract Clause, may be an administrative regulation having the force and operation of a statute.

657. The impact of OAR 333-019-1015 ("Mask Rule") and OAR 333-019-1030 ("Vax Rule") upon Plaintiff's contractual obligations was both substantial and severe.

658. Not only did the Mask Rule modify the scope of services that Plaintiff had agreed to perform for the School, it did so by changing Plaintiff's liability protection in an area where the element of liability protection was vital -- public health/medical intervention on Plaintiff's students.

659. Vax Rule further modified the terms of employment that Plaintiff had agreed to with the School, by changing in an area where the element of reliance is vital -- protection of Plaintiff's clearly established Constitutional rights (4th Amendment; 14th Amendment Equal Protection; *Cruzan v MO Dep't of Health*; *Roe v Wade*) and Statutory (ORS 127.507; ORS 659A.136) right to privacy.

660. The state legislature had *not* declared any need for the "protection" of K-12 school employees or students.

661. The means chosen to implement these purported purposes were deficient, particularly in light of the fact that neither the cold "vaccines" nor "approved" papers "protect" against nor prevent transmission of the cold.

662. The imposed conditions, that K-12 school employees surrender papers to show paper-"proof" of having been injected either with non-FDA approved substances, or with DNA-modifying gene therapy with unknown long term effects; or to have arbitrarily "approved" papers as an occupational condition, with no limit to the emergency duration, is unreasonable and inappropriate to the purported end of controlling the spread of the cold.

663. Both Mask Rule and Vax Rule continue to be enforced twelve (12) months and ongoing, after Governor Brown declared the end of the "COVID-19 emergency".

664. As a result, impairment by Vax Rule was substantial as Plaintiff's contractual relationship with the School was permanently altered, in that Plaintiff was dismissed under strained relationship with the School.

665. Plaintiff lost her entire livelihood within the K-12 education field as a result of Vax Rule without due process.

666. Plaintiff suffered damages for which she is entitled to recover.

VERIFIED COMPLAINT

### *Bills of Attainder Clause Violation*

667. Public Health Director Banks knew or should have known that Article I, § 9 Clause 3 of the US Constitution clearly establishes Plaintiff's, and others' right to be free from any Bill of Attainder.

668. Plaintiff is barred from occupation in the entire K-12 educational field without any due process.

669. The purported non-punitive purpose of Vax Rule is to "control" the cold and "to ensure that students can stay in school and receive in-person instruction."

670. Despite contradictory statements within Vax Rule itself, Vax Rule implies that "protecting" K-12 students too young to be "vaccinated" is Vax Rule's primary interest.

671. Vax Rule declares that after October 18, 2021, K-12 schools "may no longer employ" staff who have not surrendered "proof of vaccination" papers or staff that do not have "approved" exception papers.

672. Vax Rule has led to substantial occupational disadvantages for those without the "required papers", that would not have otherwise occurred.

673. K-12 students are generally aged 5 years or older.

674. By October 12, 2021, at least one "vaccine" was authorized for use in children over 5 years of age.

675. Thus, any purported reason for demanding that K-12 employees be "vaccinated" in order to "protect" children too young to be "vaccinated" is not consistent with the regulatory objective.

VERIFIED COMPLAINT

676. Vax Rule has no rational connection to any purported non-punitive purpose of "controlling" the cold, since the rule itself admits that the prescribed treatments neither prevent contraction or transmission of the cold.

677. Vax Rule's purported non-punitive purpose is a sham or mere pretext to punish K-12 school employees who do not share the totalitarian ideologies of Brown and Banks.

678. Vax Rule's demand for highly detailed private, identifiable medical information or detailed religious assertions, to be arbitrarily "approved" by education administrators, is excessive with respect to Vax Rule's purpose.

679. The Vax Rule was proximately directed against a whole class of K-12 school employees "without papers" for punishment by way of threatening imposition of harsh fines on employing K-12 schools which did not seize such papers from their employees.

680. Vax Rule's proximate sanction on this class of individuals "without papers", involves restraint on an individual's liberty to choose his occupation within a particular field.

681. Historically,

"Disqualification from the pursuits of a lawful avocation ... often has been, imposed as punishment. By statute 9 and 10 William III, chap. 32...

In France, deprivation or suspension of civil rights, or of some of them, and among these of ... being employed in a school...are punishments prescribed by her code." *Cummings v. Missouri*, 71 U.S. 277 (1867)

682. Banks knew or should have known that Vax Rule proximately targets one group — K-12 school employees — and it imposes punishment on that

group by depriving these individuals of rights previously enjoyed, namely, the clearly established rights to equal protection and privacy. ORS 659A.136 (2007); *Jacobson v. Massachusetts* (1905); *Cruzan v. Director, Missouri Department of Health* (1990)

683. No reason is given for the selection of the arbitrary and capricious October 18, 2021 dateline, or why K-12 school employees must now surrender their private papers, 19 months after Governor Brown declared the "COVID-19" emergency, over a year after Plaintiff was offering in-person educational services; and 4 months after Brown declared that Oregon was now "able to [fully] reopen... because of the efficacy of the vaccines."

684. Vax Rule's operation promotes the traditional aims of punishment — retribution for behavior which is not only not a crime but are clearly established Constitutional and Statutory rights.

685. Vax Rule assumes guilt on the K-12 individual employees unable or unwilling to surrender "papers" - for the healthcare system being overwhelmed and for school closures; rather than on the dogma and the policy failures of Brown or Banks, who closed schools and who denied patients "non-essential" medical treatment for over a year without logic.

686. Vax Rule judged punishment on those without "vaccination papers" unless the presumption of guilt was removed by the "approval" of "exceptions", to be arbitrarily enforced by local education administrators or officials who have no license or authority to make medical or religious determinations upon their employees.

VERIFIED COMPLAINT

687.  Such punishment - loss of not only current employment, but being barred occupation within the *entire* K-12 education field, is grossly disproportionate to Vax Rule's purported non-punitive purpose of "controlling" a cold.

688.  Through legislative action under the color of law, Plaintiff and others were deprived of their livelihoods, through arbitrary enforcement by education-industry officials and not by proper judicial processes.

689.  Vax Rule excludes Plaintiff and others from judicial due process, without evidence, opportunity for hearing, or executive adjudication, subject to judicial review.

690.  Had procedural safeguards been in place, a reasonable independent policy-maker would have determined that Plaintiff is not a threat to any *reasonable* Oregon Health Authority measures to "control" the cold.

691.  Vax Rule has the effect "to inflict punishment without the safeguards of a judicial trial and "determined by no previous law or fixed rule." The Constitution declares that that cannot be done either by a State or by the United States." *United States v. Lovett*, 328 U.S. 303, 316-17 (1946)

692.  While Vax Rule does not use language sentencing Plaintiff and others to perpetual exclusion from a chosen vocation, it accomplishes that result.

693.  In effect, the Vax Rule acted like a bill of attainder; and had the effect of law which includes bills of pains and penalties.

694.  Thus, Vax Rule's proximate sanctions on the allegedly "non-compliant" individual, "compels a conclusion that the [rule's] primary function is to serve

as an additional penalty" for a special category of K-12 school employees without the "papers" aligning themselves to the totalitarian ideologies of Brown and Banks. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)

695. Brown and Banks made no serious or credible effort to ensure that Vax Rule was proportional to problems that it could legitimately seek to ameliorate.

696. Vax Rule subjects Plaintiff and others to a burden that is severe, permanent and inescapable as it severely limits and restricts Plaintiff's occupational opportunities in the K-12 education field.

697. Vax Rule has no time limits, no benchmarks, no expiration, but may be revised or rescinded either in whole or in part; may be rescinded but continue to authorize K-12 school employers to adopt their own "vaccination" requirements; or be rescinded then reinstated, based on the unreviewable whims of Banks or the Health Authority.

698. There is no mechanism for relief, even if the factual assumptions behind the Vax Rule are definitively proven false.

699. Banks exhibits bad faith by continuing to use Vax Rule to punish a class of individuals, simply because these individuals do not subscribe to Banks' dogmatic beliefs that the "vaccines" work in "controlling" the cold.

700. Plaintiff's interest in retaining Plaintiff's means of livelihood was substantial as Plaintiff is the sole breadwinner of her family.

701. The reckless or callous indifference of the individual Defendants as described in herein, with regards to the promulgation and enforcement of

VERIFIED COMPLAINT

OAR 333-019-1015 ("Mask Rule") and Vax Rule under the color of law,

directly or proximately resulted in Plaintiff being deprived of Plaintiff's

Constitutionally-protected rights as described here.

702. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as

hereinafter set forth in her prayer for relief.

## COUNT 5
## 42 U.S.C. § 1983 - CONSPIRACY AGAINST RIGHTS CLAIM

For Declaratory and Injunctive Relief against all Defendants in their Official
Capacities

For Damages against all Defendants in their Official and Individual Capacities

703. Plaintiff realleges and incorporates by reference all paragraphs above:

704. Under the color of law, Brown, while clothed as the Governor of Oregon,

misused the authority of the state by directing the Oregon Health Authority

("OHA") to promulgate OAR 333-019-1015 ("Mask Rule") and OAR

333-019-1030 ("Vax Rule").

705. Brown could not have reasonably believed that the Governor has the

power to use executive branch agencies to effect Brown's own legislative

actions.

706. In directing the Health Authority to target K-12 school employees via

Mask Rule and Vax Rule; Brown knew or should have known that Brown set

in motion a series of constitutionally-injurious acts by the Health Authority,

VERIFIED COMPLAINT

State Education Service Districts, employing K-12 school districts and education-related associations.

707. Governor Brown's directives were the proximate cause of the series of Plaintiff's constitutional injuries described and alleged in the subsequent Claims for Relief.

708. Banks acted under the color of law while clothed as the Health Authority Director of Public Health, misused her authority when she approved the promulgation of OAR 333-019-1015 ("Mask Rule") and OAR 333-019-1030 ("Vax Rule"), mere days after Governor Brown publicly announced her directives to the Health Authority to impose these rules on K-12 school employees.

709. Banks could not have reasonably believed that Governor Brown's tweets or directives had the validity to authorize Banks to promulgate Mask Rule or Vax Rule without legislative approval, in contravention with clearly established rights under the 1st, 4th and 14th Amendments as well as ORS 659A.136.

710. Both Governor Brown's directive on August 19, 2021 and Vax Rule, adopted on August 25, 2021, imposed cold "vaccination" on K-12 employees and volunteers as an occupational condition.

711. Although neither OAR 333-019-1015 ("Mask Rule") nor Vax Rule make reference to Brown's publicly stated directives, the timing of the enactment and implementation of both Mask Rule and Vax Rule, as well as the use of the arbitrary and capricious date of October 18, 2021, can be inferred to

VERIFIED COMPLAINT

demonstrate the existence of an agreement or meeting of the minds between Banks and Brown, to violate this discrete class of K-12 employees of their Constitutionally-protected rights.

712. Banks' approval of Mask Rule and Vax Rule furthered the conspiracy, and were the proximate cause of the series of Plaintiff's constitutional injuries as described herein.

713. In furtherance of the conspiracy, Woods, Hill and the School BOARD members, while clothed as the Superintendent, Human Resources Director and BOARD members of the School respectively, misused the authority of the School as Plaintiff's employer, to enforce Mask Rule and Vax Rule under the color of law.

714. In furtherance of the conspiracy, Union Rep. Sconce and insurer's legal counsel, acting in joint action with Superintendent Woods and HR Hill, misused their respective employment positions to assist public school officials in the performance of a government duty - that is to enforce the edicts of Vax Rule on Plaintiff under the color of law.

715. Woods, Hill, Sconce, insurer's legal counsel and the School BOARD members could not have reasonably believed that Mask Rule or Vax Rule had the validity to authorize anyone to infringe on Plaintiff's clearly established under the 1st, 4th, 13th and 14th Amendments as well as ORS 659A.136.

716. The individual Defendants by each of their direct or proximate actions in implementing or enforcing Vax Rule or Mask Rule or both; with reckless or callous indifference, conspired to injure, oppress, threaten, or intimidate

Plaintiff in the free exercise or enjoyment of the rights or privileges as described herein, secured to Plaintiff by the Constitution or laws of the United States, or because of Plaintiff having so exercised the same.

717. Such actions cannot reasonably be characterized as acting in good faith.

718. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 6
### 42 U.S. Code § 1983 - THIRTEENTH AMENDMENT CLAIM

For Declaratory and Injunctive Relief against Brown, Banks and Woods in their Official Capacities

For Damages against Brown, Banks and Woods in their Official and Individual Capacities

719. Plaintiff realleges and incorporates by reference all paragraphs above:

720. OAR 333-019-1015 ("Mask Rule") was a scheme intended to cause Plaintiff to believe that Plaintiff was required to perform the services of a Public Health Officer or licensed medical professional.

721. Brown and Banks are responsible for the promulgation of Mask Rule and are therefore liable as the persons responsible for subsequent injuries and damages which Plaintiff incurred because of Mask Rule.

722. Superintendent Woods cited "Ready Schools, Safe Learners" guidelines and Mask Rule under the color of law to deceive Plaintiff, an immigrant, into

believing that the guidelines and Mask Rule were laws which Plaintiff had to comply with; and that Plaintiff would lose her livelihood if Plaintiff did not perform the services as demanded.

723.  Believing that Mask Rule was a law, Plaintiff carried out Woods' instructions to prescribe and enforce the use of medical devices (masks) on Plaintiff's students.

724.  Plaintiff performed the services of a Public Health officer or medical professional without pay because the order came from high-level public officials.

725.  As a proximate result of Brown's and Banks' actions in promulgating Mask Rule, Plaintiff was by-proxy, enlisted to involuntarily perform public health mitigation measures.

726.  Woods' demand that Plaintiff and other School instructional staff perform public health mitigation services without pay under the color of "Mask Rule" law, violates Plaintiff's and others' clearly established rights to be free from involuntary servitude under 13th Amendment. ORS 163.263 (2007)

727.  The School BOARD's custom or policy of demanding all instructional staff to perform public health mitigation services without pay under the color of "Mask Rule" law, enabled its agents or employees to act with deliberate indifference to Plaintiff's right to be free from involuntary servitude.

728.  Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

VERIFIED COMPLAINT

## COUNT 7
## 42 U.S.C. § 1981 - EQUAL RIGHTS UNDER THE LAW CLAIM
### Denial of right to enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship

For Injunctive Relief and Damages against Hill in her Individual and Official Capacities

---

729.  Plaintiff realleges and incorporates by reference all paragraphs above:

730.  HR Hill knew or should have known that Plaintiff had the right to be paid equally, in accordance with the salary step-scale and part-time per hour pro-rate as enshrined within the School Collective Bargaining Agreement.

731.  HR Hill is the final decision maker with regards to execution of the School employment contracts.

732.  Hill, without authority, effectively changed Plaintiff's terms of pay from $29.83 per hour, which is the proper Collective Bargaining rate, to $29.83 per period which is approximately $19.89 per hour.

733.  Hill is, or appears to be, "white".

734.  At all times relevant to this lawsuit, all similarly-situated teachers hired by the School were, or appeared to be, "white citizens".

735.  Amongst all the "white citizens" teachers, Plaintiff is distinctively Chinese (of Singapore national origin).

736.  Plaintiff is therefore an identifiable class of persons who HR Hill subjected to intentional discrimination because of Plaintiff's ancestry or ethnic characteristics.

737. Hill knew or should have known that Plaintiff has a clearly established right to equal terms, conditions or privileges of employment regardless of race or national origin. 42 U.S.C. § 1981, Title VII of the Civil Rights Act (1964), ORS 659A.030(b) (2007)

738. As a result of Hill's out-of-scope actions, Hill denied Plaintiff the right to equal benefits, terms and conditions of employment.

739. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 8
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS CLAIM**

For Declaratory and Injunctive Relief against Hill in her Official Capacity; and

Damages against Hill in her Individual Capacity

740. Plaintiff realleges and incorporates by reference all paragraphs above:

741. Plaintiff had a prospective economic advantage with the School, to serve as the School's temporary Science teacher, to be paid at the per hour prorate according to step-scale of the Collective Bargaining Agreement.

742. HR Hill had zero (0) controlling interest or stake in Plaintiff's prospective employment contract with the School.

743. HR Hill was in charge of the execution of the contracts between the School and the Plaintiff.

744. Hill created such a substantial burden on both the School and the Plaintiff, that correct execution of the contractual terms would be impossible.

745. Plaintiff alleges that Hill had zero (0) justifications for improperly changing the terms of Plaintiff's pay rate from "per hour" to "per period" without any prior authorization.

746. Plaintiff alleges that Hill knowingly and willingly ignored the change to "per period" resulted in pay far less than what was promised to Plaintiff, to further Hill's own interest and did so willfully and negligently.

747. HR Hill is the direct cause of the damages and breached Hill's fiduciary duty to the Plaintiff by performing duties, functions and responsibilities outside the scope of Hill's employment.

748. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendant as hereinafter set forth in her prayer for relief.

## COUNT 9
## ORS 659A.030(b) - RACIAL WAGE DISCRIMINATION

For Declaratory and Injunctive Relief; and
For Damages against Woods and Hill in their Official Capacities

749. Plaintiff realleges and incorporates by reference all paragraphs above:

750. The School is an "employer". ORS 659A.001(4)(a)

751. Douglas ESD is an "employment agency". ORS 659A.001(5)

752. Plaintiff was an "employee" of the School. ORS 659A.001(3)

VERIFIED COMPLAINT

753. Plaintiff rendered educational services wholly in Oregon to the School, who agreed to pay Plaintiff at a fixed rate.

754. At all times relevant to this lawsuit, all similarly-situated employees of the School were, or appeared to be White and of American national origin.

755. Plaintiff is distinctly of Chinese ethnic background.

756. Plaintiff is therefore distinguished by race, and is a member of a "Protected class" for the purposes of State Law. ORS 659A.001(11); ORS 659A.030(b); ORS 652.210(6); OAR 839-005-0000(1)

757. Plaintiff performed work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, which is "work of comparable character" for the purposes of State Law, as other teachers. ORS 652.210(16)

758. From around January- March 2021, Plaintiff was paid $24 per hour for Plaintiff's teaching services.

759. Similarly-situated teachers who performed work of comparable character were paid $208.84 per day i.e. $29.83 per hour when prorated.

760. The discrimination is not a result of a bona fide occupational qualification reasonably necessary to the normal operation of the School's business.

761. Superintendent Woods was aware of HR Hill's disparate pay rate but did not rectify the situation until Plaintiff threatened to quit.

762. Therefore, Woods and Hill intentionally discriminated against Plaintiff in terms of pay rate.

VERIFIED COMPLAINT

763. On February 24, 2022, Plaintiff discovered that Plaintiff was paid a discriminatory lower wage rate because Plaintiff is a member of a "Protected Class".

764. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 10
### 42 U.S.C. § 2000e-2(a)(1), (b) - DISPARATE WAGE BASED ON RACE OR COLOR CLAIM

For Damages against Woods and Hill in their Official Capacities

---

765. Plaintiff realleges and incorporates by reference all paragraphs above:

766. Douglas ESD and the School are governmental agencies and are "persons" for the purposes of 42 U.S.C. § 2000e(a).

767. Superintendent Woods is an "agent" of the School and is therefore an "employer" for the purposes of 42 U.S.C. § 2000e(b).

768. HR Hill is an "agent" of the School and Douglas ESD and is therefore an "employer" for the purposes of 42 U.S.C. § 2000e(b).

769. Douglas ESD is an "employment agency" for the purposes of 42 U.S.C. § 2000e(c), and is an "employer" for the purposes of 42 U.S.C. § 2000e(b).

770. As the Superintendent of the School and as Director of Human Resources respectively, Woods and Hill have the appearance of a significant degree of influence in vital job decisions, which gives Woods and Hill the opportunity to impose such influence on employees.

VERIFIED COMPLAINT

771. Plaintiff was an "individual" employed by the School, and was an "employee" for the purposes of 42 U.S.C. § 2000e(b).

772. Plaintiff was born with, and cannot change such "immutable characteristics" which are shared by all or only individuals who identify as a member of a particular racial minority group - Chinese; and is distinguishable by "race" for the purposes of 42 U.S.C. §§ 2000e-2(a)(1), (2).

773. Plaintiff is therefore a member of a "protected class" for the purposes of Title VII of the Civil Rights Act of 1964.

774. Plaintiff's educational, work experience and 6-year employment track record with the School shows that Plaintiff was qualified for Plaintiff's job and that Plaintiff's work performance met the School's legitimate expectations.

775. On February 25, 2022, Plaintiff discovered that Plaintiff's race was a sole reason or motivating factor for Plaintiff's adverse employment terms in the third quarter of the 2020-2021 academic year.

776. Plaintiff was paid less than others similarly-situated under circumstances that were discriminatory in nature.

777. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 11
## ORS 659A.136 - MEDICAL EXAMINATIONS AND INQUIRIES OF EMPLOYEES CLAIM

For Damages against Woods in his Official Capacity

778. Plaintiff realleges and incorporates by reference all paragraphs above:

779. Pursuant to State law, Superintendent Woods is an "employer" and Plaintiff is an "employee". ORS 659A.001(3), (4)(a).

780. Woods, in requiring the Plaintiff to submit information via electronic or written means, which relates to the past, present or future physical ("vaccination") status, is requiring medical information for the purposes of State law. ORS 659A.136(1)

781. From 2016 to October 17, 2021, Plaintiff was not required to submit any medical information to the School as a condition of employment.

782. The position of Math tutor involves a highly specialized ability to solve, and to explain high-school level Math problems and concepts to high-school students.

783. Only a limited number of the School employees are available to perform these essential job functions.

784. Plaintiff was hired for Plaintiff's expertise or ability required to perform the function of a Math tutor.

785. Plaintiff was able to perform the essential functions of a Math tutor.

786. Using the "survey" as a pretext, the School required Plaintiff to submit to a medical examination or inquiry, years after the commencement of Plaintiff's employment.

787. The "survey" was not a voluntary medical examination related to any health insurance plan or employee health program.

788. The medical inquiry including demand for date, type and location of "vaccine" received, is an inquiry which is sensitive, private and is not in scope of Plaintiff's existing or any future proposed tutoring or teaching employment contract.

789. By requiring Plaintiff to submit personally-identifiable medical or health information via the "survey", Woods utilized standards, criteria or methods of administration that perpetuate the discrimination of employees who are subject to common administrative control.

790. When Plaintiff did not surrender her medical papers, Plaintiff suffered adverse employment action - termination.

791. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 12
### 42 U.S.C. § 1983 - FOURTH AMENDMENT CLAIM

For Declaratory and Injunctive Relief; and
For Damages against Banks, Hill, Sconce and Woods in their Official and
Individual Capacities

792. Plaintiff realleges and incorporates by reference all paragraphs above:

793. Public Health Director Banks is responsible for the promulgation of Vax Rule under the color of law and is therefore liable as the person responsible for subsequent injuries and damages which Plaintiff incurred because of Vax Rule.

794. As an employee of a public school, Plaintiff has substantial legitimate expectations of medical and religious privacy.

795. At the time of Superintendent Woods' demand for Plaintiff's private papers, Woods, HR Hill and Union Rep. Sconce were acting under the color of laws of the State of Oregon.

796. Banks, Woods, Hill and Sconce knew or should have known that Plaintiff has a clearly established right to be free from unreasonable searches and seizures of her person and papers under the 4th Amendment.

797. Woods compelling Plaintiff to surrender her private medical or religious papers under the color of "Vax Rule" law, was a search for 4th Amendment purposes.

798. The demand for these papers was not justified at its inception because it was not for a purpose related to Plaintiff's job function or for investigation into work-related misconduct.

799. The demand for these papers were not a discretionary function of a K-12 school district Superintendent or of the Public Health Director.

800. The papers which Woods, Hill and Sconce demanded are excessively intrusive under the circumstances and are not necessary to further Vax Rule's purported purpose.

801. Union Rep. Sconce's possession of Plaintiff's religious documentation in joint action with Woods and Hill was a seizure for 4th Amendment purposes.

802. The manner in which Woods, Hill and Sconce conducted the alleged "pre-termination hearing" was an unreasonable seizure of Plaintiff's body for 4th Amendment purposes and was not justified at its inception.

803. The School had a custom and de facto policy in place of demanding that all School employees surrender their private papers as a condition of employment under the color of "Vax Rule" law.

804. Douglas ESD had a custom and de facto policy of enabling K-12 school districts to demand the papers of each school's employees as a condition of employment under the color of "Vax Rule" law.

805. The Union had a custom and de facto policy of supporting the enforcement of Vax Rule under the color of "Vax Rule" law.

806. The School, Douglas ESD and the Union failed to adequately train their respective employees on constitutional rights.

807. This lack of proper training enabled their respective agents and employees to act with deliberate indifference to the constitutional rights of the School employees under the color of law.

808. Banks, Woods, Hill and Sconce acted willfully, maliciously or with reckless disregard for Plaintiff's constitutional rights.

809. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT 13**

## 42 USC §1983 - FIRST AMENDMENT FREE EXERCISE CLAIM

For Declaratory and Injunctive Relief; and
For Damages against Banks, Woods, Hill, Sconce and insurer's legal counsel
in their Official and Individual Capacities

810. Plaintiff realleges and incorporates by reference all paragraphs above:

811. Vax Rule's demand for medical or for "prescribed" exception papers burdens Plaintiff's exercise of religion.

812. Vax Rule is not neutral and is not generally applicable in that it applies inordinately to K-12 school employees or volunteers (see further discussion in the Equal Protection count above).

813. Public Health Director Banks' demand that "exceptions" have to be filed on the Health Authority's "prescribed exception form" placed undue burdens on Plaintiff's minority religious expression.

814. Vax Rule imposed far more restrictive conditions for religious accommodation requests than is required under Title VII of the Civil Rights Act and has nothing to do with Vax Rule's purported purpose.

815. Insurer's legal counsel through joint action and pervasive entwinement, by declaring that Plaintiff had to submit a signed OHA form 3871, placed undue religious burdens on Plaintiff.

816. Union Rep. Sconce, through joint action, by declaring that OHA form 3871, if signed with an "under duress" notation, would not be binding, placed undue religious burdens on Plaintiff.

817. Superintendent Woods approved all exceptions filed by its employees and volunteers - *except* Plaintiff's request.

818. The restrictions which the Defendants imposed on Plaintiff's religious expression had nothing to do with Vax Rule's purported purpose.

819. The restrictions were directed not at Plaintiff's conduct, classroom expression or practice of teaching, and were not part of Plaintiff's "educational services" to the School.

820. Banks, Woods, Hill, Sconce and insurer's legal counsel attempted to chill Plaintiff's religious exercise under the color of "Vax Rule" law.

821. Banks, Hill, Sconce and insurer's legal counsel can be said to be the final policy-makers for the subject-matter as described in this Claim.

822. Banks, Woods, Hill, Sconce and insurer's legal counsel knew or should have known that Plaintiff has a clearly established right to free exercise under the 1st Amendment.

823. The School BOARD approved Woods' decision to terminate Plaintiff under the color of "Vax Rule" law, based on Woods' restrictions on Plaintiff's religious expression.

824. The School, Douglas ESD, Union and the School's insurer, failed to adequately train their respective employees on constitutional rights, thus enabling each of their respective agents and employees to act with deliberate indifference to the constitutional rights of Plaintiff under the color of "Vax Rule" law.

VERIFIED COMPLAINT

825. Banks, Woods, Hill, Sconce and insurer's legal counsel acted willfully, maliciously or with reckless disregard for Plaintiff's constitutional rights.

826. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 14
### 42 USC §1983 - FIRST AMENDMENT FREEDOM TO REFRAIN FROM ASSOCIATION CLAIM

For Injunctive Relief against Brown and Banks in their Official Capacities

For Damages against Brown, Banks, Hill, Woods, Sconce and OSBA legal counsel in their Official and Individual Capacities

827. Plaintiff realleges and incorporates by reference all paragraphs above:

828. Governor Brown and Public Health Director Banks have every right to have their illogical beliefs that their self-admitted ineffectual "vaccines" can "protect" K-12 employees and students and "control" a cold.

829. However, Brown and Banks cannot impose their beliefs on others.

830. As longer-term data shows lack of "vaccine" efficacy, Banks' increasingly mindless adherence to Vax Rule betrays her totalitarian mind-set — those who dissent are banished by way of occupational expulsion.

831. That a discrete quasi-suspect class of individuals have to be compelled or induced into surrendering papers to prove allegiance with totalitarian ideology, is no different from the State requiring employees to establish their loyalty by extracting oaths.

832. Plaintiff fled from a country which embraces authoritarian ideology.

VERIFIED COMPLAINT

833.  The principles that, under the First Amendment, an individual should be free to believe as he will, and that, in a free society, one's beliefs should be shaped by his mind and his conscience, rather than coerced by the State, prohibit...support of an ideological cause he may oppose as a condition of holding a job as a public school teacher. *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977)

834.  The Supreme Court has prohibited a State from compelling any individual to affirm his belief in God, or to associate with a political party as a condition of retaining public employment. *Torcaso v. Watkins*, 367 U.S. 488 (1961)

835.  They are no less applicable to this case.

836.  An examination of our Nation's history, legal traditions, and practices demonstrates that the right to expressive association has been recognized by the courts as a fundamental right.

837.  Brown, Banks, Woods, Hill, Sconce and insurer's legal counsel knew or should have known that Plaintiff has a clearly established right of association. First Amendment; ORS 243.662 (1973); *Janus v. AFSCME* (2018); *NAACP v. Alabama* (1958)

838.  Brown, deliberately, while clothed as the Governor of Oregon; and Banks, deliberately, while clothed as the Oregon Health Authority Director of Public Health, acted under the color of law, to impose the force of the state in order to induce K-12 school employees into surrendering papers in order to

ascertain, via the employing K-12 school districts, if these employees were aligned with Brown's and Banks' totalitarian beliefs.

839.  Woods, Hill, Sconce and insurer's legal counsel deliberately conspired to compel or induce Plaintiff into surrendering her papers.

840.  There was no logical basis for their demand for such papers.

841.  Plaintiff was forced to associate with the ideological beliefs unrelated to public education.

842.  Plaintiff was further induced into associating with the Union for an issue unrelated to the Collective Bargaining Agreement without any due process procedures in place to allow Plaintiff to object to the forced association.

843.  Plaintiff was satisfactorily performing her job when she was discharged for refusing to associate with the totalitarian ideologies with which Plaintiff is conscientiously against.

844.  The School's demand for medical or religious "papers' ' from all the School employees as a condition of employment under the color of "Vax Rule" law, shows a custom, practice and de facto policy of forced association with Brown's and Banks' totalitarian ideologies.

845.  The School, Douglas ESD and the Union "always" inducing teachers, whether or not they are members of the Union, into being represented by the Union during disciplinary proceedings can be said to be a custom, practice and de facto policy of forced association with a labor organization.

VERIFIED COMPLAINT

846. Public statements issued by officials of Douglas ESD, the Union and the School's insurer show each organization's de facto policy in support of Governor Brown's totalitarian ideology.

847. The School's, Douglas ESD's, the Union's and the School's insurer's failure to adequately train; as well as each of their custom and de facto policies of forced association enabled their respective agents and employees to act under the color of "Vax Rule" law with deliberate indifference to Plaintiff's constitutional rights.

848. The School BOARD approved Woods' decision to terminate Plaintiff based on Plaintiff's alleged lack of "papers" under the color of "Vax Rule" law.

849. Brown, Banks, Woods, Hill and Sconce acted willfully, maliciously or with reckless disregard for Plaintiff's constitutional rights.

850. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 15
## ORS 659A.030 - DISCRIMINATION BECAUSE OF RACE, COLOR OR RELIGION CLAIM

For Damages against Defendants Woods and Hill in their Official Capacities

851. Plaintiff realleges and incorporates by reference all paragraphs above:

852. The School is an "employer", Douglas ESD is an "employment agency" and are "public bodies" for the purposes of ORS 659A.001.

853. Plaintiff is an "employee" for the purposes of ORS 659A.001(3).

VERIFIED COMPLAINT

854. Plaintiff holds minority religious beliefs and is a member of a religious protected class.

855. Plaintiff has distinguishing characteristics of being Chinese of Singapore national origin and is a member of racial and national origin protected classes.

856. It is entirely appropriate for Plaintiff, based on Plaintiff's conscience, to request reasonable religious accommodations to Vax Rule, which had no tangential effect on Plaintiff's ability to perform the essential functions of being an educator.

857. The discrimination is not a result of a bona fide occupational qualification reasonably necessary to the normal operation of the School's business.

858. Ruthann Crabtree and Reuben Stratford are Christians and do not have distinguishing characteristics (race, national origin or color) of Protected Classes.

859. Plaintiff was subjected to disparate terms and conditions of employment as compared to Ruthann Crabtree and Reuben Stratford, who held similarly-situated jobs, at the same time and location as Plaintiff.

860. Woods and Hill distinguished Plaintiff based on Plaintiff's conscientious beliefs; and made the decision to discharge Plaintiff, based on the racial or religious distinction as a sole or motivating factor for the disparate treatment.

861. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT 16**
**42 U.S.C. § 1985(3) - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**

For Damages against Woods, Hill and Sconce in their Official and Individual Capacities

---

862. Plaintiff realleges and incorporates by reference all paragraphs above:

863. Superintendent Woods, HR Hill and Union Rep. Sconce, because of racial or religious animus or both, towards Plaintiff, willfully and maliciously conspired, planned and agreed using misrepresentation, coercion or intimidation, to prevent Plaintiff from seeking the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Oregon including but not limited to Plaintiff's rights to religious freedom, freedom of association; as well as Plaintiff's right to be secure in her person and her papers.

864. Pursuant to their conspiracy, Plaintiff was induced to associate with the ideological dictates of Brown, Banks, the School, the School's insurer, the Union and Douglas ESD.

865. Pursuant to their conspiracy, Woods, Hill and Sconce willfully, intentionally, recklessly, maliciously and with callous indifference, intimidated and harassed Plaintiff, subjected Plaintiff to interrogation of Plaintiff's minority religious beliefs, while uttering threats to terminate Plaintiff for not "complying".

866. The inquisition caused Plaintiff to become stricken with fear of imminent loss of livelihood and to suffer extreme terror, mental anguish and emotional and physical distress.

867. A discriminatory animus was created by the perceived authority the Defendants gained over Plaintiff, in their conscious objective to violate Plaintiff's substantive rights under the color or law.

868. Woods, Sconce and Hill orchestrated overt acts for the purpose of directly depriving Plaintiff, because of Plaintiff's Chinese race or religion or both; whereas none of the "white" employees of the School were subjected to any of the indignities of Woods', Sconce's and Hill's conspiracy.

869. Hill and Sconce can be said to be the final policy-makers for the subject matter in this Claim.

870. Woods, Hill and Sconce acted willfully, maliciously or with reckless disregard for Plaintiff's constitutional rights.

871. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 17
### 42 U.S.C. § 1986 - NEGLECT TO PREVENT

For Damages against Woods and insurer's legal counsel in their Official and Individual Capacities

872. Plaintiff realleges and incorporates by reference all paragraphs above:

873. Insurer's legal counsel had actual knowledge of the §1985 conspiracy because HR Hill consulted with the School's insurer's legal counsel prior to subjecting Plaintiff to disparate treatment and Constitutional injury.

874. Upon information and belief, the insurer's legal counsel, by their "legal advice", directed Woods and Hill to openly religiously discriminate against Plaintiff under the color of law.

875. The insurer's legal counsel had the power to prevent or aid in preventing the §1985 conspiracy by advising Woods or Hill that the School was required to abide by Constitutional and statutory due process, equal protection, religious freedom protections; as well as all relevant clearly established Federal and State laws - but they did not.

876. Discovery will reveal what other "legal advisement" insurer's legal counsel offered Woods and Hill in furtherance of the §1985 conspiracy against Plaintiff.

877. Superintendent Woods had the power to prevent or aid in preventing the commission of the § 1985 violations by not allowing Hill and Sconce to conspire against Plaintiff, but Woods did not.

878. Woods' active participation in the §1985 conspiracy, shows that Woods had actual knowledge of, but neglected or refused to prevent the § 1985 conspiracy.

879. As a result of Woods' and insurer's legal counsel's neglect or refusal to prevent the §1985 conspiracy, wrongful class-based acts were committed against Plaintiff by the §1985 conspirators.

VERIFIED COMPLAINT

880. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 18
### DISCRIMINATION UNDER TITLE VII
**Disparate Treatment and Disparate Impact Based on Religion and Race or as an alternative;**
**42 U.S.C. § 1983 FOURTEENTH AMENDMENT EQUAL PROTECTION**

For Damages against Woods in his Official and Individual Capacities

881. Plaintiff realleges and incorporates by reference all paragraphs above:

882. Superintendent Woods in his official capacity, is an employer within the meaning of Title VII, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

883. Plaintiff is an employee within the meaning of Title VII and belongs to a protected class under the statute; and is part of a quasi-suspect class based on her race (Chinese) and minority religious beliefs.

884. The School, a public school district, engages in a pattern or practice of discriminating for Christian job applicants; by using hiring or screening tactics, which have caused a disparate impact on non-Christian applicants on the basis of religion.

885. These screening tactics include, but are not limited to, hiring employees who have an educational or work background in Christian schools or

VERIFIED COMPLAINT

organizations; or by hiring employees through local church word-of-mouth channels.

886. As a result of this de facto policy, the School hires a disproportionately large number of Chrisians, in violation of Title VII.

887. These covert practices serve to discriminate against a disproportionate number of persons of Plaintiff's non-Christian religious beliefs.

888. These hiring screens are not job-related for the secular teaching positions in question and not consistent with business necessity as required by Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).

889. Plaintiff was a Math educator responsible for providing the School with educational services.

890. Plaintiff held all the qualifications required for the position.

891. Superintendent Woods, Plaintiff's supervisor, was empowered by the School to take tangible employment actions against Plaintiff.

892. Woods and Hill engaged in discriminatory actions against Plaintiff, in violation of Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e2(a)(1), by imposing harsher, vague and fluid conditions by which Plaintiff had to abide by, because of Plaintiff's religious beliefs.

893. The discrimination was not job-related for the Math educator position in question and not consistent with business necessity as required by Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).

894. Plaintiff is particularly vulnerable because of Plaintiff's cognitive disability.

895. Common sense and human experience indicate that Plaintiff being replaced with a Christian about a month after Plaintiff had made Plaintiff's minority beliefs known, as compared to the School making no successful attempt to hire another Math tutor in the prior 4-6 years is not an acceptable level of probability of coincidence.

896. Plaintiff's disparate treatment as to how Woods would "approve" her religious reasonable accommodation request violated Title VII as well as the Equal Protection Clause because the differential treatment was irrational and wholly arbitrary.

897. The disparate treatment was caused by the impermissible motivation of Plaintiff's race or religion or both.

898. The depth and magnitude of Woods' and Hill's actions as described herein, cannot be construed as a "reasonable mistake".

899. Plaintiff's disparate treatment turned to disparate impact, culminating in Plaintiff's termination.

900. Such action is pursuant to the School's preference for, and history of screening for Chistian hires.

901. Woods knew or should have unknown that Plaintiff has a clearly established right to equal protection under the law. 14th Amendment, 42 U.S.C. § 2000e-2 (1964), ORS 659A.030 (2007)

902. Plaintiff's race, color or religion was either the sole reason, or a motivating factor in the discriminatory terms that Woods and Hill imposed on

Plaintiff, in clear violation of the School's own Equal Employment Opportunity Policy GBA[70].

903. Woods is strictly liable for Woods' discriminatory conduct because Woods took a tangible employment action against Plaintiff - termination, which significantly changed Plaintiff's employment status under the color of "Vax Rule" law.

904. The School is vicariously liable for Woods' discriminatory conduct because the School did not exercise reasonable care to promptly correct the discriminatory conduct, even though Plaintiff took advantage of the School's measures designed to prevent and correct discriminatory conduct.

905. The School's custom and de facto policy of preferential hiring of Christians enabled its agents and employees to act with deliberate indifference to the constitutional rights of Plaintiff.

906. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 19
### AMERICANS WITH DISABILITIES ACT ("ADA")
### Failure to Reasonably Accommodate

For Damages against Woods in his Official Capacity

907. Plaintiff realleges and incorporates by reference all paragraphs above

---

[70] https://policy.osba.org/douglcty/G/GBA%20D1.PDF

908. Plaintiff is disabled, as defined by the Americans with Disabilities Act ("ADA" or "Disabilities Act"). 42 U.S.C. §12101, 12111(8)

909. Plaintiff suffers from Autism Spectrum Disorder, which results in hypersensitivity to sensory stimuli.

910. Autism Spectrum Disorder is a "disability'. U.S.C. §12102(a)(1)

911. Being exposed to higher than minimal sensory stimuli causes the Plaintiff's cognitive functions to shut down in varying degrees.

912. Cognitive shut down includes but is not limited to concentration, reasoning, verbal communication and decision-making.

913. The effects of sensory overload may accumulate over a period of time, depending on whether Plaintiff is able to fully reset Plaintiff's senses or not.

914. Plaintiff's Autism Spectrum Disorder is a permanent condition which has lasted throughout the Plaintiff's entire life, and has resulted in substantial limitations in communication, learning, concentrating and working.

915. Plaintiff's Autism Spectrum Disorder results in substantial limitations with the major life activities of auditory "communication", "thinking", auditory "learning" and "concentrating" in terms of major life functions. 42 USC §12102(2)(A)

916. Plaintiff's sensory processing difficulties limit Plaintiff's ability to drive to extremely short distances.

917. Plaintiff's "concentration" and driving limitations substantially limit the major life ability of "working" in terms of major life functions. 42 USC §12102(2)(A)

918. Plaintiff was otherwise qualified to perform the essential functions of her Math educator position that she held, and was a "qualified individual with a disability". 42 USC §12111(8)

919. Superintendent Woods in his official capacity, is an employer within the meaning of the Disabilities Act, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. 42 U.S.C. §12111(5)

920. Plaintiff is an employee within the meaning of the Disabilities Act. 42 U.S.C. §12111(4)

921. Plaintiff's disability prevents Plaintiff from properly processing large amounts of auditory information, especially in stressful situations.

922. Plaintiff required the reasonable accommodation of being provided with written notice on how Plaintiff could "comply" with Vax Rule without compromising her beliefs in order to continue performing Plaintiff's job.

923. Although Plaintiff requested this accommodation in writing, Defendant Woods did not make them, nor did he conduct any interactive process regarding the accommodation request.

924. Woods discriminated against Plaintiff by failing to provide Plaintiff with reasonable accommodation under the Disabilities Act.

925. Given the School's business structure and needs, Plaintiff's disability accommodation request was reasonable.

926. As a result, Plaintiff was unable to perform to the unwritten terms of Vax Rule "compliance".

927. Plaintiff was discharged from employment with the School for allegedly failing to "comply" with Vax Rule.

928. Although Plaintiff has diligently sought other employment, she has been unable to find a comparable job at comparable pay.

929. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 20
### DISCRIMINATION UNDER TITLE VII
### Harassment Because of Protected Characteristics
### or 42 U.S.C. § 1981a as an alternative

For Damages against Hill and Woods in their Official and Individual Capacities

---

930. Plaintiff realleges and incorporates by reference all paragraphs above:

931. Woods and Hill in their official capacities are employers within the meaning of Title VII, are engaged in an industry affecting commerce, and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

932. Plaintiff is a member of a religious minority. 42 U.S.C. § 2000e(j), 42 U.S.C. § 2000e(2)(a)(1) and 42 U.S.C. § 2000e(2)(a)(2)

933. Plaintiff is protected by Title VII from harassment based on her religion in her workplace. 42 U.S.C. §2000e-2

934. Plaintiff was qualified for her position.

935. Plaintiff's religious beliefs do not affect Plaintiff's capacity as an Math educator.

936. Woods and Hill created a hostile work environment through their discriminatory words and actions because of Plaintiff's minority religious beliefs.

937. The hostile environment includes significantly that on October 14, 2021, with the appearance of Plaintiff's replacement, Brian Jenks; and Union Rep. Sconce, who would later that day, induce Plaintiff to associate, for the improper purpose of conducting an inquisition into Plaintiff's minority religious beliefs.

938. On October 18, 2021, Woods orchestrated rearranging Plaintiff's classroom setup without Plaintiff's approval.

939. The conduct by Woods, Sconce and Hill had the purpose or effect of unreasonably interfering with Plaintiff's work performance or creating an intimidating, hostile or offensive working environment.

940. Plaintiff perceived Plaintiff's working environment to be abusive or hostile.

941. The series of actions by Woods, Hill and Sconce as described herein had the effect of seriously and adversely altering the conditions of Plaintiff's employment, culminating in Plaintiff's termination.

VERIFIED COMPLAINT

942. After Plaintiff's alleged termination on October 18, 2021, Woods and Hill continued their harassment campaign against Plaintiff, orchestrating the public announcement and public School BOARD deliberation of Plaintiff's actual termination.

943. The actions of Woods and Hill as described herein cannot be construed as an honest mistake by any reasonable person, but rather, a blatant effort to publicly humiliate and harass Plaintiff.

944. Woods is strictly liable for Woods' discriminatory conduct because Woods took a tangible employment action against Plaintiff - termination, which significantly changed Plaintiff's employment status.

945. The School is vicariously liable for Woods' discriminatory conduct because the School did not exercise reasonable care to promptly correct the discriminatory conduct, even though Plaintiff took advantage of the School's measures designed to prevent and correct discriminatory conduct.

946. Plaintiff suffered damages for which she is entitled to recover. WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 21
### ORS 165.007 - FORGERY IN THE SECOND DEGREE;
### 42 U.S. Code § 1983 - FRAUDULENT MISREPRESENTATION

For Damages against Woods in his Official and Individual Capacity

947. Plaintiff realleges and incorporates by reference all paragraphs above:

VERIFIED COMPLAINT

948. At around noon on October 18, 2021, whilst in his office on the School campus, Woods falsely made, completed and presented to Plaintiff, a written instrument in the form of a Notice of Termination.

949. By using the "Notice of Termination" as a written instrument and citing Vax Rule under the color of law to terminate Plaintiff without due process, Woods knowingly intended to defraud Plaintiff into believing that Woods had the authority to dismiss Plaintiff, where in fact he had no such Statutory authority.

950. The act of claiming that Plaintiff attended an alleged "pre-termination hearing" is evidence that Woods knew that Plaintiff had a clearly established right to pre-termination due process.

951. Woods knew that the representation of Woods' authority to Plaintiff was false, because Woods arranged to have the School BOARD vote to approve his *recommendation* of Plaintiff's dismissal during the November 8, 2021 BOARD meeting.

952. The written instrument - the "Notice of Termination" - was instrumental in depriving Plaintiff of Plaintiff's Property Interest.

953. The School BOARD ratified Defendant Woods' willful or reckless dismissal action against Plaintiff.

954. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT 22**

VERIFIED COMPLAINT

## 42 U.S. Code § 1983 - FIRST AMENDMENT RETALIATION CLAIM

For Damages against Woods in his Official and Individual Capacities

---

955. Plaintiff realleges and incorporates by reference all paragraphs above:

956. At the time of Plaintiff's protected speech, Plaintiff was acting as a private citizen speaking as to a matter of public concern.

957. As a matter of public concern, Plaintiff's speech was that of broad concerns; seeking to bring to light the unlawful conduct of State and the School officials invading into employee-rights to privacy as a condition of public employment.

958. Plaintiff did not speak out in her classroom nor direct any of her speech to her students.

959. Plaintiff's interest in her speech against forced medical treatment and unreasonable employer demands for private papers unrelated to essential job function as an occupational requirement, outweighs any interest of the School in promoting the efficient operation and administration of government services.

960. Cathy Knapp, acting in the course and scope of her employment as a School administrator, deprived Plaintiff of Plaintiff's right to free speech when Knapp cautioned Plaintiff against speaking out anymore against Vax Rule.

961. Woods, acting in the course and scope of his employment as the School Superintendent deprived Plaintiff of her right to free speech when Woods first

told Plaintiff to stop speaking out against Vax Rule; and when Woods finally terminated Plaintiff in retaliation under the color of "Vax Rule" law.

962. The adverse employment action - termination, taken against Plaintiff, would deter a person of ordinary firmness from continuing to engage in protected speech.

963. Plaintiff's speech was a substantial or motivating factor for the adverse employment action.

964. Woods knew or should have known that retaliating against Plaintiff violated Plaintiff's clearly established Constitutional rights, and was not objectively reasonable in light of the circumstances. US Constitution First Amendment; *Tinker v Des Moines* (1969)

965. The School's failure to adequately train, enabled its agents and employees to act under the color of "Vax Rule" law with deliberate indifference to Plaintiff's constitutional rights.

966. The School BOARD ratified Woods' decision to terminate Plaintiff, thus enabling Woods, acting as an agent and employee of the School, to act with indifference to Plaintiff's right to free speech.

967. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 23
### BREACH OF CONTRACT FOR A DEFINITE PERIOD OF TIME and CONSEQUENTIAL ECONOMIC LOSS

For Damages against Woods in his Official Capacity

VERIFIED COMPLAINT

968. Plaintiff realleges and incorporates by reference all paragraphs above:

969. Plaintiff had a lawfully executed Probationary teacher employment contract with the School for the 2021-22 school year (to end on June 3, 2022).

970. Plaintiff performed all obligations under the contract - Plaintiff performed all assigned educational duties, attended all staff development meetings, made all required reports, possessed the proper "Charter Registry" teacher license and had a Bachelor's degree qualification as required by state law, duly adopted Oregon Department of Education Rules, and by duly adopted the School BOARD policy.

971. Woods in his official capacity did not perform his contractual obligations in that Woods:

(a)     demanded Plaintiff's private medical information, in contravention with ORS 659A.136;

(b)     assisted a labor organization's efforts to represent Plaintiff, in contravention with ORS 243.662;

(c)     failed to conduct mandatory good faith interactive process for Plaintiff's reasonable accommodation requests under Title VII of the Civil Rights Act and the Disabilities Act;

(d)     terminated Plaintiff's employment without prior the School BOARD approval;

(e)     terminated Plaintiff's employment without providing written notice as required by ORS 342.835, the School Policy GCPD[71] and Policy GCPD-AR[72]; and

(f)     terminated Plaintiff without cause.

972.   Plaintiff's dismissal was not related to the School budgetary issues.

973.   Woods' nonperformances are breaches of the parties' contract.

974.   Plaintiff is over the age of 40 years old, lives in a tiny community and suffers from a disability that limits Plaintiff's employment options.

975.   It is highly unlikely that Plaintiff would be able to find a job that would even remotely replace the future earning potential that the School would have provided.

976.   Plaintiff calculates the total consequential economic loss which is a direct result of the School's breach of contract, in the amount of at least $2,155,558.61, which includes the liquidated future wage and future benefit losses.

977.   The exact amount will be determined at trial.

978.   Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 24
## TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

---

[71] https://policy.osba.org/douglcty/G/GCPD%20D1.PDF
[72] https://policy.osba.org/douglcty/G/GCPD%20R%20D1.PDF

For Damages against Woods in his Individual Capacity and against Hill, Sconce and insurer's legal counsel in their Official and Individual Capacities

979. Plaintiff realleges and incorporates by reference all paragraphs above:

980. At all times relevant to this lawsuit, Plaintiff had an existing business relationship with the School.

981. Plaintiff alleges that Woods, Hill, Sconce and insurer's legal counsel had zero (0) controlling interest or stake in the employment contract between Plaintiff and the School.

982. Plaintiff alleges that Woods, Hill and Sconce were the direct cause; while insurer's legal counsel was a proximate cause to Plaintiff's contractual injuries.

983. Woods, Hill, Sconce and insurer's legal counsel created such a substantial burden on both the School and Plaintiff that continued performance of the contractual terms would be impossible.

984. Plaintiff alleges that Woods, Hill, Sconce and insurer's legal counsel have zero (0) justifications changing the terms of Plaintiff's employment contract without any authority.

985. Plaintiff alleges that Woods, Hill, Sconce and insurer's legal counsel knowingly, intentionally and willingly ignored that Plaintiff is protected by the 1st and 4th Amendments; Title VII of the Civil Rights Act and ORS 659A.136, to further their own respective interests; and did so willfully and negligently.

986. Woods, Hill, Sconce and insurer's legal counsel knew or should have known that each of their actions were substantially certain to incur

VERIFIED COMPLAINT

interference with Plaintiff's employment contract; and that Plaintiff's dismissal would have been a necessary consequence of each of their respective actions.

987. Hill, Sconce and insurer's legal counsel - all third parties; had a "duty of non-interference".

988. Instead, they each interfered for improper purposes, which were unrelated to the respective missions and purposes of Douglas ESD, the Union and the School's insurer.

989. As the Superintendent and official of the School, Woods owes a duty of advice and action to the School BOARD, which makes the final decision on Plaintiff's termination.

990. By refusing to comply with 1st and 4th Amendment protections, ORS 659A.136, the Disabilities Act, Title VII of the Civil Rights Act; and by circumventing due process procedures as laid out by ORS 342.835(1) and the School Policy GCPD-AR, Woods cannot be said to have been acting for the benefit of the School.

991. Woods was not acting within the scope of his authority when he terminated Plaintiff without prior School BOARD approval.

992. Woods in his individual capacity, was therefore a third party for the tort of intentional interference with Plaintiff's economic relations with the School.

993. There was no legitimate reason for Woods' actions.

994. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 25
### 42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM
### Deprivation of Property Interest without Due Process

For Declaratory and Injunctive Relief; and
For Damages against Rex Fuller, Charlie Sawyer, Rebekah Sawyer, Clint Thompson, John Boling, Valerie Anderson in their Official and Individual Capacities

---

995. Plaintiff realleges and incorporates by reference all paragraphs above:

996. Plaintiff had property interest in her employment.

997. Defendants Rex Fuller, Charlie Sawyer, Rebekah Sawyer, Clint Thompson, John Boling, Valerie Anderson (collectively "BOARD members") knew or should have known that Plaintiff has the clearly established right to pre-termination due process. ORS 342.835(1) (2007); *Cleveland Bd. of Educ. v. Loudermill* (1985), the School Policy GCPD-AR

998. The alleged "pre-termination hearing" on October 14, 2021 was a sham for the following reasons:

(a) Woods had preemptively hired someone to replace Plaintiff;

(b) Plaintiff was not given at least a 24 hour notice of any meeting or "hearing";

(c) the "pre-termination hearing" was not conducted before any policy maker;

VERIFIED COMPLAINT

173

(d)     Plaintiff was not given notice of the true nature of the October 14, 2021 "meeting";

(e)     Plaintiff was not given any oral or written Notice of the charges against Plaintiff;

(f)     Plaintiff was not provided any opportunity to representation of her choice;

(g)     Plaintiff was not provided any opportunity to present evidence to support Plaintiff's defense;

(h)     Plaintiff was not given the opportunity to confront and examine witnesses;

(i)     Plaintiff was not given the opportunity to present witnesses on Plaintiff's own behalf.

999.    The BOARD members violated the School's own duly adopted BOARD Policy GCPD-AR[73].

1000. In this matter, Plaintiff's interest in a substantial pre-termination, pre-deprivation of occupation in the entire K-12 field, far outweighed any managerial efficiency or public safety interest.

1001. As such, Plaintiff is entitled, based on the probable value of Plaintiff's Liberty deprivation, to far greater procedural pre-termination and post-termination safeguards, which are not adequately afforded by Statutory Law and Procedure.

---

[73] https://policy.osba.org/douglcty/G/GCPD%20R%20D1.PDF

VERIFIED COMPLAINT

### *Inadequate State Post-Deprivation Due Process Procedure*

1002. Post-termination proceedings allowing for a Probationary teacher to be heard before the School Board exist under State law. ORS 342.835

1003. However, Plaintiff was denied due process of law because post-deprivation procedures under State law are inadequate. ORS 342.835

1004. Post-deprivation procedure under State law does not provide for Probationary Teachers to be notified of the right to a hearing; nor to be notified of a hearing; nor does it provide for any hearing procedure. ORS 342.835

1005. As a result, Plaintiff was unaware of any State-provided post-termination procedures until Plaintiff received the Fair Dismissals Board's lack of jurisdiction letter.

1006. By this time, too much time had passed and Plaintiff had already suffered from too much economic and non-economic injury stemming from Plaintiff's dismissal to seek redress from the School BOARD.

1007. The BOARD members were acting in the course and scope of their positions as District Board members for the School when they each acted under the color of "Vax Rule" law and deprived Plaintiff of her right to due process.

1008. The BOARD members acted willfully, deliberately, maliciously or with reckless disregard for Plaintiff's right to due process under the 14th Amendment.

1009. Plaintiff suffered damages for which she is entitled to recover.

VERIFIED COMPLAINT

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 26
### 42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM
### Stigma Plus

For Declaratory and Injunctive Relief; and
For Damages against Banks, Rex Fuller, Charlie Sawyer, Rebekah Sawyer, Clint Thompson, John Boling, Valerie Anderson in their Official and Individual Capacities

---

1010. Plaintiff realleges and incorporates by reference all paragraphs above:

1011. The BOARD members oversaw posting of public notices on the School website, as well as on the Days Creek Post Office Notice Board announcing Plaintiff's name for termination.

1012. The BOARD members publicly discussed Plaintiff's termination.

1013. Plaintiff suffered from public embarrassment.

1014. The BOARD members knew or should have known that Plaintiff has the clearly established statutory right to be free from stigmatizing disciplinary or terminating employment action in the public record. ORS 192.345(12) (2019)

1015. The Notice of termination letter alleged that Plaintiff had "not complied with the mandate".

1016. These terms are stigmatizing statements because "non-compliance" adversely alters Plaintiff's opportunities for future employment in the K-12 industry under the color of "Vax Rule" law.

VERIFIED COMPLAINT

1017. The BOARD members imposed "stigma" upon Plaintiff by publicly enforcing official action - termination of public employment, against Plaintiff for allegedly failing to comply with the edicts of Vax Rule.

1018. Plaintiff had in fact "complied" with the black letter of Vax Rule.

1019. Plaintiff contested and continues to contest these charges of "non-compliance".

1020. The penalty for alleged "non-compliance" with Vax Rule comes with tangible and material loss of property interest and liberty interest.

1021. Defendant Banks, acting with the force of the state-imposed burden, proximately deprived Plaintiff not only of her present K-12 employment but of future opportunity for employment within the entire K-12 education field, thus seriously impairing Plaintiff's chance of earning a living.

1022. The BOARD members acted willfully, deliberately, maliciously or with reckless disregard for Plaintiff's right to due process under the 14th Amendment "stigma plus" theory.

1023. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

### COUNT 27
### ORS 164.075 - EXTORTION CLAIM

For Damages against Woods in his Official and Individual Capacities

1024. Plaintiff realleges and incorporates by reference all paragraphs above:

VERIFIED COMPLAINT

1025. Acting under the color of "Vax Rule" law, Superintendent Woods compelled or induced Plaintiff and other School employees ("others") to deliver their private medical papers to the School.

1026. The demand for detailed, identifiable health information papers is property that is highly valuable; and can be transferred or sold.

1027. Woods compelled or induced delivery of said property by instilling in Plaintiff and others a fear that, if the property was not so delivered, that Woods would perform the act of terminating Plaintiff or these others, which is related to Woods' official duties.

1028. Woods unlawfully used or abused his position as a public servant by failing or refusing to perform his official duty to *not* make such demands on any School employee.

1029. Woods' demand for highly identifiable health information from all the School employees affected Plaintiff adversely.

1030. When Plaintiff was unable to deliver the papers as demanded, Woods unlawfully used or abused his public servant position to terminate Plaintiff's employment.

1031. The School BOARD ratified Defendant Woods' actions as described herein.

1032. Plaintiff suffered damages for which she is entitled to recover.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT 27**

## 18 U.S.C. § 1962 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") CLAIM

For Damages Against Brown, Banks, Hill, Woods, Sconce and insurer's legal counsel in their Official and Individual Capacities

---

1033. Plaintiff realleges and incorporates by reference all paragraphs above:

1034. Slavery and extortion are predicate acts - "racketeering activities". 18 U.S.C. §1961(1)(A)

1035. Brown, Banks, Hill, Woods, Sconce and insurer's legal counsel in their individual and official capacities are distinct persons which form an "enterprise". 18 U.S.C. § 1961(4)

1036. Governor Brown is the principal architect of the enterprise.

1037. Public Health Director Banks played some part in directing the enterprise.

1038. Plaintiff was one of the intended targets of the Defendants' racketeering scheme.

1039. Plaintiff suffered from economic, non-economic and Constitutional injuries as a result of the Defendants' commission of the extortion and involuntary servitude.

1040. Upon information and belief, as part of the same racketeering enterprise, at least one teacher, Peter Bottman, was subject to similar predicate acts by the Springfield Public Schools District.

1041. Upon information and belief, on or around November 15, 2021, Springfield Public Schools District officials, abused their public servant

VERIFIED COMPLAINT

179

positions, citing OAR 333-019-1030 ("Vax Rule") under the color of law to terminate Bottman for failing to deliver his property to Springfield Public Schools District.

1042. Upon information and belief, as part of the same racketeering enterprise, three Bend-La Pine school district teachers, Mark Schulz, Zach Webb, Kelly Lundy and at least 20 other staff members, were subject to similar predicate acts by the Bend-La Pine school district.

1043. In a pattern of racketeering activity, on or around October 4, 2022, Bend-La Pine School District officials abused their public servant positions, citing OAR 333-019-1030 ("Vax Rule") under the color of law to terminate these teachers or employees for failing to deliver their property to the Bend-La Pine school district.

1044. Pursuant to the common purpose of Mask rule and Vax Rule enforcement, Plaintiff alleges that Brown, Banks, Woods, Hill, Sconce, the School, Douglas ESD, Bend-La Pine School District, Springfield Public Schools District, Oregon Health Authority, Oregon Department of Education, Oregon School Boards Association, Oregon Education Association, Oregon Teachers Standards and Practices Commission; as well as all other K-12 school districts and Education Service Districts in Oregon; agreed to being associates acting as part of an enterprise which poses a threat of continuing inherently unlawful goals of demanding delivery involuntary services or demanding deliver of highly valuable and transferable property, or both; from current and prospective K-12 school employees to their respective employers.

VERIFIED COMPLAINT

1045. The Defendants, each citing Mask Rule or Vax Rule or both, in their many iterations, were "each aware of the essential nature and scope of [the] enterprise and intended to participate in it." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015).

1046. The efendants are separate and distinct from the association- in-fact enterprise they formed.

1047. Their roles originate from different positions, employers, and areas of expertise.

1048. Under color of law OAR 333-019-1030 ("Vax Rule"), Oregon K-12 schools and Education Service Districts are associates who continue to engage in predicate acts (see Extortion Claims) by demanding that prospective employees deliver their highly valuable and transferable property as a condition of employment in their "regular way" of "conducting ongoing legitimate business." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992)

1049. At all times relevant to this lawsuit, the associates engaged in, or had other activities that involved banking, which affects interstate commerce.

1050. The enterprise activities set for herein involve interstate or foreign commerce through the use of Wire and U.S. Mail, which are channels of interstate commerce.

1051. All K-12 school districts and education service districts which fired, constructively discharged or refused to hire employees who had not delivered

their papers (collectively "victims") obtained property to which these districts were not entitled to.

1052. As a result, the victims' assets were depleted, decreasing their ability to make future expenditures for items in interstate commerce.

1053. The injuries incurred from the predicate acts were foreseeable and concrete in nature; and were the preconceived purpose or the specifically intended consequence of the Defendants' racketeering activities.

1054. As a whole, the interstate effect of the enterprise's activities are substantial as a matter of practical economics.

1055. As long as Vax Rule is not repealed or rescinded, this enterprise will operate with open-ended continuity.

1056. Once Vax Rule is rescinded or repealed, this enterprise will operate with close-ended continuity.

1057. Plaintiff suffered injury to her business or property as a result of the RICO violation for which she is entitled to recover damages.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT 28
### 42 U.S. Code § 1983 - FOURTEENTH AMENDMENT CLAIM
### Procedural Due Process

For Declaratory Relief against Defendant Employment Department

---

1058. Plaintiff realleges and incorporates by reference all paragraphs above:

1059. Plaintiff's claim of entitlement to employment benefits as is grounded in the statute defining eligibility for said benefits.

1060. The Supreme Court requires the administrative process determining eligibility to comply with due process. *Goldberg v. Kelly* (1970).

1061. First, the Oregon Administrative Procedure Act requires a contested case hearing for every "proceeding before an agency . . . [i]n which the individual legal rights, duties or privileges of specific parties are required by statute or Constitution to be determined *only after an agency hearing.*" (emphasis added) ORS 183. 415(2); ORS 183. 310(2)(a)(A).

1062. The Employment Department determined that Plaintiff was ineligible for employment benefits before any hearing was conducted.

1063. Second, without notifying Plaintiff, the assigned administrative law judge to Plaintiff's December 15, 2021 hearing was changed to an administrative law judge who potentially held a historical racial animus against Plaintiff.

1064. Plaintiff was thus denied the right to request a change of administrative law judge pursuant to ORS 183.645 and OAR 471-060-0005.

1065. Third, during the April 28, 2022 hearing, the administrative law judge adjudicated Civil Rights Title VII issues, which are clearly outside the scope of Employment Department's subject matter jurisdiction. 42 U.S.C. § 2000e-5(f)(3)

1066. Such Title VII adjudication has no bearing on Plaintiff's eligibility for employment benefits and does not belong in Plaintiff's file.

VERIFIED COMPLAINT

1067. Fourth, Plaintiff was determined to be ineligible for benefits based on the administrative law judge's own added testimony and suppositions rather than any substantial evidence of misconduct on Plaintiff's part.

1068. Fifth and most importantly, the administrative appeals process lasted an unreasonable length of time.

1069. The final denial decision was not affirmed until August 5, 2022 - about nine (9) months after its initial denial.

1070. *Flores de Vega v. Oregon Employment Department* class action lawsuit shows that it is the custom, practice and de facto policy of the Employment Department to impose undue delays in its employment benefit adjudication process.

1071. State law states that the Employment Department must adjudicate the decisions of the administrative law judge "promptly". ORS 657.275

1072. The common understanding of the word "promptly" means "without delay: very quickly or immediately"[74].

1073. The U.S. Department of Labor defines the payment of benefits as timely if at least 87% of regular unemployment claims are paid within 14 days of the end of the first week for which claimants were eligible for benefits[75].

1074. Plaintiff waited thirty times that long—and counting— to receive benefits she desperately needs.

---

[74] Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/promptly
[75] U.S. Government Accountability Office, Unemployment Insurance: States' Customer Service Challenges and DOL's Related Assistance, at 26 (May 2016), https://www.gao.gov/assets/680/677082.pdf.

VERIFIED COMPLAINT

184

1075. Unemployment benefits are meaningful to Plaintiff as it replaces wages to pay for necessities that cannot wait, such as food, gas or electricity.

1076. A nine (9) month delay in making an erroneous decision regarding benefits designed to help people pay for urgent basic needs like food and other necessities of life renders the benefits significantly less meaningful.

1077. The clear statutory directive to the Employment Department to process employment benefit claims "promptly", coupled with the dire need of these benefits to provide money for basic living expenses after the loss of a job, indicates that the delay was patently unreasonable.

WHEREFORE, Plaintiff respectfully prays for relief against Defendant as hereinafter set forth in her prayer for relief.

## IX. DAMAGES

1078. As a direct and proximate result of Brown's, Banks', Woods', Hill's, Sconce's, School BOARD members', insurer's legal counsel's and Employment Department's actions, Plaintiff suffered the following injuries and damages:

a.    Irreparable Constitutional injury;

b.    Wage loss due to unlawful wage differential;

c.    Lost earnings;

d.    Occupational loss;

e.    Loss of society;

f.    Loss of seniority;

g.    Damage to reputation past and future;

VERIFIED COMPLAINT

h.     Mental anguish, emotional distress and physical illnesses in the form of loss of appetite, nausea, stress-induced stomach aches, heart palpitations, headaches, hair-loss, crying, sleep disruption;

i.     Loss of pension, educational and other employment benefits;

j.     Plaintiff was discharged from employment with the School. Although Plaintiff has diligently sought other employment, she has been unable to find a job at comparable pay. Plaintiff seeks compensation for all lost wages and benefits, including loss of Social Security benefits. Reinstatement of Plaintiff in her previous position is impractical and unworkable. Therefore, Plaintiff seeks an award of back pay, front pay and retirement benefits to compensate her up to the retirement age of 67.

## X. ATTORNEY FEES & COSTS

1079. Plaintiff is entitled to award of attorney fees and costs under ORS 659A.885; Title VII, 42 U.S.C. §2000e-5(k) and under 42 U.S.C. § 1988(b).

## XI. PRAYER

1080. For these reasons, Plaintiff asks for judgment against the named Defendants for the following:

A.     Enter judgment for Plaintiff's 1st claim, declaring that Brown's and Banks' OAR 333-019-1015 ("Mask Rule") and OAR 333-019-1030 ("Vax Rule") is unconstitutional because it violates the Separation of Powers clause under the Oregon Constitution; declaring that Brown and Banks had actual and constructive knowledge that violations of the Constitution were occurring;

declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Defendants.

B.     Enter judgment for Plaintiff's 2nd claim, declaring that the Brown's and Banks' Vax Rule is unconstitutional because it violates the Equal Protection clause under the 14th Amendment; declaring that Brown and Banks had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Brown, Banks and Woods.

C.     Enter judgment for Plaintiff's 3rd claim, declaring that Brown's and Banks' Vax Rule is unconstitutionally vague and thus void; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Banks, Hill, Sconce, insurer's legal counsel and Woods.

D.     Enter judgment for Plaintiff's 4th claim, declaring that Vax Rule is an unconstitutional Bill of Attainder and unconstitutionally impaired lawfully executed contracts; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Brown and Banks.

E.     Enter judgment for Plaintiff's 5th claim, declaring that Defendants, all acting under the color of law, conspired to deprive K-12 school employees of their Constitutional rights under the 1st, 4th, 13th and 14th Amendments; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by all Defendants.

VERIFIED COMPLAINT

F.     Enter judgment for Plaintiff's 6th claim, declaring that Mask Rule violates the nondelegation doctrine and the 13th Amendment; declaring that Brown, Banks and Woods had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Brown, Banks and Woods.

G.     Enter judgment for Plaintiff's 7th claim, declaring that Hill willfully subjected Plaintiff to unlawful wage differential, thus denying Plaintiff of equal terms of a contractual relationship as enjoyed by white citizens; enjoining future violations of the law by Hill; awarding Plaintiff back pay as well as the liquidated value of all benefits lost, punitive damages of $150,000 from Hill in her individual capacity, litigation expenses; and awarding such other and further relief as the Court deems just and proper.

H.     Enter judgment for Plaintiff's 8th claim, declaring that Hill willfully tortiously interfered with Plaintiff's prospective economic relationship; enjoining future violations by Hill; awarding Plaintiff back pay as well as the liquidated value of all benefits lost, punitive damages of $150,000 from Hill in her individual capacity, litigation expenses; and awarding such other and further relief as the Court deems just and proper.

I.     Enter judgment for Plaintiff's 9th and 10th claims, declaring that Woods and Hill unlawfully discriminated against Plaintiff in terms of wage; enjoining future violations by Hill and Woods; punitive damages of $150,000

per claim from each Defendant; awarding Plaintiff front and back pay as well as the liquidated value of all benefits lost.

J.      Enter judgment for Plaintiff's 11th claim, declaring that Woods unlawfully inquired into Plaintiff's medical history; enjoining future violations by Woods; awarding Plaintiff compensatory damages or $200, whichever is greater.

K.      Enter judgment for Plaintiff's 12th claim, declaring that Hill, Sconce, Banks and Woods had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Hill, Sconce, Banks and Woods.

L.      Enter judgment for Plaintiff's 13th claim, declaring that Defendants' violations of the Constitution were willful; restraining and enjoining future violations by Banks, Woods, Hill, Sconce and insurer's legal counsel.

M.      Enter judgment for Plaintiff's fourteenth claim, restraining and enjoining future violations by Brown, Banks, Woods, Hill, Sconce and insurer's legal counsel.

N.      Enter judgment for Plaintiff's fifteenth claim, awarding Plaintiff compensatory damages or $200, whichever is greater.

O.      For Plaintiff's 16th and 17th claims, Plaintiff demands actual damages; punitive damages of $200,000 per claim from Hill, Woods, Sconce and insurer's legal counsel in *each* of their individual capacities ($200,000 x number of Defendants).

VERIFIED COMPLAINT

P.     For Title VII and Disabilities Act claims, Plaintiff demands back pay, front pay, all liquidated values of back and front benefits lost; punitive damages; prejudgment and post judgment interest on all sums, including attorney fees and litigation costs; and awarding such other and further relief as the Court deems just and proper.

Q.     For Plaintiff's 23rd claim, Plaintiff demands the back pay plus the liquidated value of all benefits lost, the liquidated value of consequential economic loss, pre and post judgment interest on all sums; in the total amount expected to be at least $2,155,558.61. The exact amount to be determined at trial.

R.     For Plaintiff's 24th claim, Plaintiff demands actual damages; punitive damages of $200,000 from Hill, Woods, Sconce and insurer's legal counsel in each of their individual capacities  ($200,000 x number of Defendants).

S.     Enter judgment for Plaintiff's 25th and 26th claim, declaring that BOARD members Fuller, C. Sawyer, R. Sawyer, Anderson, Boling and Thompson willfully denied Plaintiff her Constitutional right to due process; restraining and enjoining future violations by Defendants; awarding Plaintiff $5,000 in damages from each of the School BOARD members in their *individual* capacities (totalling $30,000); *or* equitable relief from each of the Defendants in the form of a public apology for denying Plaintiff her right to due process, to be made in front of a full School assembly, in the presence of Plaintiff; as well as a public apology video or notice by each Defendant to be posted prominently on the School website and everywhere that notices were

VERIFIED COMPLAINT

posted regarding Plaintiff's termination. Final details of equitable relief to be determined at trial.

T.    For Plaintiff's 27th claim, the direct and proximate damages of Mask Rule and Vax Rule caused and perpetuated by the Defendants named herein are extensive and substantial among the class of victims. Plaintiff seeks triple damages.

U.    Enter judgment for Plaintiff's 28th claim, declaring that the Employment Department unconstitutionally denied Plaintiff due process by changing administrative law judges without prior notice; by adjudicating Title VII issues without jurisdiction; and that subjecting Plaintiff to eight or more months wait before adjudicating its final order is an unconstitutional undue delay.

V.    For claims 1 through 27, Plaintiff demands actual damages of $369.00 per minute from Brown, Banks, Woods, Hill, Sconce and insurer's legal counsel each for time seized from Plaintiff during the violation of Plaintiff's constitutionally protected rights. Jury shall determine the actual time and liability proportion.

W.    For claims 1 through 27, Plaintiff demands remuneration for actual damages in the amount of at least $385,542.83 time spent learning how to plead a case, postage and printing costs, legal books, paralegal training course Jurisdictionary as well as any further costs incurred, to be determined at trial. Jury shall determine the actual time and liability proportion.

VERIFIED COMPLAINT

X. For claims 1 through 27, Plaintiff demands compensatory damages, including but not limited to damages for emotional pain and suffering, personal humiliation; awarding reputational damages; prejudgment and post judgment interest on all sums, including attorney fees and costs; and deprivation of fundamental constitutional rights suffered by Plaintiff for Defendants' color-of-law actions performed in their official or individual capacities against Plaintiff under 28 U.S.C. § 1343; and awarding such other and further relief as the Court deems just and proper.

Y. For claims 1 through 27, Plaintiff demands damages from the School BOARD members in their official capacity, and from Brown, Banks, Woods, Hill, Sconce, insurer's legal counsel in their individual and official capacities in the amount of $150,000,000.00 for the arbitrary, capricious, and unreasonable deprivation of Plaintiff's rights. Jury shall determine the liability proportion.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on claims unrelated to Constitutional claims as well as other issues so triable.

## XII. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is

VERIFIED COMPLAINT

supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3/20/23

Respectfully submitted,

Jill Bong, Plaintiff

## NOTARY STATEMENT

State of OREGON
County of Douglas

Signed (or attested) before me on (date) 3/20/2023 , 2023

By Jill Bong.

Notary Public - State of Oregon

Official Stamp

OFFICIAL STAMP
JANA TIA LARSON
NOTARY PUBLIC - OREGON
COMMISSION NO. 1023414
MY COMMISSION EXPIRES APRIL 11, 2026

ABSENCE OF ENDO...
UMPQUA BANK

VERIFIED COMPLAINT